14CV7962

Page 2

# MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT
## SENTENCE BY A PERSON IN FEDERAL CUSTODY

| United States District Court | District The Southern District of New York |
|---|---|

| Name (under which you were convicted): Melissa G. King | Docket or Case No.: 10 Cr. 122 (JGK) |
|---|---|

| Place of Confinement: FCI Coleman Medium Satellite Camp; Coleman, FL | Prisoner No.: 62944-054 |
|---|---|

| UNITED STATES OF AMERICA | Movant (include name under which you were convicted) Melissa G. King |
|---|---|
| v. | |

## MOTION

1. (a) Name and location of court that entered the judgment of conviction you are challenging:
   The Honorable John G. Koeltl, U.S.D.J.
   Daniel Patrick Moynihan United States Courthouse
   500 Pearl Street
   New York, NY 10007-1312

   SEP 3 0 2014
   PRO SE OFFICE

   (b) Criminal docket or case number (if you know): 10 Cr. 122 (JGK)

2. (a) Date of the judgment of conviction (if you know): 7/19/2012

   (b) Date of sentencing: 6/21/2012

3. Length of sentence: 72 months

4. Nature of crime (all counts):
   The first Indictment included twelve counts: Count One was for embezzlement from employee benefit plans and Counts Two through Twelve were for money laundering.
   The first and second Superseding Indictments included seventeen counts: Count One was for embezzlement from employee benefit plans, Count Two was for mail fraud, Counts Three through Thirteen were for money laundering, and Counts Fourteen though Seventeen were for tax evasion.
   The third Superseding Indictment included two counts: Count One was for embezzlement from employee benefit plans and Count Two was for filing false tax returns (the Indictment states: "false subscription to U.S. Individual Income Tax Return").

5. (a) What was your plea? (Check one)

   (1)  Not guilty ○     (2)  Guilty ●     (3)  Nolo contendere (no contest) ○

   (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to?
   I pleaded not guilty to the first Indictment, which was filed on or about February 17, 2010; not guilty to the first Superseding Indictment, which was filed on or about June 30, 2010; not guilty to the second Superseding Indictment, which was filed on or about January 24, 2011; and guilty to the third Superseding Indictment, which was filed on or about October 21, 2011. I pleaded guilty to both counts identified in the third Superseding Indictment.

6. If you went to trial, what kind of trial did you have? (Check one)   Jury ○   Judge only ○

7.  Did you testify at a pretrial hearing, trial, or post-trial hearing?     Yes ◯     No ◉

8.  Did you appeal from the judgment of conviction?     Yes ◯     No ◉

9.  If you did appeal, answer the following:

    (a) Name of court:

    (b) Docket or case number (if you know):

    (c) Result:

    (d) Date of result (if you know):

    (e) Citation to the case (if you know):

    (f) Grounds raised:

    (g) Did you file a petition for certiorari in the United States Supreme Court?     Yes ❑     No ❑

        If "Yes," answer the following:

        (1) Docket or case number (if you know):

        (2) Result:

        (3) Date of result (if you know):

        (4) Citation to the case (if you know):

        (5) Grounds raised:

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications concerning this judgment of conviction in any court?

        Yes ☑     No ❑

11. If your answer to Question 10 was "Yes," give the following information:

    (a) (1) Name of court:  The Honorable John G. Koeltl, U.S.D.J.

        (2) Docket or case number (if you know): 10 Cr. 122 (JGK)

        (3) Date of filing (if you know):

(4) Nature of the proceeding: Letter(s) requesting the Court to vacate the judgment of conviction or to appoint counsel to help me file a formal petition.

(5) Grounds raised:

The letters specifically identified the following claims: (1) I was denied the effective assistance of counsel guaranteed by the Sixth Amendment; and (2) The government engaged in prosecutorial misconduct in violation of my Fifth Amendment right to due process.

The letters also raised the following claims, though they were not idenitified under separate headings: (1) My guilty plea was unconstitutional because it was not entered knowingly, intelligently, and voluntarily; (2) I was denied the right to file an appeal in violation of my right to due process guaranteed by the Fifth Amendment; (3) The prosecution erroneously limited my choice of counsel in violation of my Sixth Amendment right to be represented by counsel of my choice; and (4) I am actually innocent of the charges, as I pleaded guilty based on incorrect legal advice, and as there was insufficient evidence to support the convictions when I was sentenced.

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?    Yes ❑   No ☑

(7) Result: The Court Orders stated that the petition must be brought by the defendant .

(8) Date of result (if you know): 6/28/2013  and  7/24/2013

(b) If you filed any second motion, petition, or application _                    ormation:

(1) Name of court: The Honorable John G. Koeltl, U.S.D.J.

(2) Docket or case number (if you know): 10 Cr. 122 (JGK)

(3) Date of filing (if you know): 9/9/2013

(4) Nature of the proceeding: Letter requesting the Court to vacate the judgment of conviction or to appoint counsel to help me file a formal petition.

(5) Grounds raised:

The letters specifically identified the following claims: (1) I was denied the effective assistance of counsel guaranteed by the Sixth Amendment; and (2) The government engaged in prosecutorial misconduct in violation of my Fifth Amendment right to due process.
The letters also raised the following claims, though they were not idenitified under separate headings: (1) My guilty plea was unconstitutional because it was not entered knowingly, intelligently, and voluntarily; (2) I was denied the right to file an appeal in violation of my right to due process guaranteed by the Fifth Amendment; (3) The prosecution erroneously limited my choice of counsel in violation of my Sixth Amendment right to be represented by counsel of my choice; (4) I am actually innocent of the charges, as I pleaded guilty based on incorrect legal advice, and as there was insufficient evidence to support the convictions when I was sentenced; and (5) the sentence imposed at the sentencing hearing violated my 8th Amendment right to be protected from cruel and unusual punishments.

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?    Yes ❑   No ☑

(7) Result: Ultimately, the Court attached the form to the Court Order, and extended the time.

(8) Date of result (if you know): 9/17/2013

(c) Did you appeal to a federal appellate court having juri                    tion taken on your motion, petition, or application?

(1) First petition:      Yes ❑   No ☑

(2) Second petition:   Yes ❑   No ☑

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:
The information was submitted in several long letters, which were written by my family, and which requested the Court to either vacate the judgment of conviction, or to appoint counsel to help me file a formal petition. Therefore, there was nothing to appeal, as the Court never decided on the claims identified in the letters. (This ultimately also made my family responsible for this petition.)

12. For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

**GROUND ONE:**

My guilty plea was unconstitutional because it was not entered knowingly, intelligently, and voluntarily.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

See pages 6 - 58, which begin on the following page.

(b) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐   No ☐

(2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition. or application?

Yes ☑   No ☐

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition: Letter(s) requesting the Court to vacate the judgment of conviction or to appoint counsel to help me file a formal petition.

Name and location of the court where the motion or petition was filed:
The Honorable John G. Koeltl, U.S.D.J.
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

**I. My guilty plea was unconstitutional because it was not entered knowingly, intelligently, and voluntarily.**

    1. I relied on the advice of my court-appointed defense attorney, who openly referred to my case as a "large pro bono account" and as a "drain on his firm," and who ultimately advised me to plead guilty based on incorrect legal advice, without conducting an adequate investigation of the facts and of the evidence of my case.

    When I was arrested, the civil case was in mid-discovery, and was already pending for (approximately) eight months. KingCare was clearly intending to dispute the Local 147 Trustees' accusations in civil court, hiring civil attorneys, independent forensic auditors, and filing an answer to the Trustees' Complaint, as well as significant counterclaims.[1]

    When I was arrested, I repeated over and over that KingCare completed the additional work, and that the payments made to KingCare were earned. In response, Department Of Labor Agent Joseph Della Penna told me that "there are a lot of innocent people in prison" and that "once the jury hears horses, they will convict."[2]

---

[1] KingCare's Counterclaims from the civil case are attached as Exhibit 1.
(In addition, it should be noted that, attached as Exhibit 16 is a declaration, verifying that, to the best of my knowledge, each of the attached exhibits represent true and correct copies of the original materials.)

[2] Here, it should be noted that DOL Agent Della Penna's Complaint admitted that there was an additional 26% in the KingCare accounts, which exceeds the cost of the purchases listed by DOL Agent Della Penna in his Complaint.
It should also be noted that the prosecution relied on this strategy throughout the proceedings, listing purchases made by my family (which, as far as I am aware, were each made legitimately, with after-tax income, as verified by the EisnerAmper and Vasil Reports) in an attempt to paint a picture of a "lavish lifestyle" in court, while providing a completely false and misleading construction of the facts of this case (as they addressed the payments on a cash basis, over six-years, when the prosecution was informed from the beginning that KingCare was owed deferred compensation from the prior years), in order to make it seem as if an embezzlement had occurred, when it was clear that no embezzlement had actually occurred in this case (especially from the Fund Records, which show that the Trustees requested the additional work, and from the nature of the payments that were made to KingCare, as the payments were transparent and fully disclosed).
For example, the prosecution fraudulently argued in court that the additional projects were "phantom projects," when it was clear from the discovery materials that the additional work was completed. To cite another example, the prosecution also argued that KingCare "grossly over-billed" the Funds for the work that was completed, though they made this argument while refusing to acknowledge that the administrative expenses were deferred; while devaluing the administrative services that they had to admit were provided to Local 147; and while it was clear that the prosecution did not have any evidence to support this accusation in court. (On this point, it should be noted that each firm that properly reviewed the amount of work and the level of the work completed by the company, as well as the expenses, stated that it would have cost much more for them to have provided comparable services, especially given that most of the additional

Despite the fact that I told DOL Agent Della Penna many times that the work was completed and that payments made to KingCare were earned; despite the fact that the government removed the exculpatory evidence from the KingCare offices pursuant to a search warrant executed on the day of my arrest; and despite the fact that the prosecution had no evidence of an embezzlement to present in court; the prosecution chose to proceed with their false accusation, persisting in asserting that I embezzled $42 million from the Local 147 Benefit Funds, when it was clear that this had not occurred, and when it was clear that this could not have occurred, given that the payments were transparent and that the additional services were reflected in the original Fund Records; given that the prosecution removed evidence of KingCare's work-product from the KingCare Offices; and given the level of oversight that the Benefit Funds are subject to in this industry, which make the prosecution's accusation ridiculous on its face.[3]

---

projects required specialized services and specialized software to meet this particular client's servicing requirements.)

Concerning DOL Agent Della Penna's comment, this comment is also significant, as it is indicative of DOL Agent Della Penna's unprofessional conduct, which he displayed throughout this case, as investigators are supposed to be impartial, and as it was clear that DOL Agent Della Penna wished to make a sensational case out of the Local 147 Trustees' fraudulent accusation, essentially because my family owned horses, even though there was no evidence of an embezzlement to present in court in this case (as no embezzlement occurred), and even though it was clear from the records that no embezzlement had occurred, as KingCare completed a tremendous amount of additional work at the direction of the Local 147 Trustees; as the payments made to KingCare were transparent and fully disclosed; as the payments made to KingCare were earned, as confirmed by the EisnerAmper and Vasil Reports, which were submitted to the Court prior to the sentencing hearing; and as it is clear from the Fund Records that the payments were in amounts that were intended to be transparent upon audit, as the payments are very easily identifiable as payments that were made to KingCare, and as payments were in amounts that could only have been transferred to KingCare, as no other entity received compensation in this way.

It should also be noted that DOL Agent Della Penna's comment shows that this case was truly fraud upon the court, as it was clear during the proceedings that there was no embezzlement in this case; as it was clear during the proceedings that the prosecutors knew that there was no embezzlement in this case; as the prosecution continuously lied in court, as they wished to make a sensational case at any cost; and as it is clear that the prosecution had an immense motive to lie in court, as they went out in this press before conducting an adequate investigation in this case, so they created an enormous amount of pressure to make their case in court, when it was clear during the proceedings that the prosecutors knew that no crimes were committed in this case, and that they continuously (and intentionally) lied in court, which ultimately led to the imprisonment of an innocent individual.

[3] On this point, it should be noted that it is clear that the level of oversight in this case makes the prosecution's case ridiculous on its face, as the prosecution's answer to this point is to assert that there was no oversight and that the Local 147 Trustees were not involved in the day-to-day administration of the Funds, which is another fraudulent representation, as it is contradicted by the original Fund Records, by the evidence produced in discovery, by the EisnerAmper Report (which relied on the original Fund Records to show that there was no embezzlement in this case), by having even a very cursory understanding of how the industry operates, and by the materials attached to this petition, which show that the Trustees were very involved in the day-to-day administration of the Funds. (These materials include Exhibits 7A-7B, and Exhibits 14A-14B,

When I was indicted, the prosecution restrained my family's assets, intentionally preventing me from securing my choice of counsel, and intentionally preventing the forensic auditors from finishing the forensic audit that was necessary to prove my innocence, and to demonstrate that no embezzlement, tax crime, or mail fraud occurred in this case.[4]

Throughout the criminal proceedings, several well-respected defense attorneys approached the prosecutors, attempting to have funds released for defense costs. Each time, the prosecutors pretended as if they would be reasonable, and then refused to release any funds for my defense, without providing an adequate legal explanation for refusing this request.  (This request was based on pre-indictment period funding and on funding from other sources, so it was clear during the proceedings that the prosecutors should have been able to release funds for my defense.)

On this point, it should also be noted that it was clear during the proceedings that the prosecutors were improperly refusing to release funds for my defense because they knew that my case was defensible, as it was clear that the prosecution did not have any

_____

which are discussed under the separate claim that the prosecutors engaged in prosecutorial misconduct, on pages 146 - 151, and on pages 166 - 171, respectively.)

[4] It is also significant to note that the Local 147 Trustees and the Trustees' civil attorneys likely went to the Department of Labor at that time, as the Local 147 Trustees were supposed to be deposed in the civil case, as KingCare had filed extensive Counterclaims in civil court, and as the Trustees and the Trustees' civil attorneys needed the government to restrain my family's assets in order to prevent me (and to prevent KingCare) from defending against their fraudulent accusations in civil court, as there was no embezzlement in this case.

(It should also be noted that it is unlikely that the Local 147 Trustees would have waited approximately eight months to call the Department of Labor if they had truly believed that someone had embezzled $40 million from the Benefit Funds, or that the Local 147 Trustees would have asked for additional administrative support during "the transition" if they had truly believed that I had embezzled any funds from the Local 147 Benefit Funds.  Moreover, attached as Exhibits 14A-14B and discussed on pages 166 - 171, is additional evidence of the Local 147 Trustees' intentions to file a fraudulent lawsuit, and attached as Exhibits 6-10 is evidence showing that the Affidavit signed by one of the Employer Trustees was perjured testimony, which is also discussed on pages 146 - 151, under the separate claim that the prosecutors engaged in prosecutorial misconduct.)

In addition, it should also be noted that the prosecutors, the Local 147 Trustees, and the Local 147 Trustees' civil attorneys put forth many of the same fraudulent arguments during the criminal case – e.g. that the additional projects were "phantom projects," when it was clear that the additional projects were completed – so it is clear that this case was truly a conspiracy and truly a fraud upon the court, as well as a very serious abuse of prosecutorial power and of the public's trust, as the prosecutors "went after" an innocent American family, without having any evidence of wrongdoing, and while they were very intentionally improperly refusing to release funds for my defense so that I could not defend myself against their fraudulent accusations. Moreover, it was also a very serious abuse of prosecutorial power and of the public's trust, as the prosecutors went out in the press and made many unfounded accusations after I was arrested, without having any evidence of an embezzlement, and without caring at all for their accuracy, as they only wished to make a sensational case in court, regardless of the truth of their accusations, and regardless of the damage that they caused in the process.

evidence of a crime to present in court, as there were no crimes in this case, and as the Trustees' civil Complaint (which formed the basis of DOL Agent Della Penna's Complaint) was based on fraudulent representations.

    In addition, it should be noted that I was advised that the prosecutors stated during the early meetings that they would not be releasing any funds for the defense in this case (even though they showed at the sentencing hearing that they brought charges without having sufficient evidence in order to prove any of their accusations in court), and that the prosecution's answer was that "this is the Southern District of New York," and that I "better come in and take a plea deal."[5]  (Here, it should be also noted that the prosecutors

---

[5] These comments are also significant, as AUSA Hernandez essentially admitted in court prior to the sentencing hearing that the prosecutors did not want to have to prove that there was a loss amount in court in this case, and that they were using the tax evasion and mail fraud charges – which they also had no right to bring, as the prosecutors also did not have sufficient evidence in order to prove the tax evasion or mail fraud charges in court, as no crimes were committed in this case – in order to try to force me into entering into a Plea Agreement, so that I would admit to a loss amount in court, so that they could make a sensational case, and so that they would not have to prove their accusations at trial.

    To this effect, at the May 11, 2012 hearing, AUSA Hernandez stated:

> *If we are going to have a potentially lengthy Fatico about the loss amount, which is in essence the issue of criminal liability, because if we prove embezzlement and there is no dollar threshold, we have proven the crime under that circumstance, we wouldn't consent to that and we would say the proper remedy would be to tear up the agreement, and we would have a trial in which Ms. King's exposure would be decades in prison.*
> (May 11, 2012 Transcript, p. 8.)

    As this statement shows that the prosecutors wanted me to plead guilty and admit to a loss amount in court, which would relieve them of the burden of having to prove their case at trial; as it was clear when the prosecution rested that the prosecutors did not have sufficient evidence in order to bring criminal charges in this case, as they did not have sufficient evidence in order to prove their accusations at trial (as their case was based on fraudulent accusations, as no embezzlement, tax crime, or mail fraud actually occurred in this case); and as it is clear from this statement that the prosecutors added the tax evasion and mail fraud charges (which they also did not have sufficient evidence to prove in court), in order to try to force me into entering into a Plea Agreement, so that they would not have to prove their case at trial (as this increased the risk of choosing to proceed to trial); it is clear that the prosecutors intentionally (and willfully) abused their prosecutorial power by proceeding with this case, as AUSA Hernandez's statement shows that the prosecutors realized that they were abusing their prosecutorial power by proceeding with this case, as it was clear during the proceedings that the prosecutors did not have sufficient evidence in order to prove their accusations at trial (which they also demonstrated at the sentencing hearing, as they turned to disputing the percentages listed in the EisnerAmper Report at the sentencing hearing, which demonstrated in court that the prosecutors knowingly and willfully criminalized a civil billing dispute), and as it was clear that the prosecutors were intentionally stretching the evidence and the law in order to try to make a sensational case in court, as it was clear during the proceedings that no crimes were actually committed in this case, and as it was clear during the proceedings that the prosecutors had a legal and ethical obligation to acknowledge all of the exculpatory material that was put before them during this case, and to

---

also refused to release any funds for living expenses, and I believe, at one point argued that my children should get jobs, though they had no right to restrain my family's assets.)

In addition, when the defense attorneys approached the prosecutors, asking to sell wine that was in storage to pay for defense costs, the prosecutors added the wine to the Restraining Order.[6] The prosecutors also restrained an Insurance Settlement, which was intended specifically for defense costs, and which was settled out of court because the Trustees took KingCare off of their Fiduciary Policy directly before they filed the civil Complaint, attempting to prevent KingCare from defending against their accusations in civil court.[7] (Here, it should be noted that I was advised that these funds could not legally be restrained or forfeited, and that the Court allowed the prosecution to restrain and forfeit these funds, which could not be traced to the government's accusations, without requiring that the government provide any evidence of a crime, though these funds were intended specifically for defense costs.)

As the prosecutors improperly restrained my family's assets (as well as improperly restrained the funds that were intended specifically for defense costs, as the prosecutors restrained the Insurance Settlement, which the prosecutors should not have been able to restrain, as these funds could not be traced to the government's accusations, and as these funds were intended specifically for defense costs) and then improperly refused to release funds for my defense (without providing an adequate legal explanation for refusing this request), my children ultimately wrote my pre-trial motions, which were then submitted by Mr. Michael Handwerker, as the prosecutors had successfully prevented me from securing proper counsel to defend my case.[8] On this point,

---

drop the charges, as it was clear during the proceedings that the prosecutors knew that no embezzlement, tax crime, or mail fraud actually occurred in this case.

In addition, it should also be noted that The Government's Request to Charge also supports this conclusion. For example, though the Indictment accuses me of mail fraud, on this count, The Government's Request to Charge states as follows: "Furthermore, the mailed matter need not itself be fraudulent. For example, the mailed matter need not contain any fraudulent representations and indeed may be completely innocent." (The Government's Request to Charge, p. 35.) Therefore, it is clear that the prosecutors knew that I was not guilty of mail fraud when I was indicted, as it is clear from The Government's Request to Charge that the prosecutors knew that there was no mail fraud in this case.

[6] This also highlighted the lack of investigation in this case, as well as the prosecutors' unethical conduct, as the prosecutors added the wine to the Restraining Order so late in the proceedings, and as the prosecutors only added the wine to the Restraining Order because the defense attorneys came forward with knowledge of these assets, as they wished to sell the assets in order to be able to fund a proper defense.

[7] On this point, it is significant to note that KingCare was insured under the Local 147 Fiduciary Policy because the Board of Trustees and the Fund Professionals did not consider KingCare to be a Fiduciary of the Funds. If the Fund Professionals had considered KingCare to be a Fiduciary, KingCare would have been required to carry its own insurance policy.

[8] On this point, it should be noted that while Mr. Handwerker started as my defense attorney and later received compensation through CJA, this was only supposed to be temporary, as I intended to secure proper counsel, as this was a complex case that required significant attention to detail; as Mr. Handwerker was not familiar enough with the facts of my case in order to present the Defense's position in court, or to write my submissions that were filed in court; and

---

throughout the proceedings, several defense attorneys commented that the government was "litigating with children," as my children were often left to write the papers that were ultimately submitted to the Court.[9]

---

as it was typical for the papers to be left to my children to write when Mr. Handwerker was responsible for these submissions.

In addition, it should be noted that Mr. Ronald Smith was also only supposed to represent me temporarily, as Mr. Smith tried to help my family in court while other defense attorneys approached the prosecutors outside of court, attempting to have funds released for defense costs. However, as the prosecutors (later) pretended as if they would be reasonable, and then refused to release any funds for defense costs, I was not able to secure other counsel, which left me without proper representation for much of the proceedings, as Mr. Handwerker and Mr. Smith were not supposed to defend my case, and as it was clear that they could not do so at trial.

It should also be noted that, though counsel was later appointed to defend my case, my first court-appointed defense attorney ultimately advised me to plead guilty based on incorrect legal advice, without conducting an adequate investigation of the facts and of the evidence of my case, and while he openly referred to my case as a "large pro bono account" and as a "drain on his firm," and that my second court-appointed defense attorney chose to protect Mr. Schachter, rather than defend her client, so it is clear that I was never able to secure proper representation, nor was I ever actually given a fair opportunity to present my defense in court.

This is also very significant, as the prosecutors admitted that there is likely no loss amount in this case in the sentencing submissions; as the prosecutors turned to disputing the percentages listed in the EisnerAmper Report at the sentencing hearing, which showed that the prosecutors knowingly criminalized a civil billing dispute, and which showed that they brought charges without having sufficient evidence in order to prove their accusations at trial; as it was clear during the proceedings that the prosecutors were refusing to release funds for my defense because they knew that my case was defensible, as no crimes were actually committed in this case; and as the prosecutors went out in the press the day after my arrest, referring to this case as "the largest Union embezzlement in Union History," and as a "shopping spree of epic proportions," even though the prosecutors had no evidence of an embezzlement to present in court, as no embezzlement had actually occurred in this case.

[9] It should also be noted that my attorneys were leaving the papers to my children, as they were not familiar enough with my case in order to be able to write the papers, and as they were not willing to put in the time or effort in order to actually write the papers that were submitted, or to the be able to put together an adequate defense to present in court.

Further, it should also be noted that it was clear during the proceedings that most of my papers were not written by attorneys, as the language often reflected the writer's inexperience with the process. For example, on this point, at the sentencing hearing, AUSA Facciponti stated: *"She says in her reply brief that there was an incredible rush to judgment. That is a statement a defense attorney makes to a jury in an opening statement at a trial. Not at sentencing where she has pled guilty."* (June 21, 2012 Sentencing Hearing Transcript, p. 36-37.)

Here, it should be noted that this was included, as it is part of an argument that was taken from the case law that was incorporated in my pre-trial Motion to Dismiss, as my guilty plea was not entered knowingly, intelligently, and voluntarily (as I pleaded guilty based on Mr. Schachter's incorrect legal advice), and as the case should have been dismissed when the government rested, as the prosecutors demonstrated at this sentencing hearing that no crime was committed in this case, and that they knowingly criminalized a civil billing dispute. However, it is also clear from the language included above that this was not incorporated by a lawyer, and further that if I had been properly represented by my lawyers, my attorneys would have filed a proper motion to withdraw my guilty plea prior to the sentencing hearing, as I pleaded guilty based on incorrect

After the prosecution successfully limited my choice of counsel, Mr. Michael Schachter, an attorney from Willkie Farr & Gallagher LLP, was appointed to defend my case.[10] Though I had originally believed that this would allow for my innocence to come out, it soon became clear that Mr. Schachter was not willing to spend the time on my case in order to truly understand the significant documents, records, and details of my case, which was necessary in order for Mr. Schachter to prepare an adequate defense to present in court.

Though I was very, very sick throughout the criminal proceedings, I asked Mr. Schachter on several occasions to review the defense materials with me so that I could demonstrate to him that no embezzlement actually occurred in this case. When it became clear that Mr. Schachter would not take the time to review these materials with me, I even offered to make a presentation in order to demonstrate that I was actually innocent of the charges. In response, though Mr. Schachter called several "strategy meetings," he never permitted our conversations to go very far, and always returned to the subject of arranging a Plea Agreement with the government before I could go through the defense materials, including the original Fund Records, which show that no embezzlement occurred in this case.[11]

Further, during these "strategy meetings," Mr. Schachter also openly referred to my defense as a "large pro bono account" and as a "drain on his firm." He also told me that the Court was "sick of [my] case"; that he would use my case to "train" the less experienced attorneys who were assigned to my case; and that I would have a 95% chance of being convicted at trial under the circumstances.

In addition, I often felt as if Mr. Schachter was intentionally trying to make our conversations very difficult, in order to push me towards entering into a Plea Agreement

---

legal advice, as I was actually innocent of the charges, and as the EisnerAmper and Vasil Reports, which were submitted to the Court prior to the sentencing hearing, showed that there was no basis in fact for the government's accusations when I was sentenced.

[10] Here, it should also be noted that the prosecution essentially admitted in the sentencing submissions that there was no loss amount in this case, so there was also no legal basis to refuse to release funds for my defense, or to limit my choice of counsel.

Therefore, though I stated that I needed to be represented by competent counsel, and though Mr. Schachter was then appointed to defend my case, I deserved to be given the opportunity to present my defense, with my own choice of counsel, and with adequate resources, not to be rushed by an attorney that I did not choose (and who did not actually wish to defend my case) because the prosecutors (who knew during the proceedings that no crimes were actually committed in this case) improperly brought criminal charges, and then improperly refused to release any funds for my defense, as they wished to make a sensational case in court, and as they had already gone out in the press the day after my arrest, without conducting an adequate investigation, and when it was clear from the documents that were produced in discovery in the civil case prior to my arrest that no crimes were actually committed in this case.

[11] This is also confirmed by the EisnerAmper Report, which was submitted to the Court prior to the sentencing hearing, and which used and attached the original Fund Records in order to demonstrate that no crimes were committed in this case.

---

with the prosecutors (against my wishes). For example, when I stated that I was concerned for my safety and for the safety of my family, as I had received several threats, Mr. Schachter told me that if I was really afraid, then I should plead guilty, as I would no longer be in any danger.

This rushed and unconcerned approach to my case also extended to the meetings that were supposed to be reserved for reviewing the defense materials. For example, during one of the meetings, prior to stepping out of the room, Mr. Schachter reminded several of the younger attorneys who were assigned to my case "not to be nice to [me]" in his absence. This is significant, as it is indicative of Mr. Schachter's approach to my case, as he acted as a prosecutor, rather than as my defense attorney, and as it was clear that he wished to "put this mater behind him" as soon as possible, regardless of the impact on my defense.[12]

In the end, Mr. Schachter ultimately advised me to plead guilty based on incorrect legal advice, without obtaining expert witness reports to verify the facts of my case, without contacting KingCare's civil attorneys from the civil case, and after he had stopped contacting the tax expert who had advised on the original tax filings (who also could have confirmed his original advice).

This was ultimately tremendously harmful to my defense, as the EisnerAmper and Vasil Reports, which were submitted to the Court after Mr. Schachter was relieved as counsel (and prior to the sentencing hearing), later confirmed that no embezzlement, tax crime, or mail fraud actually occurred in this case; however, by the time the EisnerAmper and Vasil Reports were submitted to the Court, I had already pleaded guilty based on Mr. Schachter's incorrect legal advice.

Therefore, had Mr. Schachter taken the time to review the defense materials with me prior to arranging a Plea Agreement with the prosecutors, and had Mr. Schachter obtained expert witness reports prior to arranging a Plea Agreement with the prosecutors, it would have been clear to Mr. Schachter that there was no embezzlement, tax crime, or mail fraud in this case, and that the Plea Agreement was only beneficial to the prosecution, as the Fund Records show that the Trustees' civil Complaint was fraudulent; that the payments were transparent and fully disclosed; and that the Fund professionals

---

[12] Here, it should be noted that I believe that Mr. Schachter intentionally refused to review the defense materials with me prior to the plea hearing, as he did not want to know about the details of my defense, as he wished to arrange a Plea Agreement with the prosecutors so that he could "put this matter behind him" as soon as possible, as he felt that this case was a "large pro bono account" and a "drain on his firm."

This is also clear from Mr. Schachter's emails (which are attached as Exhibits 2A-2F and discussed below), as Mr. Schachter advised me to plead guilty based on incorrect legal advice; as it is clear from Mr. Schachter's emails that he knew that his legal advice was incorrect, and that he knew that I was not properly advised when I signed the Plea Agreement; and as it is clear from the emails that he realized that I was not properly advised when he allowed me to plead guilty in court.

were aware of and were approving the additional administrative expenses and the nature of the additional work.

Concerning Mr. Schachter's incorrect legal advice, as demonstrated by the attached correspondence, I pleaded guilty because Mr. Schachter advised that I was guilty of embezzlement, as KingCare had provided services to the Union, the Welfare Fund, and the Collective Bargaining Parties, and had received compensation from for these services from the Retirement, Annuity, and Additional Security Benefit Funds, per the Trustees' direction.[13]

Concerning the work that was completed for the Union, the Welfare Fund, and the Collective Bargaining Parties, Mr. Schachter advised that this additional work was a violation of ERISA, which "undermined" the Trustees' ability to ratify the expenses, and further, that I was guilty of embezzlement, as I "paid myself for my work."

(Here, it should be noted that I did not actually "pay myself for my work"; I worked on projects that were completed by KingCare, and the Board of Trustees ratified the payments made to KingCare for this work, as outlined in the Administrative Agreements, and in accordance with the Trustees' past practice.)

To this effect, on October 5, 2011, the following email was sent to Mr. Gise, a younger attorney from Willkie Farr & Gallagher LLP (who, as far as I'm aware, was also inexperienced in criminal law), and copied to Mr. Schachter, discussing Mr. Schachter's legal advice:

> If the numbers tie out and there was no embezzlement. And the minutes show specific authorization for paying certain costs am I still in violation of the statute? In other words, I am being held to a higher standard then the Trustees?

(Melissa King, (10/5/2011)) (Exhibit 2A)

Mr. Gise answered as follows (also copying the email to Mr. Schachter):

> The numbers tying out and the authorization are both undermined by the fact that some, if not much, of the work was for the Union, not the Funds. The issue is therefore whether you knew the work was for the Union but paid for with the Funds' money.

> It's not a question of being held to a higher standard. The trustees are not charged, and are not being held to a standard in that sense. Moreover, the difference is that the Trustees did not pay themselves for the work, as you did. It is those payments that are being examined in light of the legal standard. Whatever the trustees did or did not do, the issue is the payments, which relate to you, and not to the Trustees.

---

[13] It should be noted that the work that should have been completed by Castrovinci is also reflected in the records, as KingCare completed additional work for the Welfare Fund, as requested by the Union and directed by the Local 147 Trustees.

(David Gise, (10/5/2011)) (Exhibit 2A)

As this legal advice formed the basis of the Plea Agreement, it is clear that Mr. Schachter and Mr. Gise committed malpractice, as this legal advice was very far removed from the accusation made by prosecution, and as this legal advice was very far removed from the charges that are identified in the Superseding Indictment. (Here, it is also significant to note that the Court discredited this legal advice at the sentencing hearing, ruled that I had not accepted responsibility, and, if I'm remembering correctly, referred to this legal advice as a "hyper-technicality," as the loss amount in my sentencing submissions was argued using Mr. Schachter's incorrect legal advice, as this incorrect legal advice formed the basis of the Plea Agreement, and as my defense attorneys had refused to file the motion to withdraw my guilty plea prior to the sentencing hearing.)

Further, it is significant to note that, even by this theory of guilt, my case still should have been considered defensible. On this point, I told Mr. Schachter many times (which a proper review of the Fund records would have confirmed) that the Trustees had ratified the administrative expenses going back for over twenty years; that the Union, the Welfare Fund, and the Collective Bargaining Parties included the same participants as the Retirement, the Annuity, and the Additional Security Benefit Funds (though two of the three Funds had many more participants); and that I did not know this particular work, which was at the Trustees' direction, could be considered a violation of ERISA law.

In addition, I also told Mr. Schachter that KingCare provided TPA services, and that all of the Fund Fiduciaries, who were highly accredited experts in their respective fields and in ERISA law, were making and approving the decisions made by the Board of Trustees.[14] Further, I also told Mr. Schachter that the additional projects were also

---

[14] It also should be noted that, (as far as I am aware) the Union members knew that the Funds were supporting the Union in this way, so, (as far as I am aware) this practice was in no way "concealed" from the Participants; the Union members wanted the Union to remain separate, so that the International Organization (LIUNA) would not merge the Union into a District Counsel, and (as far as I am aware) even voted at meetings to allow for the Funds to support the Union so that the two entities would remain separate.

In addition, it should also be noted that, regarding the additional work and the deferral of expenses, (as far as I am aware) the Fund participants also wanted their funds the next day and wanted to be able to pay their expenses when there wasn't any work in the industry, which allowed them to care for their families when there was no work, as they were not earning welfare or health benefits during this period. (This allowed for the participants to pay their mortgages, to pay for medical care, and to pay for funerals during this time, among additional necessary expenses, though there was no work in the industry at that time.)

Further, it should also be noted that (as far as I am aware) all funding comes from future contributions negotiated by the Collective Bargaining Parties, and that the actuarial data is reviewed to determine the funding that is required to fund future benefits. (As KingCare was not a fiduciary, KingCare was not privy to the agreements or to the future guarantees made by the Collective Bargaining Parties when they were in negotiations; however, the deferral of the administrative expenses shows that it was the Trustees' philosophy to defer the expenses until the work in the industry increased.)

detailed in KingCare's Counterclaims from the civil case, showing that neither KingCare's civil attorneys nor I knew that this additional work could be considered an embezzlement. (KingCare's Counterclaims from the civil case are attached as Exhibit 1.)

When I told Mr. Schachter and Mr. Gise that I did not know this additional work and additional compensation could be considered an embezzlement, Mr. Schachter and Mr. Gise advised that I was still guilty under the statute; that I would still be convicted at trial (as I allowed the company to receive this additional compensation, and as I also worked on the additional projects); and that I did not have to be a fiduciary to be guilty under the statute.

This is significant, as this shows that I was under the impression that I was guilty of embezzlement, regardless of whether I knew that this additional work could be considered a violation of ERISA, so I was under the impression that the only way for me to proceed was to plead guilty, and further, that the Plea Agreement that Mr. Schachter had arranged with the prosecution was a better result than the result that I would receive if I chose to proceed to trial, which explains why I pleaded guilty, even though I maintained that I never intentionally caused any loss to the Funds, and when I maintained that I worked endlessly, even when the long hours began to take a very serious toll on my health (especially as I often had to ignore my health concerns in order to be able meet the Trustees' daily servicing requirements).

Further, this is also significant, as this explains my assertion at the plea hearing that I was satisfied with my attorney's legal advice, though I often felt uncomfortable with Mr. Schachter's rushed approach to my case, as I was under the impression that entering into a Plea Agreement was the only way to proceed, as I would be found guilty at trial because of this theory of guilt (which, again, the Court discredited at the sentencing hearing, and, if I'm remembering correctly, dismissed as a "hyper-technicality" at the sentencing hearing); as I was under the impression that my only option was to plead guilty, and that Mr. Schachter and Mr. Gise had worked out the best Plea Agreement possible; and as I was under the impression that my only option was to plead guilty, as I was not well enough to defend myself against my attorney's incorrect legal advice at that time, as well as his overbearing method of questioning, which was intended to push me towards entering into a Plea Agreement with the prosecutors, as he wished for me to plead guilty, as he wished to "put this matter behind him" at that time.

---

Moreover, it should also be noted that Mr. Fitzsimmons, Sr., also received a salary from the Funds to make the day-to-day administrative decisions, which (as far as I am aware) was a decision that was also supported by the Union membership. (This can be confirmed by the February 3, 1994 Board of Trustees Minutes, which are attached as Exhibit 11A, and which advise: "Mr. Richard Fitzsimmons has been furnishing administrative services to the Retirement Fund, the Annuity Fund and the Additional Security Fund. The Trustees decided to enter into a formal contractual agreement with Mr. Fitzsimmons. They directed Mr. Sues to prepare the appropriate contracts reflecting that relationship. Mr. Sues is to distribute them to the Board and Mr. Fitzsimmons." (February 3, 1994 Board of Trustees Minutes, p. 5.)(Exhibit 11A))

On this point, when I asked my court-appointed defense attorneys if the Defense needed an ERISA expert for the case, as I was not a fiduciary, as KingCare was considered a third party by the Fund Professionals and provided TPA services, and as I did not know that the additional work could be considered an embezzlement, so there was no criminal intent in this case, I was told that an expert would only make the circumstances worse, as I was already in violation of the statute.

To this effect, on October 5, 2011, Mr. Gise wrote the following email, responding to the question of whether the defense needed an ERISA Expert for the case:

> Typically that is a matter of law found by the judge, so an expert would not be helpful. Also, you do not need to be a fiduciary to violate the statute, unfortunately.
> (David Gise, (10/5/2011)) (Exhibit 2B)[15]

Mr. Schachter also responded as follows:

> Imagine what an expert would say about using fund assets for union expenses or taking fees with no invoices and no records which show exactly what is owed. It seems to me that any expert in the duties of a fund administrator would convict you through his testimony.

> (Michael Schachter, (10/5/2011)) (Exhibit 2B)

To this accusation, I responded that the contract did not work that way; that the expenses were transparent and reviewed by the fund accountants; that I couldn't imagine another administrator providing the level of work that we provided, either; and that, in fact, we were also doing Castrovinci's work for him, as KingCare also provided services to the Welfare Fund.[16]

---

[15] It also should be noted that, though it is clear that Mr. Gise and Mr. Schachter knew that I pleaded guilty based on incorrect legal advice (as the additional work was completed, as I did not know that the additional work could be considered a violation of ERISA, and as Mr. Schachter later advised that he "[didn't] know how [I was] to get [my] plea back," as discussed below), it seems that Mr. Gise and Mr. Schachter should have asked for the Court to rule on this issue and on the jury instructions prior to advising me to plead guilty based on this incorrect legal advice (as this legal advice was later discredited at the sentencing hearing, and if I'm remembering correctly, dismissed as a "hyper-technicality" at the sentencing hearing), if they truly had any concerns on this point.

[16] It should be noted that the work that should have been completed by Castrovinci is also reflected in the records, as KingCare completed additional work for the Welfare Fund, as requested by the Union and directed by the Local 147 Trustees.

In addition, it should also be noted that, in the later years, the Local 147 Trustees also requested that KingCare take over administering the Welfare Fund; however, we decided that we would not do so, as the demand for additional work and for daily support was so high; as the Trustees were very threatening and verbally abusive when the work was not completed fast enough; and as the costs to KingCare were also becoming very high to meet the additional servicing requirements, so we refused this request.

I also told Mr. Schachter that there is evidence of significant work and of significant expenses; that they were the Trustees and their decisions were approved by their lawyers who are ERISA experts; and that, clearly, if I didn't think that the Trustees had the right to make those decisions, it wouldn't be so transparent or my defense in the civil case (as this shows that I didn't know that the additional work could be considered a violation of ERISA), so it was clear that there was no criminal intent in this case.

Moreover, I also told Mr. Schachter that many lawyers had said that the billing issues, as he stated them, were surmountable, given the way the expenses were presented, with administrative reports at the end of each year, which takes the place of invoices, given that the trustees knowingly deferred the expenses, and given that this way of requesting the additional work and this way of presenting the expenses to the Board continued on for 20 years. Finally, I told Mr. Schachter that any expert would tell you that past practice is very relevant to charging someone with embezzlement, and that, as far as I was aware, I was within my understanding of the contract (and of the Local 147 Trustees' requests).

It should also be noted that KingCare was not required to layout expenses for the additional services provided to Local 147 under the Administrative Agreements; that the EisnerAmper and Vasil Reports, which attached the original Fund Records, show that the Trustees requested the additional projects and personally directed the employees while the additional projects were in progress, that KingCare incurred tremendous expenses in order to provide the additional services as directed by the Local 147 Trustees, and that there is evidence and records of the tremendous expenses; and that the Administrative Agreements state that the paid administrative expenses were to be reconciled on an annual basis, so it is clear that Mr. Schachter did not even try to understand the Administrative Agreements prior to attacking my conduct and prior to attacking my defense in this case (which also shows that he acted as a prosecutor, rather than as my defense attorney).

Similarly, Mr. Schachter also advised that I was guilty of tax fraud, even though he had personally been in contact with the tax attorney who advised on the original filings, in conjunction with KingCare's accounting firm, who also compiled all of KingCare's books and records. (Here, it should also be noted that all of the income and business expenses were vetted and approved by KingCare's accounting firm – who also worked at times from the KingCare office in Irvington, so it is clear that everything was transparent – and by KingCare's tax attorney, and that, as far as I am aware – as I have no knowledge of the tax code or of taxable events – all purchases were made legitimately, with after-tax income, and were reported and paid as advised by counsel, and by KingCare's accounting firm.)

On this issue, Mr. Schachter advised that staying in an apartment for 30 days in a year for business purposes was considered tax fraud, as I should have paid the taxes on it, and further, that I was guilty, as I knew that I had stayed in the apartment. This was later refuted by Mr. Stechel, who advised on the original tax filings, and who was the

Defense's tax expert during the proceedings. (This is also confirmed by the Vasil Report, which was submitted to the Court prior to the sentencing hearing, as the Report uses the original tax filings to show that the business structure of the company was legitimate, and to show that the taxes were reported and paid, as advised by counsel and by KingCare's accounting firm.)

For the plea hearing, I told Mr. Schachter that I wanted to say that the additional projects were completed at the direction of the Trustees and with the full knowledge of the Fund Professionals, who were the ERISA specialists. Mr. Schachter provided scripted statements and a Questions and Answers Sheet for the plea hearing, and took this out before the hearing. The edited scripted statements and the "Draft Q&A" Sheet are attached as Exhibit 3.

It should also be noted that Mr. Schachter told me that he removed this information from the scripted statements after discussing them with AUSA Facciponti. This is very significant, as the prosecution proceeded to argue in court that I had not accepted responsibility, when this would suggest that the prosecutors also knew that this incorrect legal advice formed the basis of the Plea Agreement; as the prosecutors turned to disputing the percentages listed in the Report at the sentencing hearing, which demonstrated in court that the prosecutors knowingly criminalized a civil billing dispute, and that they had no right to bring charges in this case in the first place, as they brought charges in this case without having sufficient evidence in order to prove their case at trial;[17] and as the prosecutors objected at the sentencing hearing, as they wished for the Court to impose a greater sentence, when it was clear at the sentencing hearing that the prosecutors knew that no crimes were committed in this case.

To this effect, the sentencing hearing transcript reads as follows:

The Court:  I'll recognize the government for anything the government wishes to tell me.

Mr. Facciponti:  Other than we object to the non-guideline sentence, Your Honor.

The Court:  All right.[18]

Therefore, it is very significant that AUSA Facciponti and AUSA Hernandez were aware during the proceedings that my guilty plea was not entered knowingly, intelligently, and voluntarily, as I pleaded guilty based on incorrect legal advice, and as it was clear at the sentencing hearing that no crimes were committed in this case (especially as the prosecutors turned to disputing the percentages listed in the EisnerAmper Report at the sentencing hearing, which demonstrated in court that the prosecutors knowingly criminalized a civil billing dispute, and which demonstrated in court that they knowingly

---

[17] To this effect, at the sentencing hearing, AUSA Facciponti stated: "I don't see, based upon these, how she can claim that 80 percent of Emily Prober's time was devoted to Local 147 special projects." (June 21, 2012 Sentencing Hearing Transcript, p. 47.)

[18] June 21, 2012 Sentencing Hearing Transcript, p. 71.

brought charges in this case without having sufficient evidence in order to prove their case at trial);[19] that KingCare completed the additional projects at the direction of the Local 147 Trustees, contrary to the prosecutors false representations in court (e.g. the prosecution argued in court that the additional projects were "phantom projects," when they clearly knew that KingCare completed the additional work, and when they clearly felt that they could get away with this fraudulent representation, as they felt that the Court would endorse their position, especially as I had already pleaded guilty, though this was based on Mr. Schachter's incorrect legal advice), as confirmed by the original Fund Records and by the EisnerAmper Report, which was submitted to the Court prior to the sentencing hearing; that the prosecutors knowingly and willfully committed a fraud upon the court, as they repeatedly lied in court in order to make a sensational case, when it was clear during the proceedings that they knew that I was actually innocent of the charges (e.g. the prosecutors argued in court that the additional projects were "phantom projects," when it was clear during the proceedings that the additional work was completed by the company); and that the prosecutors knowingly imprisoned an innocent person, and knowingly conspired to deprive me and my family of our constitutional rights, so that they could make a sensational case in court at my expense and at my family's expense.

### 2. I was misadvised by my court-appointed defense attorney on several significant elements of the Plea Agreement.

Mr. Schachter also advised that I was not pleading guilty to "many millions of dollars." When I went "off script" during the plea hearing, and stated that I was pleading guilty, "but not to many millions," afterwards Mr. Schachter became very angry and told me to write to the Court and apologize.[20] I refused to do so. I still don't understand Mr. Schachter's emails on the loss amount, nor do I understand the tax count that I pleaded guilty to, as it apparently does not work the way that I was advised it would work (especially regarding the loss amount).

The following correspondence shows that I was intentionally misled on the loss amount identified in the Plea Agreement:

A. On October 16, 2011, five days before the Plea Hearing, Mr. Gise wrote:

The amount of the loss on the other count will be worked out with the government. Given that the loss includes the money earned for work done on the special projects for the Union, the number likely will exceed 10 million. The issue is whether we can get it under 20 million, and we will try.

(David Gise, (10/16/2011)) (Exhibit 2C)[21]

---

[19] To this effect, at the sentencing hearing, AUSA Facciponti stated: "I don't see, based upon these, how she can claim that 80 percent of Emily Prober's time was devoted to Local 147 special projects." (June 21, 2012 Sentencing Hearing Transcript, p. 47.)

[20] October 21, 2011 Plea Hearing Transcript, p. 36-37.

[21] This email is also very significant, as Mr. Gise's email shows that the defense attorneys also referred to the payments made to KingCare as payments that were "earned" by the company.

I answered as follows:

How do you know. We never even went through them. Some [of the] benefits [were] after the contract was put in place after the 2002 contract.

It will be too late after the plea. I will fight with IRS about the amount after signing something that says millions of dollars.

(Melissa King, (10/16/2011)) (Exhibit 2C)

Mr. Schachter then responded:

What says millions of dollars? The Plea Agreement says we are stipulating that a preponderance of the evidence supports a conclusion that the loss amount, which includes payment you received for work for the union rather than the fund, plus the amount you received without authority, plus the amount from king care that you did not report, was in excess of $7 million. You are not pleading guilty to any number. You are only stipulating that there is an evidentiary basis from which the court could find that this amount exceeded $7 million. I don't see how this has any negative repercussions for your parents or your children.

(Michael Schachter, (10/16/2011)) (Exhibit 2C)

This email is significant, as this email shows that Mr. Schachter was aware that his advice was not accurate, as everything related to the Plea Agreement says "many millions," and further, that he was well aware that he had me sign the Plea Agreement based on incorrect legal advice, as the Plea Agreement includes the phrase "many millions."

In addition, this is significant, as this email shows that Mr. Schachter realized that the only way I was going to agree to plead guilty was if he intentional misled me on several significant aspects of the Plea Agreement, including the nature of the offenses (as KingCare completed the additional work, as the Trustees directed the additional work while the additional projects were in progress, and as there was no criminal intent in this case), as well as on the loss amount that is identified in the Plea Agreement, as I told him that I could not plead guilty to "many millions" of dollars, and as Mr. Schachter advised that I was not, in fact, pleading guilty to "many millions" of dollars by signing the Plea Agreement.

---

In addition, this email is also significant, as it shows that while the younger attorneys (who, as far as I'm aware, were also less experienced in criminal law) looked through the materials that the government produced in discovery, the attorneys looked through the discovery materials before they had asked the proper questions, so they did not fully understand the records and the work-product they were reviewing, and therefore, could not conduct a proper review of the discovery materials at that time.

Therefore, it is clear that Mr. Schachter realized that if he had accurately described the Plea Agreement, I would not have signed the Plea Agreement, nor would I have agreed to plead guilty (as I would have insisted on proceeding to trial), as I was not guilty of the offenses identified in the Indictments.  (It is also clear that this is exactly what Mr. Schachter didn't want, as he wished for me to plead guilty, so that he could "put this matter behind him" at that time.)

In addition, Mr. Schachter's email (Exhibit 2C) is also significant, as it confirms that Mr. Schachter and Mr. Gise advised that the third party interests could still be litigated after I signed the Plea Agreement.  To this effect, Mr. Schachter wrote: "I don't see how this has any negative repercussions for your parents or your children." (Michael Schachter, (10/16/2011)) (Exhibit 2C) On this point, Mr. Schachter also advised that I would not be affecting the business structure of the company, or affecting any third party claims by signing the Plea Agreement, as Mr. Schachter advised that third party claims could still be raised after the Plea Agreement was signed, and that only I was giving up any rights to these properties and entities, which I did not own in the first place.

(As I found out later, this was also incorrect, and also caused the additional losses to my parents and my children, who lost these properties, even though I did not have the legal ability to forfeit these properties on their behalf, as the entities were set up by counsel, for completely legitimate reasons.)

Finally, it should be noted that I am not sure of what Mr. Schachter was referring to when he wrote "plus the amount you received without authority," and that this is believed to be a result of Mr. Gise's difficulty with the analysis of the Local 147 Benefit Funds' Certified Financial Statements, as Mr. Gise wouldn't review the expenses with me prior to the plea hearing.

B. On October 16, 2011, five days before the plea hearing, Mr. Schachter wrote:

You are not agreeing to [8 years]. We will argue to the Judge that he should impose much less time, and we just can't know how he will rule, but it will be much, much better than when you are convicted after trial. You are not agreeing to a $20 million loss. There will be no agreement on the amount of loss at all. Does this help?

(Michael Schachter, (10/16/2011)) (Exhibit 2D)

C. On October 16, 2011, I wrote the following email to Mr. Schachter, clearly demonstrating that I did not understand the loss amount identified in the Plea Agreement:

Please change page 10 paragraph 13 to substantial amount not many millions of dollars. In the Superseding Indictment.

(Melissa King, (10/16/2011)) (Exhibit 2E)

Mr. Schachter responded:

They will not change that information. You are not admitting that fact, only the elements of the offense that you are reading. It is just what is in the charges.

(Michael Schachter, (10/16/2011)) (Exhibit 2E)

D. On November 17, 2011, nearly one month after the plea hearing, I sent the following email to Mr. Gise, demonstrating that I did not understand the tax count or the loss amount that is identified in the Plea Agreement:

Do you know if the tax filings were sent to Ira Stechel? The IRS wanted to meet 11/22. I believe they will look to reschedule.

I would think that there should be no agreement of any possible loss factor under the plea, for any reason, until I have a chance to review. Please advise. Thanks.

(Melissa King, (11/17/2011)) (Exhibit 2F)

Mr. Gise responded as follows (also copied to Mr. Schachter):

We have not agreed to anything.  I am checking with Shaimaa to confirm the tax docs were sent. If not we will send them asap.

(David Gise, (11/17/2011)) (Exhibit 2F)

This communication is significant, as this communication shows that I did not understand how the loss amount worked under the Plea Agreement; as this communication shows that my attorneys were aware that I did not understand how the loss amount worked under the Plea Agreement; and as this communication shows that my attorneys realized that I did not understand how the loss amount worked under the Plea Agreement, and did not make any effort to properly advise me on how the loss amount worked under the Plea Agreement.  (Again, it should also be noted that I am still unsure of the tax count that is identified in the Plea Agreement, as it apparently does not work the way I was advised it would work, especially regarding the loss amount.)

Finally, it should be noted that I repeatedly asked for the transcript of the plea hearing, and could not obtain a copy of the transcript for a long time after the plea hearing was held.  As demonstrated by Exhibit 2G, Mr. Gise forwarded a copy of the transcript of the plea hearing on December 21, 2011, which was two months after the plea hearing.

### 3. I was not advised at all on several additional elements of the Plea Agreement.

In addition to Mr. Schachter's incorrect legal advice regarding the nature of the offenses and the loss amount that is identified in the Plea Agreement, there were also several aspects of the Plea Agreement that Mr. Schachter did not review with me. For

example, (as far as I'm aware) Mr. Schachter never advised that there would be a period of supervised release, or what this would involve; I found out about this aspect of the process when the Court imposed the sentence.

On this point, at the sentencing hearing, the Court stated:

> *I will impose a term of three years supervised release on Count One and one year of supervised release on Count Two, both to run concurrently, with the standard conditions of supervised release in this district and those recommended by the probation department.*[22]

In addition to the period of supervised release, Mr. Schachter also never went over much of the legal terminology contained within the Plea Agreement. For example, Mr. Schachter never reviewed the definition of a Habeas Corpus proceeding; he only advised that I was waiving my "appellate rights." This is confirmed by the "Draft Q&A" Sheet, which was provided for the plea hearing, and which advises: "[Judge Koeltl] will likely explain the rights you are giving up by entering a plea: right to trial by jury, appellate rights." ("Draft Q&A" Sheet, p. 1.) (Exhibit 3)

Moreover, as confirmed by the "Draft Q&A" Sheet, though I was advised that I waived my "appellate rights" under the Plea Agreement, I was not advised that it is also common for Plea Agreements to be executed without this provision (so that the defendant can still appeal the sentence), as I was under the impression that the defendant waives his or her "appellate rights" as part of the process of pleading guilty. In addition, I was also never advised that there are issues that the Defendant can always appeal, including the knowing and voluntary aspects of the plea (which I also would have chosen to appeal, had I known that this was an option after the plea hearing, as discussed below, on pages 89 - 92 and on pages 187-244).

Finally, apparently there was also an issue relating to whether the prosecutors had jurisdiction to prosecute this case, which Mr. Schachter briefly mentioned, but, in essence, glossed over. It seems that this point should have been properly addressed, as I would have requested for my case to be transferred, as many very well-respected defense attorneys have commented on the prosecutors' unethical conduct throughout this case, as well as on DOL Agent Della Penna's unprofessional conduct and on the unprofessional comments that DOL Agent Della Penna made throughout the case.[23]

---

[22] June 21, 2012 Sentencing Hearing Transcript, p. 67.

[23] These comments, which were also made by individuals who have extensive backgrounds in law enforcement, focused on how investigators are supposed to be impartial, and on how DOL Agent Della Penna had completed no investigative work on this case, and yet was determined to make a sensational case, essentially as my family owned horses, even though it was clear that there was no evidence of an embezzlement to present in court (especially as no embezzlement had occurred).

It also seems that this issue is significant, as I was kept on home confinement for 16 months when the government did not have any evidence of a crime to present in court; while the

    <u>4. I was heavily dependent on my court-appointed defense attorney's legal advice throughout the process, as my health was significantly compromised when my court-appointed defense attorney arranged the Plea Agreement, and as my health was significantly compromised when my guilty plea was entered.</u>

    In addition, as Mr. Schachter and AUSA Hernandez addressed at the plea hearing, I was not well during the time leading up to the plea hearing, and during the time that my court-appointed defense attorney decided to arrange the Plea Agreement with the prosecutors. At that time, my health was significantly compromised, as I was recovering from an extensive spine surgery, and as I was also likely facing a second operation, which was described as (and which will be) much more invasive. To this effect, at the plea hearing, Mr. Schachter stated: *"This would be a more serious surgery even than her last one in that it requires entry through the chest, the surgery requires moving her heart and can result in serious scarring of the lung."* (October 21, 2011 Plea Hearing Transcript, p. 5.)

    Further, during this period, Mr. Schachter also received a letter from my spine surgeon, which was also submitted to the Court during the proceedings. Attached as Exhibit 4, Dr. Tindel's letter advises that I was recovering from my spine surgery during this time, and that I was taking narcotic pain medication "[that was] impairing [my] function and judgment." (Dr. Nathaniel Tindel's Letter, p.1.) (Exhibit 4)

    Prior to the plea hearing, Mr. Schachter and I also spoke about my health several times, as we discussed that I was not capable of proceeding to trial at that point, [24] and as we discussed that I would not have been able to testify if my case proceeded to trial at that point, as I was not well enough to testify at that time, and as I was taking several very strong pain medications, which would have made it impossible for me to testify at that time.

    In addition, this point is very significant, as the attached correspondence shows that I was intentionally misled on several significant elements of the Plea Agreement, including the nature of the offenses and the loss amount, [25] and as I stated that I was pleading guilty, "but not to many millions," while Mr. Schachter was sitting next to me,

---

prosecutors admittedly searched for a crime; when my children would have signed for me from the beginning; and now, apparently, when the prosecutors did not have jurisdiction to prosecute this case, as it seems that this case should have been transferred to the White Plains Division. (Therefore, by extension, the prosecution also, apparently, did not have jurisdiction to keep me on home confinement, to restrain my family's assets, to sell off my family's assets prior to trial, and to refuse to release funds for my defense.)

[24] To this effect, at the plea hearing, Mr. Schachter stated: *"The government also informed me that the government's physician stated that in fact Ms. King, through sitting through any protracted period of time, ran a danger of doing permanent damage to her spine... I don't believe that any reasonable accommodation could have been arranged."* (October 21, 2011 Plea Hearing Transcript, p. 5-6.)

[25] For example, as discussed above, five days before the plea hearing, Mr. Schachter wrote: "...There will be no agreement on the amount of loss at all. Does this help?" (Michael Schachter, (10/16/2011)) (Exhibit 2D)

---

which did not prompt him to attempt to correct my understanding of the Plea Agreement during the proceedings, nor to attempt to correct my understanding of the Plea Agreement after the plea hearing.[26]

For the plea hearing, when I had asked Mr. Schachter about my pain medication, as I was heavily medicated throughout my recovery, and as I repeatedly asked my defense attorneys if the Defense could obtain additional extensions, given that I was not well during this time, Mr. Schachter told me that this was not a valid reason to ask for additional time; that "the time we have is the time we have"; and that I should not take my medication on the morning of the plea hearing "in case [Judge Koeltl] asks."

This is significant, as the Court asked during the plea hearing if I had taken any medication within 24 hours, to which I responded that I had not, though this would not have been possible at that time, given the amount of pain that I was experiencing during my recovery.[27] It is also significant to note that I had not realized during the plea hearing that the Court had asked a different question than I had previously discussed with Mr. Schachter, though this would have been clear to someone who was truly competent to plead guilty.[28]

Moreover, this is also significant, as Mr. Schachter and Mr. Gise knew that I was not well enough to go 24 hours without pain medication at that time, as I had discussed my health with Mr. Schachter and with Mr. Gise several times; as Dr. Tindel's letter makes it clear that I could not go 24 hours without any pain medication during that time (Exhibit 4); and as Mr. Schachter only advised me not to make my medication the morning of the plea hearing and did not mention a 24-hour period of time before the plea hearing.

Finally, this is also significant because Mr. Schachter and Mr. Gise advised that the Court would not grant any more extensions of time, and that I would have to proceed to trial in my current state.

On this point, at the plea hearing, Mr. Schachter stated:

---

[26] To the contrary, Mr. Gise's emails concerning the loss amount show that my defense attorneys realized that I did not understand how the loss amount worked under the Plea Agreement, as discussed above, and as demonstrated by Exhibit 2F, as Mr. Gise reassured me that the attorneys had not agreed to a loss amount under the Plea Agreement, nearly one month after the plea hearing.

[27] To this effect, at the plea hearing, the Court asked: *"In the past 24 hours, have you taken any drugs, medicine or pills, or have you drunk any alcohol?"* (October 21, 2011 Plea Hearing Transcript, p. 12.)

[28] It should also be noted that, while the "Draft Q&A" Sheet includes this question, I had not noticed that the Court had asked about a 24-hour period of time at the plea hearing, as I had discussed not taking my medication on the morning of the plea hearing with Mr. Schachter, and as it would not have been possible for me to have gone 24 hours without any medication during this time, given the pain that I was experiencing during my recovery.

*Had we not reached a resolution we probably would be back before the Court asking for additional adjournments because I think, based on the government's physician as well as Ms. King's physician, I don't believe that any reasonable accommodation could have been arranged. However, Ms. King very much wants to put this matter behind her and so regardless of any possibility of seeking an adjournment of trial, she wishes to resolve this matter now.[29]*

However, contrary to Mr. Schachter's representations in court, I had asked both Mr. Schachter and Mr. Gise many times if it would be possible to request additional time, as I was not well throughout this time; in response, each time I was advised that it was not possible to obtain additional extensions; that I "must understand that [I would] not receive any more time"; that the Court "[was] sick of [my] case"; and that "the time we have, is the time we have."

It is also important to note that I never advised Mr. Schachter that I wished to "put this matter behind me" in this way, nor did I say that I "[wished] to resolve this matter" at that time. To the contrary, I always stated that I wished to clear my name, and that I never intentionally caused any loss to the Funds.

Further, it should also be noted that Mr. Schachter is the only person who ever expressed this sentiment, as he repeatedly referred to the cost of my defense, and as he repeatedly returned to the subject of arranging a Plea Agreement with the government before I could go through the defense materials. (This is also very significant, as I was not well throughout this time, so I was not able to continuously fight against the prosecutors, and as I was not well enough to defend myself at the time from my own court-appointed defense attorneys.)

Finally, it should be noted that, though I repeatedly told Mr. Gise that everything was transparent (which a proper review of the records would have confirmed) and that the payments made to KingCare were reflected on the Local 147 Benefit Funds' Financial Statements, Mr. Gise refused to listen to me on this point; instead, he repeatedly asserted that the Local 147 Benefit Funds' Certified Financial Statements did not reflect all of the payments made to KingCare. He also made me feel as if I were crazy, or as if I were being unreasonable, and repeatedly stated that I "may not like [his] math skills, but that [was] the reality." Despite the fact that this issue was clearly not resolved (at least as far as I was concerned), Mr. Gise would not properly address the expenses with me before the plea hearing.

After I pleaded guilty, Mr. Schachter told me that, Mr. Ronald Richmond, one of the Local 147 Trustees' civil attorneys, was his "good friend," and that I should go over and "tell them" why the payments are not reflected on the Local 147 Benefit Funds' Certified Financial Statements. I was then finally able to review the expenses with Mr. Gise, and it then became clear to Mr. Gise that the expenses are listed on the Local 147

---

[29] October 21, 2011 Plea Hearing Transcript, p. 6.

Benefit Funds' Certified Financial Statements.[30]  After Mr. Gise and Mr. Schachter realized that the expenses were listed on the Local 147 Benefit Funds' Certified Financial Statements, Mr. Schachter told me that he "[didn't] know how [I was] going to get [my] plea back."

Here, it should also be noted that Mr. Gise's refusal to investigate the possibility that the payments were listed on the Local 147 Benefit Funds' Certified Financial Statements was in keeping with their actions throughout the time that Mr. Schachter and Mr. Gise worked on my case, as Mr. Schachter also repeatedly failed to remember key elements of the case (especially concerning the descriptions of the extensive work-product that was produced by KingCare), and as Mr. Schachter demonstrated on many occasions that he was not interested in involving himself in the details of my defense, though I desperately tried to communicate the facts of this case to him.

Therefore, had Mr. Schachter and Mr. Gise asked the proper questions prior to the plea hearing, and had they reviewed the records with me prior to the plea hearing, it would have been clear that the payments were listed the Local 147 Benefit Funds' Certified Financial Statements, and by extension, that my case was clearly defensible, as the payments were transparent and fully disclosed, as there was no embezzlement, tax crime, or mail fraud in this case.

When I expressed my wish to have a Fatico hearing to determine the loss amount, as I had wished to dispute the numbers provided by the government (and as it was clear that the payments were listed on the Local 147 Benefit Funds' Certified Financial Statements, so it was clear that I was actually innocent of the government's accusations, as Mr. Schachter advised that he "[didn't] know how [I was] going to get [my] plea back"), Mr. Schachter advised that it was against his professional opinion, as the loss amount would not change the length of my term of imprisonment under the Plea Agreement.  (It is also significant to note that a hearing on the loss amount also would have shown that my case was defensible, as it would have come out in court that the payments were transparent, that the expenses are listed on the Local 147 Benefit Funds' Certified Financial Statements, and, assuming that the Reports would have been completed, that there was no loss amount in this case, as the EisnerAmper and Vasil Reports, which were submitted to the Court prior to the sentencing hearing, used the original Fund Records and the original tax filings to show that there was no embezzlement, tax crime, or mail fraud in this case.)

---

[30] Here, it should be noted that it would have been clear to Mr. Gise that the expenses were reflected on the Local 147 Benefit Funds' Certified Financial Statements if he had taken the time to properly review the expenses with me, as neither KingCare nor I had the accounting knowledge to prepare Certified Financial Statements for the Funds – the only knowledge that was available was of the expenses and of the payments that were made to KingCare. Therefore, had Mr. Gise reviewed the expenses with me, it would have been easy for him to have recognized where the expenses are listed on the Local 147 Benefit Funds' Certified Financial Statements prior to the plea hearing. (It should also be noted that the books and records were certified and prepared by Local 147's CPA and field auditors, who were hired by and reported to the full Board of Trustees, and who were also the accountants for the Union and for the Welfare Fund.)

When I refused to give up the Fatico hearing, Mr. Schachter stated that he could not stand next to someone in court who pleaded guilty and then continued to maintain their innocence.[31] In response, I told Mr. Schachter that I still wanted to have a hearing to dispute the loss amount. In court, Mr. Schachter was then relieved as counsel, and Ms. Fontier was appointed to take Mr. Schachter's place.

When I expressed my wish to file a motion to withdraw my guilty plea, Ms. Fontier sent a formal letter, advising that she spoke with Mr. Schachter; that she reviewed the transcript of the plea hearing; that she reviewed the Plea Agreement; and that she would not file the motion to withdraw my guilt plea, as she had determined that my guilty plea was knowing and voluntary. In addition, Ms. Fontier's Letter, which is attached as Exhibit 5, also advises (among other things): (1) attorneys are not obligated to file motions that are "frivolous"; (2) Mr. Schachter would testify "at any hearing" questioning the "knowing" and "voluntary" aspects of the plea; and (3) CJA defendants are entitled to representation, but "are not entitled to be involved in legal strategy." (Ms. Fontier's Letter, p. 1-2.)(Exhibit 5)[32]

It should also be noted that I was advised that Mr. Schachter's incorrect legal advice was correct; that if I filed a motion to withdraw my guilty plea, the motion would be denied; that the government would be permitted to proceed to sentencing on the current charges, and then prosecute on the remaining 15 open counts; and that, even if I were to get my plea back, which would never happen, the Court would give me a pro forma trial, where the significant documents would be excluded, as the Court was "deaf to the Defense" in this case (even though the government never presented any competent evidence of embezzlement, tax crime, or mail fraud in court).

Concerning Mr. Schachter's legal advice, on May 23, 2012, Ms. Fontier wrote the following email:

> I did not say that was not an embezzlement. If you paid yourself for work done for the Union out of the Funds, that was not for the benefit of the Funds then it is still an embezzlement. Basically, what I believe David said to you is that even if you believe you were being fairly compensated for work done, if you paid yourself out of the improper account, it is still embezzlement. Think of it this

---

[31] It should be noted that this I did not actually plead guilty and then maintain my innocence; Mr. Schachter advised me to plead guilty based on incorrect legal advice when I was actually innocent.

[32] Here, it should be noted that, while Ms. Fontier agreed with Mr. Schachter's incorrect legal advice and refused to file the motion to withdraw my guilty plea prior to the sentencing hearing, the Court discredited Mr. Schachter's incorrect legal advice at the sentencing hearing (as Mr. Schachter's incorrect legal advice was used to argue the loss amount in my sentencing submissions, as this incorrect legal advice formed the basis of the Plea Agreement), so it is clear that Mr. Schachter's legal advice was incorrect, and that the motion to withdraw my guilty plea would not have been frivolous, as it was clear that my guilty plea was not entered knowingly, intelligently, and voluntarily, as I pleaded guilty based on Mr. Schachter's incorrect legal advice.

way...

If I do work for you, and believe that I am due $100 for that work, so I then take $100 from Michael, I have just stolen $100 from Michael. It makes no difference that I believe that I am owed the money. It also would make no difference if you told me to take the money from Michael, because you say he owes it to you. If I take $100 from Michael, for work done for you, then I have stolen from Michael.

(Alice Fontier, (5/23/2012)) (Exhibit 2H)[33]

Again, it should be noted that, while my case should have been considered defensible on this point, as there was no criminal intent in this case (as demonstrated by KingCare's Counterclaims from the civil case, which are attached as Exhibit 1), it is also clear that Mr. Schachter and Mr. Gise committed malpractice in advising to plead guilty based on this incorrect legal advice, as this legal advice was very far removed from the accusation made by prosecution, and as this legal advice was very far removed from the charges that are identified in the Superseding Indictment. (Again, the Court discredited this legal advice at the sentencing hearing, and if I'm remembering correctly, dismissed this legal advice as a "hyper-technicality" at the sentencing hearing.)

I then answered:

Yes but that was at the Trustees direction.  Therefore, if the Trustees did not have the right to authorize then it could be considered an embezzlement.  But if I did not know that the Trustees did not have the right to authorize then there was no bad intent.

(Melissa King, (5/23/2012)) (Exhibit 2H)

Ms. Fontier then answered:

Are you back to thinking you want to withdraw your plea? I will repeat again, that I don't believe you will ever be successful in getting it back. You will be tried on the 15 open counts, and almost certainly sentenced to 96 months on the two counts to which you have already pled.

I also will not file what I believe to be a frivolous motion. The email below from David is an accurate statement of the law. He did not mislead you into thinking

---

[33] Here, it should be noted that, as Ms. Fontier is an experienced criminal attorney, she had to know that this legal advice was incorrect; that, in this case, the entities were related, that the same Trustees controlled each of the entities, and that whether or not the Participants benefitted from the additional work would require a separate analysis for each project (though I believe that all of the projects "benefitted" each of the entities); and that, in any event, I did not know that the additional work could be considered a violation of ERISA law, so there was no criminal intent in this case. (This is also demonstrated by KingCare's Counterclaims from the civil case, which are attached as Exhibit 1, and which show that neither KingCare's civil attorneys nor I knew that the additional work could be considered an embezzlement.)

you had committed a crime, that you had not committed. Your statements at the plea were unequivocal and did not rely on the "defense" that you are now asserting. You stated at the plea you took a "significant amount of money" for your own "personal use." That is an embezzlement. We need to work on the sentencing memorandum and move on from this discussion.

(Alice Fontier, (5/23/2012)) (Exhibit 2H)

However, as demonstrated by the attached correspondence (Exhibits 2A-2M), I would not have pleaded guilty had Mr. Schachter accurately described the nature of the offenses and the loss amount identified under the Plea Agreement. Further, it is also clear from the attached materials that I was misled as to the effects of the scripted statements, which were provided and then edited, as demonstrated by Exhibit 3. Moreover, I was clearly not well enough to plead guilty at that time, nor was I well enough to make the decision to plead guilty when my guilty plea was entered, as demonstrated by Dr. Tindel's letter, which was submitted to the Court during the proceedings, and which is attached as Exhibit 4.

Therefore, my guilty plea was not entered knowingly, intelligently, and voluntarily, as I pleaded guilty based on my court-appointed defense attorney's incorrect legal advice; as I was misadvised on several significant elements of the Plea Agreement, including the nature of the offenses and the loss amount identified under the Plea Agreement; as I was not advised at all on several additional elements of the Plea Agreement; and as my health was significantly compromised when my court-appointed defense attorney arranged the Plea Agreement, and when my guilty plea was entered.

Further, as discussed below, my case was defensible, contrary to Mr. Schachter's representations during the plea hearing. This is clear, as the forensic auditors later verified that the payments made from the Local 147 administrative expense account were transparent; as the payments were listed on the Funds' Certified Financial Statements and can be traced to the Form 5500s; as neither KingCare nor I prepared or executed these materials; and as the EisnerAmper and Vasil Reports, which were submitted to the Court prior to the sentencing hearing, showed that there was no basis in fact for the government's accusations (and, by extension, that I was actually innocent of the charges) when I was sentenced.

5. As I pleaded guilty based on my court-appointed defense attorney's incorrect legal advice, I was misadvised as to the elements of the offenses that the prosecution would have had to prove at trial.

Concerning the government's representations at the plea hearing, when summarizing the evidence the government would present at trial, AUSA Facciponti stated:

> If the case proceeded to trial the government's evidence would include, among other things, law enforcement and lay testimony, bank records and other financial records, records of the defendant's purchases, records of Local 147 funds

*including statements mailed to participants, board of director minutes, forms filed with the Department of Labor, tax returns and accounting records for the defendant including defendant's personal tax returns. This evidence would show, among other things, that the defendant was a third-party administrator for three of the Local 147 Funds; that between 2002 and 2008 she took over $40 million from the fund's account and placed it into her personal account. She spent a substantial portion of that on many on personal expenses including horses, jewelry, travel and private jets, luxury hotels, her home in Irvington, credit card bills for additional personal expenses and two Park Avenue apartments in Manhattan including a penthouse that cost, in rent $25,000 a month.*

*None of these expenses were justified by her contracts, nor were those expenses authorized by the trustees of the Local 147 funds.[34]*

However, when faced with the original Fund Records in court, which were put together by EisnerAmper for the forensic audit, the prosecution argued that I did not deserve credit for acceptance of responsibility, as the Defense's revised sentencing memorandum incorporated the EisnerAmper and Vasil Reports as attachments. On this point, AUSA Facciponti wrote: "In sum and substance, those reports conclude that King likely embezzled no money from Local 147 and that King owes no additional federal income taxes." (The Government's Sentencing Memorandum, p.10.)

Concerning the evidence the government presented in court, in the end, the government did not rely on a single Fund Record while arguing their case; they did not present an expert witness, did not present a forensic audit, presented a tax expert who was not certified to justify a $30 million tax accusation, and repeatedly cited a perjured affidavit to contradict the content of the original Fund Records.

When faced with the original Fund Records in court, the prosecution argued to have them removed from the proceedings, as the EisnerAmper Report, which was submitted as part of the Defense's sentencing submissions, used the original Fund Records to show that there was no embezzlement in this case.

Concerning the EisnerAmper and Vasil Reports, it should be noted that the Reports verified that the government's accusations had no basis in fact, as the business was reported like any other business; as the company worked and earned; and as the income was reported and as the taxes were paid, as advised by the tax attorney who advised on the original tax filings, and as advised by KingCare's accounting firm, who also put together all of KingCare's books and records.

In addition, it should also be noted that each of the entities was prepared at the direction of counsel, and that everything was transparent and reported, as advised by counsel; therefore, nothing was concealed, and there were no crimes in this case. (This is especially true, considering that there was also no tax benefit to the prosecution's accusations, which also clearly came from my former husband, who admits in his

---

[34] October 21, 2011 Plea Hearing transcript, pages 35-36.

blackmail letter that he did not know anything about the company, as he states that he "[had] a right to know what [was] going on.")[35]

Therefore, it was clear from the EisnerAmper and Vasil Reports, which were submitted to the Court prior to the sentencing hearing, that Local 147 did not pay for any of the expenses, contrary to AUSA Facciponti's assertions in court. It was also clear that the Reports confirmed that the company received payment for services (which were rendered to multiple clients); that the company reported the income, as advised by KingCare's accounting firm and by counsel; and that the taxes were paid, as advised by KingCare's accounting firm and by counsel. Therefore, (though I am not an accountant, and though I do not have any working knowledge of certified accounting reports, or of taxable events) as far as I know, any purchases that were made were made legitimately, with after-tax income only, contrary to the prosecution's assertions in court.

It is also absolutely "absurd" to think that someone could take over $40 million dollars from the Benefit Funds, as the prosecutors accused me of doing – which is clearly a combination of the Local 147 Trustees' fraudulent accusation, as they wanted to blame me for the loss that was created by the totality of their decisions, and of my former husband's accusations, as he didn't want to have to pay his child support, so he didn't want any of the expenses to have been legitimately paid – and that this accusation is so "absurd," that it is truly a fraud upon the court for the prosecutors to have pursued this case, as it is not possible for someone to take funds out of the Benefit Plans without anyone noticing, let alone $40 million, and especially over so many years, with the Fund accountants and actuaries (who were hired by and reported to the full Board of Trustees) receiving Reports and Records, preparing Certified Financial Reports, and independently making projections from their own offices based on their own records – the accusation is just ridiculous on its face.[36]

Further, it is also clear that the prosecutors truly committed a fraud upon the court by pursuing this case, as the prosecutors had to fabricate arguments in order to make their case seem plausible (such as the prosecution's argument that the additional services were "phantom projects," when the work-product that the government produced in discovery

---

[35] Mr. Kaplan's blackmail letter was previously submitted to the Court as an exhibit to my September 9, 2013 letter, requesting the appointment of counsel.

[36] It's also extremely unjust for the determination to have been that the other Fund Professionals should be held liable for not having "uncovered" the government's fraudulent "embezzlement" sooner, as this case is clearly a fraud upon the court, as the Local 147 Trustees were clearly well aware of the additional work; were clearly well aware of the additional costs; and as the Trustees were clearly heavily involved in the daily administration of the Funds, contrary to the government's representations in court (as demonstrated by the attached materials, including Exhibits 6-10, which show that Mr. Epstein's Affidavit was perjured testimony, and which confirm that the Trustees were involved in the additional projects completed by KingCare). (Here, it should also be noted that, the Trustees were so involved in the daily administration of the Funds, and requested so much additional support, that, at one point, Mr. Fitzsimmons even told me that when his father died, he was back to work within the week, and that I could not travel to my parents in Florida, as I was needed in New York to work on their account on a daily basis.)

shows that the additional work was completed), and as it is was clear that the prosecution knew that their arguments were fraudulent during the proceedings, as there were no crimes in this case, and as it is not possible to commit the crime that the prosecutors accused me of committing.

It should also be noted that the prosecutors clearly knew that the payments were transparent and fully disclosed, and by extension, that this was, if anything, a civil case, when I was arrested; when I was indicted; when they sold off my family's property (prior to trial, without having any evidence of a crime to present in court); when they refused to release funds for my defense; when they arranged the Plea Agreement with my court-appointed defense attorney (as they refused to release any funds for a proper defense, even though they did not have any evidence of a crime to present in court); when I pleaded guilty (based on my court-appointed defense attorney's incorrect legal advice); when I was sentenced for crimes that each party – including the prosecutors, the Local 147 Trustees, the Local 147 Trustees' civil attorneys, and my own court-appointed defense attorneys – knew had not actually occurred; and when I self-surrendered at the Coleman facility in October of 2012 (with severe spinal injuries, and with a compromised immune system).

Finally, it should be noted that the EisnerAmper Report also verified that there is evidence of significant work-product from the prior period, and that there were no significant payments made to KingCare for this work during the prior period, so the EisnerAmper Report also used the Fund Records to confirm that KingCare was owed deferred compensation from the prior period when I was sentenced. (In addition, it should be noted that, attached as Exhibits 11A-11F and discussed below under the separate claim that the government engaged in prosecutorial misconduct, is additional documentation of the deferral of compensation.)

After the plea hearing, when I expressed my wish to withdraw from the Plea Agreement in court, Ms. Fontier advised that the prosecutors sent a letter, advising that they would oppose "any motion" by the Defense to withdraw the guilty plea. This is confirmed by Ms. Fontier's letter, which advises (among other things): "The government has stated in a letter dated May 16, 2012, that they will oppose any motion to withdraw [the guilty plea]." (Ms. Fontier's Letter, p. 3.) (Exhibit 5) (This is also very significant, as I believe that Mr. Schachter discussed the basis of the Plea Agreement with AUSA Facciponti prior to the plea hearing, which is why Mr. Schachter removed this information from the scripted statements from the Plea Allocution, which suggests that both parties knew that my guilty plea was not entered knowingly, intelligently, and voluntarily when I pleaded guilty, and when I was sentenced, and that both parties tried to force me into keeping my guilty plea in place when it became clear that I pleaded guilty based on incorrect legal advice, and when it was clear that each party knew that no crimes were committed in this case when I was sentenced.)

In addition, it should also be noted that I was also advised that I would not be permitted to withdraw my guilty plea, and that the government would be permitted to proceed to sentencing on the charges identified in the third Superseding Indictment, and

that they would also be permitted to prosecute on the remaining charges in the previous Indictment, though Ms. Fontier could have provided the attached emails, which show that I pleaded guilty based on incorrect legal advice; that I was misadvised as to the nature of the offenses and as to the loss amount identified under the Plea Agreement; and that I was misadvised as to the elements of the offenses that the prosecutors would have to prove at trial (which they could not have proven at trial, as none of their accusations had actually occurred).

Moreover, it should also be noted that it was clear from the prosecution's submissions to the Court that the prosecutors realized that they did not have any evidence of a crime to present in court, and that they realized that they were prosecuting a civil case in criminal court. For example, though the government accused me of mail fraud, on this Count, the Government's Request to Charge states as follows: *"Furthermore, the mailed matter need not itself be fraudulent. For example, the mailed matter need not contain any fraudulent representations and indeed may be completely innocent."* (The Government's Requests to Charge, p. 35, emphasis added.) (This point is also very significant, as the government restrained and sold off my family's assets prior to trial, even though they knew that they did not have any evidence of a crime to present in court.)

In addition, the Government's Requests to Charge is also very significant, as the Defense continuously addressed this exact issue: namely, that the Indictment did not actually identify any criminal behavior; that the government was prosecuting an "embezzlement" that had not occurred; and that, if anything, this case would constitute a civil billing dispute, as the additional work was completed, as everything was transparent and fully disclosed in this case, and as the taxes were reported and paid, as advised by counsel and by KingCare's accounting firm.  (Again, it should also be noted that I do not think that there is actually a civil billing dispute in this case, as evidenced by KingCare's Counterclaims from the civil case, which are attached as Exhibit 1.)

In other words, this argument was already put before the Court during the proceedings, and the government denied its legitimacy, though they clearly knew that it was a valid "argument," as it was clear when the prosecution rested that the prosecutors did not have sufficient evidence in order to bring criminal charges in this case, as they did not have sufficient evidence in order to prove their accusations at trial (as their case was based on fraudulent accusations, as no embezzlement, tax crime, or mail fraud actually occurred in this case).  This was also clear, as the prosecutors turned to disputing the percentages listed in the EisnerAmper Report at the sentencing hearing, which showed that the prosecutors knowingly criminalized a civil billing dispute, and which showed that they brought charges in this case without having sufficient evidence in order to prove their case at trial.[37]

---

[37] To this effect, at the sentencing hearing, AUSA Facciponti stated: "I don't see, based upon these, how she can claim that 80 percent of Emily Prober's time was devoted to Local 147 special projects." (June 21, 2012 Sentencing Hearing Transcript, p. 47.)

Here, it is also significant to note that AUSA Hernandez essentially admitted in court prior to the sentencing hearing that the prosecutors did not want to have to prove that there was a loss amount in this case, and that they were using the tax evasion and mail fraud charges – which they also had no right to bring, as the prosecutors also did not have sufficient evidence in order to prove the tax evasion or mail fraud charges in court – in order to try to force me into entering into a Plea Agreement, so that I would admit to a loss amount in court, so that they could make a sensational case, and so that they would not have to prove their accusations at trial.[38]

To this effect, at the May 11, 2012 hearing, AUSA Hernandez stated:

> *If we are going to have a potentially lengthy Fatico about the loss amount, which is in essence the issue of criminal liability, because if we prove embezzlement and there is no dollar threshold, we have proven the crime under that circumstance, we wouldn't consent to that and we would say the proper remedy would be to tear up the agreement, and we would have a trial in which Ms. King's exposure would be decades in prison.[39]*

As this statement shows that the prosecutors wanted me to plead guilty and admit to a loss amount in court, which would relieve them of the burden of having to prove their case at trial; as it was clear when the prosecution rested that the prosecutors did not have sufficient evidence in order to bring criminal charges in this case, as they did not have sufficient evidence in order to prove their accusations at trial (as their case was based on fraudulent accusations, as no embezzlement, tax crime, or mail fraud actually occurred in this case); and as it is clear from this statement that the prosecutors added the tax evasion and mail fraud charges (which they also did not have sufficient evidence to prove in court), in order to try to force me into entering into a Plea Agreement, so that they would not have to prove their case at trial (as this increased the risk of choosing to proceed to trial); it is clear that the prosecutors intentionally (and willfully) abused their prosecutorial power by proceeding with this case, as AUSA Hernandez's statement shows that the prosecutors realized that they were abusing their prosecutorial power by proceeding with this case, as it was clear during the proceedings that the prosecutors did not have sufficient evidence in order to prove their accusations at trial (which they also demonstrated at the sentencing hearing, as they turned to disputing the percentages listed in the EisnerAmper Report at the sentencing hearing, which demonstrated in court that the prosecutors knowingly and willfully criminalized a civil billing dispute), and as it was clear that the prosecutors were intentionally stretching the evidence and the law in order to try to make a sensational case in court, as it was clear during the proceedings that no crimes were actually committed in this case, and as it was clear during the proceedings that the prosecutors had a legal and ethical obligation to acknowledge all of the exculpatory material that was put before them during this case, and to drop the charges,

---

[38] This is also supported by the prosecutor's assertions during the early meetings that I "better come in and take a plea deal."

[39] May 11, 2012 Transcript, p. 8.

as it was clear during the proceedings that the prosecutors knew that no embezzlement, tax crime, or mail fraud actually occurred in this case.[40]

To put this in a different way, it is clear from AUSA Hernandez's statement that the prosecutors didn't want anyone to call their bluff, as they did not have any actual evidence of a crime to present in court, as no crimes were committed in this case, which is really "outrageous," as the prosecutors had no right to bring this case in the first place, to devastate my life, to devastate my family, and to sell off my family's property prior to trial, as it was clear during the proceedings that the prosecutors did not have any evidence of a crime to present in court, and as it was clear during the proceedings that the prosecutors had no right to bring this case in the first place, as no crimes were actually committed in this case.

Similarly, in the sentencing submissions, instead of providing any evidence to · substantiate its claims, the prosecution argued that I did not deserve credit for acceptance of responsibility, as the EisnerAmper and Vasil Reports, which were submitted as attachments to my sentencing submissions, showed that the government's accusations were unfounded.  To this effect, in The Government's Sentencing Memorandum, AUSA Facciponti wrote:

> King also frivolously contests several basic and incontrovertible facts in the PSR. King denies engaging in any conduct to conceal her embezzlement. (Rev. Sent. Br. at 41-42). King continues to hold on to the fanciful notion that King Care LLC was an independent company owned and controlled by her parents rather than King's alter ego which she had complete and total control over. (Id. at 39). She denies personally owning most of the forfeited assets. (Id. at 30). King quarrels with the notion that she utilized different entities, such as partnerships, trusts, and other legal entities to conceal and perpetrate her crimes. (Id. at 43). Finally, King continues to cling to the absurd notion that none of the horses she bought were purchased with funds embezzled from Local 147. (Id. at 43- 44).[41]

Here, it is clear from this paragraph that the prosecutors knew that their case was legally insufficient during the proceedings, as this paragraph shows that the prosecutors did not have any evidence to support these accusations, as they argued that I had not accepted responsibility, instead of providing any evidence to substantiate their claims; as this paragraph shows that the prosecutors knew that the conduct described above was essential to the charges identified in each of the Indictments; as the attached documentation shows that the prosecutors intimidated members of my family from

---

[40] Though this is also discussed below, under the separate claim that the prosecutors engaged in prosecutorial misconduct, to cite an example, the prosecutors argued in court that the additional projects were "phantom projects," despite the fact that the prosecution removed much of this work from the KingCare office locations; despite the fact that the prosecution was responsible for producing much of these materials in discovery during the proceedings; and despite the fact that the EisnerAmper and Vasil Reports showed that the additional projects were completed by the company when I was sentenced.

[41] The Government's Sentencing Memorandum, p. 13.

coming forward to dispute the forfeiture of the properties (the government's Special Interrogatories are attached as Exhibit 13B, and are discussed below on pages 160 - 164, under the separate claim that the prosecutors engaged in prosecutorial misconduct); and as this paragraph shows that the prosecutors were intentionally stretching the evidence and the law in order to make a sensational case in court, as the truth, as identified in the Defense's submissions, is much more believable than the government's theory of this case, which they fabricated, as they wished to make a sensational case in court at my family's expense.

In addition, this was also clear during the proceedings, as the EisnerAmper and Vasil Reports, which were submitted to the Court prior to the sentencing hearing, used the original Fund Records and the original tax filings to confirm that there was no embezzlement, tax crime, or mail fraud in this case, as the additional work was completed, as directed by the Local 147 Trustees; as the Fund Professionals were aware of the additional costs, and as the Trustees had ratified the expenses going back for over twenty years; and as I had not engaged in any criminal conduct, as everything was reported, paid, and included in KingCare's books and records, as advised by counsel and by KingCare's accounting firm.

Further, it is also clear from DOL Agent Della Penna's comments, which he made on the day of my arrest, that the prosecutors realized that their case was legally insufficient during the proceedings, and that the prosecutors realized that they were stretching the evidence and the law in order to make a sensational case in court, as DOL Agent Della Penna stated that "there are a lot of innocent people in prison," and that, "once the jury hears horses, they will convict," and as DOL Agent Della Penna later stated (after realizing that the work was completed and after the prosecution was advised that KingCare was owed deferred compensation) that "even if [the defendant] didn't steal the money, [the defendant] stole the money."

Moreover, it is also clear from the government's Special Interrogatories, which are attached as Exhibit 13B, that the prosecutors intimidated members of my family from coming forward to dispute the forfeiture of the properties (that were also illegally restrained), so it is clear that the prosecutors realized that other people owned the entities and properties during the proceedings. (This is also discussed below, on pages 160 - 164, under the separate claim that the prosecutors engaged in prosecutorial misconduct.)

Finally, it is also significant to note that the Defense's position, as identified in my pre-trial motions, in my sentencing submissions, and in the EisnerAmper and Vasil Reports is much more believable than the theory fabricated by the government, and that it is clear from the prosecutors' language that they realized that they were stretching the evidence and the law in order to secure a conviction in this case, and in order to convict an innocent person, especially as it was clear that the prosecutors realized during the proceedings that nothing was "concealed," and that there were no "crimes" in this case. (On this point, it is also significant to note that there is also no tax benefit to the prosecution's accusations, as the Reports confirmed that entities were transparent and

reported, and that the income was properly reported by each entity, as advised by KingCare's tax attorney and by KingCare's accounting firm.)

Similarly, at the sentencing hearing, instead of presenting any evidence to support their accusations, the prosecution argued that I did not deserve credit for acceptance of responsibility. To this effect, at the sentencing hearing, AUSA Facciponti stated:

> *She says in her reply brief that there was an incredible rush to judgment. That is a statement a defense attorney makes to a jury in an opening statement at a trial. Not at sentencing where she has pled guilty. She maintained her innocence even while claiming to accept responsibility, that the government couldn't prove its case at trial. She said the government doesn't have proof beyond a reasonable doubt in her reply brief.*

> *She blames everyone other than herself for what happened: the Trustees, the Union, the accountants, the investment advisors, the collective bargaining partners. Her ex-husband, who has nothing to do with this case, gets thrown in the mud here. And the government.[42]*

Here, it should also be noted that I have also been advised that the IRS Agent admitted that the government's "investigation" consisted of information provided by my former husband, despite AUSA Facciponti's representations in court.[43]

---

[42] June 21, 2012 Sentencing Hearing Transcript, p. 36-37.

[43] On this point, I have been advised that both IRS Agent James Hughes and DOL Agent Joseph Della Penna gave interviews on a television show called "American Greed" (for an episode titled "Union Bu$ter/ The Fool's Gold," which aired on CNBC on April 11, 2013, and which can be viewed on iTunes, YouTube, Hulu, and Amazon, among other websites), and that they admitted on national television that their "investigation" consisted of information from my former husband, who still owes a substantial amount under the Divorce Agreement; that DOL Agent Della Penna stated that he knew that he had "a slam-dunk case" when he could trace all of the payments to the KingCare accounts, and when he was able to trace payments out of the KingCare accounts, which confirms that there was no criminal intent in this case, as this confirms that the payments were completely transparent, and that the prosecutors knew that this was, if anything, as civil case, as they brought charges without having clear evidence of wrongdoing; that the prosecution thought that there was an embezzlement in this case, as the payments were in round numbers (again this argument does not make sense, as the administrative expenses were transparent and audited; as the Department of Labor conducted various audits for the payments made to KingCare for the amounts in question; as the Benefit Funds were subject to extensive oversight, which makes the prosecution's case ridiculous on its face; as the amounts were used to be transparent upon audit; as the paid administrative expenses were to be reconciled on an annual basis; as KingCare was owed deferred compensation from the prior period; and as KingCare was not required to layout expenses for the additional services provided to Local 147 under the Administrative Agreements); and that the agents' interviews confirmed that many of the prosecutors' representations in court were fraudulent, as the prosecutors continuously stretched the evidence and the law in court, as they wished to make a sensational case in court, when it was clear during the proceedings that no embezzlement, tax crime, or mail fraud actually occurred in this case.

---

Concerning my former husband's involvement in this case, it was clearly extremely unethical for the prosecutors to have proceeded with this case based on my former husband's representations, as it is clear (also from the prosecution's own admission at the sentencing hearing) that my former husband should not have been involved in this case in the first place; as it is clear that my former husband could not have provided any valuable information, as he was not involved in our lives for many years prior to this accusation (which my former husband also admits in his blackmail letter, as he stated that he knew nothing about the company, and that he "[had] a right to know what [was] going on"); as his accusations were motivated by his wish to reduce his child support; as my former husband was responsible for incurring much of the expenses that he now says are not necessary, as (I believe) my former husband was the one who committed our daughter to both the Four Winds facility and to New York Hospital - not me - so these expenses were also determined to be necessary by my former husband, as he was the one who decided that she needed this additional care when she was committed to the medical facilities that he seems to be referring to, as he was the practicing psychologist and determined that was the best way to proceed at the time (though he later denied this and "pretended" as if she wasn't sick, in order to get out of the financial responsibilities, as well as his responsibilities as a father, especially as he later pushed for our daughter to be made a ward of the state, in order to be relieved of his legal and financial responsibilities, as evidenced by his blackmail letter), so it is ridiculous for him to now say that the medical care was not "necessary" or "appropriate," as he also determined that these expenses were necessary at the time; and as it was clear when I was arrested that the payments made to KingCare were transparent and that the work was completed, so it was clear that there were no crimes in this case, as the work was completed, as the payments were earned, as the business was reported like any other business, and as the taxes were reported and paid, as advised by counsel and by KingCare's accounting firm, so it was clear during the proceedings and when I was sentenced that no crimes were committed in this case.

In addition, it should be noted that, while I agree that my former husband should not have involved himself in this case, it is clear from the government's arguments in court and from the Court's articulation of the government's case at the sentencing hearing that my former husband's accusations are central to this case, as the government's arguments were basically taken directly from his accusations (including the accusation that the company did not earn the funds in order to legitimately pay the expenses, as he did not want to have to pay his share of the expenses as outlined in the Divorce Agreement, which he would not have to do, if the expenses were not legitimately paid).

Therefore, while I agree that my former husband should not be involved in this case, and while his original accusations may not have any bearing on whether I was ultimately guilty of the charges, the reality is that my former husband is very much

---

(It should also be noted that I have been advised that DOL Agent Della Penna did not admit that the KingCare accounts held an additional 26% during his interview, as identified in his Complaint, which exceeds the cost of the purchases listed in the Indictment, and which negates the government's theory that funds were embezzled to fund my "lavish lifestyle.")

involved in this case, that his accusations form the basis of the government's case (as the prosecutors brought charges in this case without having any evidence of wrongdoing), that his accusations simply never occurred, and that the Reports showed that I was actually innocent when I was sentenced; therefore, as I have a right to discredit the government's witnesses, as my former husband is a government witness, as he is very much responsible for the government's fraudulent theory in this case (as indicated by his blackmail letter), and as I have a right to contest the government's assertions regarding the "loss amount" that the prosecutors fraudulently pushed through in court, it seems that it should not be held against me to raise his involvement in this case and to refute his accusations, as I was told that it is important to be able to explain to a jury why the government made their original accusation; as I have a right to defend myself, especially given the terrible consequences of the fraudulent accusations put forth by the Local 147 Trustees, my former husband, and the prosecution in this case; and as my former husband's accusations simply never occurred, as his fictional theory of what occurred was "imagined" without any first-hand knowledge, which he also admits in his blackmail letter, and which is clear, as he did not know anything about the business, as he had not been involved in our lives for many years.

Further, it seems that this is especially true, as the prosecutors used my former husband's fictional accusations to justify improperly restraining and selling off my family's property (also prior to trial and without presenting any evidence of a crime or of criminal behavior in court), subjecting my family to extraordinary emotional pain, subjecting me to extraordinary emotional and physical pain, having me improperly convicted of two felonies, and having me unjustly imprisoned for approximately 22 months, so, it seems that, at the very least, if my former husband's representations allowed the prosecutors to bring this case (as it is clear from Mr. Kaplan's blackmail letter that he was also in contact with the Local 147 Trustees, as he sets a cut-off date, which, as I understand, is also when the Local 147 Trustees went to the Department of Labor with their fraudulent accusation), then it seems that I should be permitted to raise his involvement in court, as I deserve to have my name cleared, and as it should come out that the government's case is premised upon truly inappropriate and ridiculous representations, as there was no "George," just a company that completed an extraordinary amount of work (under unreasonable deadlines), and reported the income and paid the taxes, as advised by its accounting firm and by counsel.

It should also be noted that, contrary to my former husband's representations in his blackmail letter, he did not "lose" in Divorce Court. The divorce attorneys worked out the Divorce Agreement after many, many years of litigation, and after extensive legal analysis; in addition, my former husband's father was a very well-known philanthropist, who also served on many non-profit boards and committees, and was also contributing to our children's lifestyle each year, so it was agreed that his father would continue to pay these funds after the divorce, so that our children would be able to continue to live the same lifestyle after the divorce. Therefore, it is not that the funds were owed to me, but these funds were to be paid as child support (not as alimony) so that the expenses that were paid for our children would be reimbursed, so that our children could continue to

live the same lifestyle after the divorce, as they were able to before the divorce, which is how divorce law is applied.

It should also be noted that, while my former husband tries to paint this picture that I have a "spending problem" and that he doesn't have the funds to pay his child support, the accusation that I have a "spending problem" did not work in the past, as he caused many of the expenses to be incurred (e.g. he committed our daughter to the medical facilities that he now wishes to refer to as my expenses, and which he now wishes to categorize as unnecessary and inappropriate) and as most of the other expenses that were incurred were suggested by the experts in each field.

Further, it should also be noted that my former husband's blackmail letter admits that he inherited funds from his father's estate, and that he is currently hiding funds though his sister in order to get out of paying his child support. On this point, it should be noted that it is more than likely that my former husband is not being honest about the extent of the funds that he inherited in order to pay the child support that is owed, given that he lied about many similar "details" in divorce court many times, and then, when caught, tried to blame me in order to get out of the consequences, which led to the divorce attorneys insisting that we sign an agreement that did not have to be enforced in Divorce Court, but could be litigated as a commercial agreement, so that they would not have to go back to Divorce Court to refute his ridiculous and self-serving accusations, and so that they would not have to go back to Divorce Court in order for him to have to live up to his obligations under the Divorce Agreement.

Moreover, it should also be noted that, while it looks as if I'm blaming my former husband, this is truly unfortunate, as I tried for many, many, many years to protect my children from my former husband's destructive behavior and to find a way to excuse his actions so that my kids would not see him as "the bad parent," until my children finally to told me to stop protecting my former husband, as he has always found a way to cause harm to this family and to our children, and to take and to destroy the positive things that I have tried to incorporate into their lives. Still, despite everything, I never imagined that he could actually do this, as I have never been able to foresee his actions (as he has always gone far beyond what I could imagine), and which have always hurt me, hurt his children, and caused significant trouble, essentially so that he could get out of his obligations, and so that he could excuse his own behavior, without suffering any consequences and without having to accept any responsibility for his devastating actions.

It should also be noted that, as it is clear that the prosecutors realized during the proceedings that they could not have proven their case at trial, given that the original Fund Records and the original tax filings show that no embezzlement, tax crime, or mail fraud actually occurred in this case, and given that none of the experts were willing to stand by the prosecution's positions in court, as their positions were clearly contradicted by the actual evidence of this case, including the original Fund Records and the extensive work-product that was completed by KingCare (which was produced in discovery by the prosecution during the proceedings), it is clear that the prosecutors never should have pursued this case, as they did not have any actual evidence to present in court, as their

case was based on truly fraudulent and ridiculous accusations.

Therefore, my guilty plea was also not knowing and voluntary, as I was misadvised as to the elements of the offense that the prosecution would have had to prove at trial, and as is it clear that the government could not have proven their case if my case had proceeded to trial, as the prosecutors' accusations in this case simply never occurred.

6. As I pleaded guilty based on my court-appointed defense attorney's incorrect legal advice, and as I was actually innocent of the charges, there was no basis in fact for my guilty plea.

As my defense attorneys refused to file the motion to withdraw my guilty plea before the sentencing hearing, the loss amount in my sentencing submissions was argued using Mr. Schachter's incorrect legal advice, as this legal advice formed the basis of the Plea Agreement, as well as using information from the following case, which was incorporated in my pre-trial Motion to Dismiss, as my criminal defense attorneys were not available when my final sentencing submissions were due, which left me without a criminal attorney to write the arguments for my final sentencing submissions.[44]

As I did not have a criminal attorney to write the arguments for my final sentencing submissions, the following case, which was incorporated in my pre-trial motions, was used to write my sentencing submissions:

In US v. Goyal, the Ninth Circuit Court of Appeals reversed the defendant's convictions for securities fraud and making materially false statements to auditors, as they agreed that no jury could have found the defendant guilty beyond reasonable doubt based on the evidence the prosecution presented at trial.[45] The Court reversed the defendant's convictions where: (1) because defendant's jury had no competent evidence of materiality before it, it could not have properly convicted him on any of the securities counts; (2) no evidence supported a finding that defendant knew that his company's subsidiary's commitments violated GAAP; and (3) there was no proof that defendant willfully concealed buy-in letters.[46]

Specifically, the following opinion was used to write my sentencing submissions, as my court-appointed defense attorneys refused to file the motion to withdraw my guilty plea prior to the sentencing hearing; as my criminal attorneys were not available when my final sentencing submissions were due, which essentially left me without a criminal attorney to write the arguments for my sentencing submissions; and as this case was also an example of a case where the prosecutors overreached, as it was clear that the prosecutors knew during the proceedings that no crimes were actually committed in this case, and as the prosecutors turned to disputing the percentages listed in the EisnerAmper Report at the sentencing hearing, which demonstrated in court that the prosecutors

---

[44] Ms. Fontier was working on a case in Somalia, and Mr. Handwerker was on trial at the time.

[45] United States v. Goyal, 9th Cir., No. 08-10436, 12/10/10.

[46] United States v. Goyal, 9th Cir., No. 08-10436, 12/10/10.