5. The petitioner's claims of ineffective assistance of counsel have merit as they are adequately supported by facts and by law.

In its response, the government advances numerous arguments regarding the validity of the petitioner's court-appointed defense attorneys' legal advice and the validity of the petitioner's court-appointed defense attorneys' legal strategy. These arguments are meritless, as discussed below.

First, the government argues that the petitioner's claims of ineffective assistance of counsel should be rejected for the following reasons: (1) the petitioner "cannot satisfy the standard for ineffective assistance of counsel because she cannot demonstrate any prejudice stemming from defense counsel's alleged failure adequately to investigate her case"; (2) the petitioner "does not allege in her Declaration that defense counsel failed adequately to investigate her case," as this point was "merely [argued]" in her brief; (3) the petitioner "fails to make out a claim that her attorney's performance was constitutionally defective or that she was prejudiced thereby" because the petitioner's claims are "conclusory" and "patently incredible"; and (4) the petitioner "does not provide any factual support for the notion that she would have been willing to forego the relative certainty that the Plea Agreement provided in favor of facing trial on fifteen additional counts of money laundering and tax evasion." (See The government's response, p. 22.)

Regarding the government's first argument that the petitioner "cannot satisfy the standard for ineffective assistance of counsel because she cannot demonstrate any prejudice stemming from defense counsel's alleged failure adequately to investigate her case," it should be noted that the petitioner has established both "deficient performance" and "prejudice," as discussed in The petitioner's motion (p. 60-138), and as discussed below.

First, regarding Mr. Schachter's failure to conduct an adequate investigate in this case, in her motion, the petitioner states as follows:

1. I was denied the effective assistance of counsel because my court-appointed defense attorney failed to conduct an adequate investigation of the facts and of the evidence of my case prior to arranging a Plea Agreement with the government.

After the Court appointed Mr. Schachter to defend my case, I told Mr. Schachter many times (which a proper review of the records would have confirmed) that no embezzlement actually occurred in this case; that the Local 147 Trustees requested the additional services; that KingCare completed the additional work; that the payments were transparent and fully disclosed; that the administrative expenses were audited; and that the administrative expenses were deferred.

In addition, I also told Mr. Schachter (either directly or in essence) that he needed to understand the Administrative Agreements, the Fund Records, and the narrative of events in order to truly understand this case, and that, without taking the time

to do so, I was afraid he would lead me down the road to conviction.

Mr. Schachter would not spend the time to understand the details of this case, and, in the end, that is exactly what happened: he led me down the road to conviction.

Though I was very, very sick throughout the criminal proceedings, I asked Mr. Schachter on several occasions to review the defense materials with me so that I could demonstrate to him that no embezzlement had actually occurred in this case. When it became clear that Mr. Schachter would not take the time to review these materials with me, I even offered to make a presentation in order to demonstrate that I was actually innocent of the charges. In response, though Mr. Schachter called several "strategy meetings," he never permitted our conversations to go very far, and always returned to the subject of arranging a Plea Agreement with the government before I could go through the defense materials, including the original Fund Records, which demonstrate that no embezzlement actually occurred in this case.[20]

In addition, during these "strategy meetings," Mr. Schachter also openly referred to my defense as a "large pro bono account" and as a "drain on his firm." He also told me that the Court was "sick of [my] case"; that he would use my case to "train" the less experienced attorneys who were assigned to my case; and that I would have a 95% chance of being convicted at trial under the circumstances.

In addition, I often felt as if Mr. Schachter was intentionally trying to make our conversations very difficult, in order to push me towards entering into a Plea Agreement with the government (against my wishes). For example, when I stated that I was concerned for my safety and for the safety of my family, as I had received several threats, Mr. Schachter told me that if I was really afraid, then I should plead guilty, as I would no longer be in any danger.

This rushed and unconcerned approach to my case also extended to the meetings that were supposed to be reserved for reviewing the defense materials. For example, during one of the meetings, prior to stepping out of the room, Mr. Schachter reminded several of the younger attorneys who were assigned to my case "not to be nice to [me]" in his absence. This is significant, as it is indicative of Mr. Schachter's approach to my case, as Mr. Schachter acted as a prosecutor, rather than as my defense attorney, and as it was clear that he wished to "put this mater behind him" as soon as possible, regardless of the impact on my defense.[21]

---

[20] This is also confirmed by the EisnerAmper Report, which was submitted to the Court prior to the sentencing hearing, and which used and attached the original Fund Records in order to demonstrate that no crimes were committed in this case.

[21] Here, it should be noted that it is clear from the nature of the payments in this case (as they were transparent and fully disclosed) and from the Fund Records (which show that the Trustees' civil Complaint was fraudulent) that my case was defensible, as

In addition, though several younger attorneys (who, as far as I'm aware, were either less experienced in criminal law or had no prior experience in criminal law) were assigned to my case, the younger attorneys reviewed the defense materials before they had reviewed the Fund Records with me, and before they asked any of the proper and necessary questions, which made it impossible for them to conduct a meaningful review of the defense materials on their own (in addition to the fact that, as far as I'm aware, they were inexperienced in criminal law, so they also had little prior experience with this type of litigation).

This also includes the Local 147 Benefit Funds' Certified Financial Statements, which Mr. Gise had trouble analyzing before the plea hearing, as he never reviewed the expenses with me prior to the plea hearing, so he could not identify where the expenses were listed on the Funds' Certified Financial Statements. Here, it should also be noted that, though I repeatedly told Mr. Gise that everything was transparent (which a proper review of the records would have confirmed) and that the payments made to KingCare were reflected on the Funds' Certified Financial Statements, Mr. Gise refused to listen to me on this point. Instead, he repeatedly asserted that the Funds' Certified Financial Statements did not reflect all of the payments made to KingCare. He also made me feel as if I were crazy, or as if I were being unreasonable, and stated that "[I] may not like [his] math skills, but that [was] the reality." Despite the fact that this issue was not resolved (at least as far as I was concerned), Mr. Gise would not properly address this issue with me before the plea hearing.

After I pleaded guilty, Mr. Schachter told me that Mr. Ronald Richmond, the Local 147 Trustees' civil attorney, was his "good friend," and that I should go over and "tell them" why the payments are not reflected on the Funds' Certified Financial Statements. I was then finally able to review the expenses with Mr. Gise, and it then became clear to Mr. Gise that the expenses are listed on the Fund's Certified Financial Statements.[22] After Mr. Gise and Mr. Schachter realized that the expenses were listed on the Funds' Certified Financial Statements, Mr. Schachter told me that he "[didn't] know how [I was] going to

---

no embezzlement, tax crime, or mail fraud actually occurred in this case.

[22] Here, it should be noted that it would have been clear to Mr. Gise that the expenses were reflected on the Local 147 Benefit Funds' Certified Financial Statements if he had taken the time to properly review the expenses with me, as neither KingCare nor I had the accounting knowledge to prepare Certified Financial Statements for the Funds – the knowledge that was important was of the expenses and of the payments that were made to KingCare. (Here, it should also be noted that the books and records were certified and prepared by Local 147's CPA and field auditors, who were also the Union accountants and the accountants for the Welfare Fund, and who were hired by and reported to the full Board of Trustees.) Therefore, had Mr. Gise reviewed the expenses with me prior to the sentencing hearing, this would have made it easy for him to recognize where the expenses are listed on the Funds' Certified Financial Statements.

get [my] plea back."[23]

Here, it should also be noted that Mr. Gise's refusal to investigate the possibility that the expenses were listed on the Funds' Certified Financial Statements was in keeping with their actions throughout the time that Mr. Schachter and Mr. Gise worked on my defense, as Mr. Schachter also repeatedly failed to remember key elements of the case, especially concerning the descriptions of the extensive work-product that was completed by KingCare, and as Mr. Schachter demonstrated on many occasions that he was not interested in involving himself in the details of my case, though I often desperately tried to communicate the facts of this case to him.

...

Therefore, it is clear that Mr. Schachter had not conducted an adequate investigation in this case prior to arranging a Plea Agreement with the government, and further, it is clear that Mr. Schachter's failure to investigate the facts and the evidence of my case (including his failure to obtain expert witness reports) ultimately caused tremendous harm to my defense, as the EisnerAmper and Vasil Reports (which were submitted to the Court prior to the sentencing hearing) later confirmed my representations that no embezzlement, tax crime, or mail fraud had occurred in this case; that KingCare completed the additional work at the direction of the Local 147 Trustees; and that the income was reported on the original tax filings, and that taxes were reported and paid, in accordance with the advice of KingCare's accounting firm and of the tax attorney who advised on the original tax filings.

...

Therefore, had Mr. Schachter conducted an adequate investigation, and had Mr. Schachter obtained expert witness reports to verify the facts of the case, the reports would have shown that my case was defensible, as no embezzlement, tax crime, or mail fraud actually occurred in this case, and by extension, that the Plea Agreement was only beneficial to the government, as the prosecution could not have proven its case at trial, as there was insufficient evidence to support the convictions when the prosecution rested, as no embezzlement had actually occurred (and as it was clear that the prosecutors knew during the proceedings

---

[23] Therefore, I was also denied the effective assistance of counsel, as Mr. Gise and Mr. Schachter should have reviewed the records with me and asked the proper questions prior to the plea hearing, which would have given them sufficient information in order to realize that no crimes were actually committed in this case. (As discussed below, it should also be noted that I believe that Mr. Schachter and Mr. Gise did not wish to know of the possible defenses in this case prior to the plea hearing, as they wished to arrange a Plea Agreement with the prosecutors, as they wished to "put this matter behind them" as soon as possible.)

that no embezzlement, tax crime, or mail fraud actually occurred in this case).

Therefore, I was denied the effective assistance of counsel, as my court-appointed defense attorney's performance was deficient, as Mr. Schachter made tactical decisions on my case before having collected sufficient knowledge of the facts and of the evidence of my case in order to be able to justify his tactical decisions (e.g. as Mr. Schachter later advised that he "[didn't] know how [I was] going to get [my] plea back"), and in order to actually make any well-informed tactical decisions on my case (e.g. as my case should have proceeded to trial, as my case was defensible). In addition, it is also clear that these errors fall below an objective standard of reasonableness for attorneys, as Mr. Schachter advised me to plead guilty before he had conducted an adequate investigation of the facts and of the evidence of my case; without obtaining any expert witness reports to verify the facts of my case; without contacting KingCare's attorneys from the civil case; and after he had stopped contacting the tax attorney who advised on the original tax filings (who also could have confirmed his original legal advice), most likely as he wished to arrange a Plea Agreement with the prosecution so that he could "put this matter behind him" as soon as possible.

Therefore, there is a reasonable probability that, but for Mr. Schachter's unprofessional errors, the outcome of the proceedings would have been different, as the EisnerAmper and Vasil Reports, which were submitted to the Court after Mr. Schachter was relieved as counsel, later confirmed that there was no embezzlement, tax crime, or mail fraud in this case, and as it would have been clear to Mr. Schachter that he should not have advised me to plead guilty (also based on incorrect legal advice) as I was actually innocent of the charges; as my case was clearly defensible, as no crimes were committed in this case; and as there was insufficient evidence to support the convictions when the prosecution rested, and when I was sentenced; had Mr. Schachter conducted an adequate investigation of the facts of and of the evidence of my case, and had Mr. Schachter obtained expert witness reports to verify the facts of my case prior to arranging a Plea Agreement with the government.

(The petitioner's motion, p. 60-66.)

Therefore, it is clear, as outlined above, that Mr. Schachter's failure to conduct an adequate investigation in this case prior to advising the petitioner to plead guilty constitutes deficient performance, as his "representation fell below an objective standard of reasonableness." See Hill v. Lockhart, 474 U.S. 57 (quoting Strickland v. Washington, 466 U.S. 688 (1984)).

Further, it is also clear that the petitioner has established prejudice, as it is clear that Mr. Schachter should not have advised the petitioner to plead guilty (also based on fraudulent legal advice), and as it is clear that Mr. Schachter would not have advised the petitioner to plead guilty, had he conducted an adequate investigation in this case, as the payments were listed the Local 147 Benefit Funds' Certified Financial Statements, which shows that the payments were transparent and fully disclosed, and that there was no

embezzlement, tax crime, or mail fraud in this case. See Hill v. Lockhart, 474 U.S. 52 (1985), in which the Supreme Court stated that:

> [Where] the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea.[24]

Further, in Hill v. Lockhart, 474 U.S. 52 (1985), the Supreme Court stated that "[in] the context of a guilty plea, a petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."

On this point, as the petitioner understands, this would apply to both the petitioner's court-appointed defense attorneys failure to investigate, as this caused Mr. Schachter to provide legal advice based on an incorrect understanding of the petitioner's case, and as Mr. Schachter then provided fraudulent legal advice in order to coerce the petitioner into pleading guilty (as he had not conducted an adequate investigation in this case), as the petitioner refused to plead guilty to the government's original accusations, as they never occurred. (See The petitioner's motion, p. 6-58 and p. 60-138.)

Further, it is also clear that the petitioner's case should have proceeded to trial, as Mr. Schachter advised the petitioner to plead guilty based on fraudulent legal advice; as she was actually innocent of the charges; as the government demonstrated at the sentencing hearing that they knowingly criminalized a civil billing dispute; and as the petitioner's case would have been dismissed when the government rested, as there was insufficient evidence to support the convictions when she was sentenced, as verified by the case law that was used to write the petitioner's sentencing submissions, and which was incorporated in the petitioner's pre-trial Motion to Dismiss. (See The petitioner's motion, p. 6-58.)

In addition, though the government also argues that "a particular decision not to investigate must be [afforded]…a heavy measure of deference," on this point, it should be noted that attorneys only "have considerable latitude to make strategic decisions about what investigations to conduct *once they have gathered sufficient evidence upon which to base their tactical choices*." See Jennings v. Woodford, 290 F.3d 1006 (9th Cir. 2002) (emphasis in original).

Specifically, this was addressed in the petitioner's motion, as the petitioner wrote:

Therefore, I was denied the effective assistance of counsel, as my court-appointed defense attorney's performance was deficient, as Mr. Schachter made tactical decisions on my case before having collected sufficient knowledge of the facts and of the evidence of my case in order to be able to justify his tactical decisions

---

[24] Hill v. Lockhart, 474 U.S. 52 (1985).

46

(e.g. as Mr. Schachter later advised that he "[didn't] know how [I was] going to get [my] plea back"), and in order to actually make any well-informed tactical decisions on my case (e.g. as my case should have proceeded to trial, as my case was defensible). In addition, it is also clear that these errors fall below an objective standard of reasonableness for attorneys, as Mr. Schachter advised me to plead guilty before he had conducted an adequate investigation of the facts and of the evidence of my case; without obtaining any expert witness reports to verify the facts of my case; without contacting KingCare's attorneys from the civil case; and after he had stopped contacting the tax attorney who advised on the original tax filings (who also could have confirmed his original legal advice), most likely as he wished to arrange a Plea Agreement with the prosecution so that he could "put this matter behind him" as soon as possible.

(The petitioner's motion, p. 66.)

Moreover, in Jennings v. Woodford, the Court "concluded that counsel's inaction could not be viewed as "strategic" where he "failed to conduct even the minimal investigation that would have enabled him to come to an informed decision." " Id. In addition, the Court stated that the test "[is] not to determine whether it is possible to find a worse attorney, but whether a particular defendant received representation sufficient to satisfy the Sixth Amendment," and further, stated that "[t]he fact that there are worse attorneys in the world does not change a bad attorney's lack of diligence into a tactical choice." Id.

Specifically, this was addressed in the petitioner's motion, as the petitioner wrote:

Therefore, there is a reasonable probability that, but for Mr. Schachter's unprofessional errors, the outcome of the proceedings would have been different, as the EisnerAmper and Vasil Reports, which were submitted to the Court after Mr. Schachter was relieved as counsel, later confirmed that there was no embezzlement, tax crime, or mail fraud in this case, and as it would have been clear to Mr. Schachter that he should not have advised me to plead guilty (also based on incorrect legal advice) as I was actually innocent of the charges; as my case was clearly defensible, as no crimes were committed in this case; and as there was insufficient evidence to support the convictions when the prosecution rested, and when I was sentenced; had Mr. Schachter conducted an adequate investigation of the facts of and of the evidence of my case, and had Mr. Schachter obtained expert witness reports to verify the facts of my case prior to arranging a Plea Agreement with the government.

(See The petitioner's motion, p. 66.)

Therefore, because Mr. Schachter advised the petitioner to plead guilty based on fraudulent legal advice, before conducting an adequate investigation, and because an adequate investigation would have led him to a more reasoned tactical choice, as it later became clear that the petitioner's case was defensible, as there were no crimes in this case, and that the Plea Agreement was only beneficial to the government, as the

prosecutors could not have proven their case at trial, it is clear that Mr. Schachter's performance was deficient. See <u>Jennings v. Woodford</u>, 290 F.3d 1006 (9th Cir. 2002).

Further, it is clear that Mr. Schachter's deficient performance prejudiced the petitioner, as Mr. Schachter's failure to conduct an adequate investigation caused the petitioner to enter a plea of guilty based on fraudulent legal advice, when her case was clearly defensible, especially as Mr. Schachter, himself, later stated that he "[didn't] know how [the petitioner was] going to get [her] plea back" when he realized that the payments were listed on the Funds' Certified Financial Statements; as Mr. Schachter later interfered in the petitioner's defense in order to prevent the petitioner from filing a motion to withdraw her invalid guilty plea, which would have included the emails that prove that the petitioner pleaded guilty based on his fraudulent legal advice; as the petitioner's case should have dismissed when the government rested, as the EisnerAmper and Vasil Reports verified prior to the sentencing hearing that there was no basis in fact for the convictions; as there was insufficient evidence to support the convictions when the government rested, as the prosecutors brought charges in this case without having sufficient evidence in order to prove their accusations at trial; as the government demonstrated at the sentencing hearing that they knowingly criminalized a civil billing dispute; and as the petitioner is actually innocent of the charges, as no crimes were committed in this case. (See <u>The petitioner's motion</u>, p. 6-58.)

Regarding the government's second point, though the petitioner attached numerous emails to her motion, which confirm that she pleaded guilty based on fraudulent legal advice (see <u>The petitioner's motion</u>, p. 6-58); though the petitioner's motion is approximately 290 pages long; and though the petitioner's motion is a pro se filing; the petitioner has attached an additional declaration to this Reply and Memorandum of Points and Authorities in order to resolve this issue. (See Exhibit 1.) Therefore, this point is moot.

Regarding the government's third argument that, in her motion, the petitioner "fails to make out a claim that her attorney's performance was constitutionally defective or that she was prejudiced thereby" because the petitioner's claims are "conclusory" and "patently incredible," on these points, the government is incorrect, as discussed below.

On this point, in <u>Frazer v. United States</u>, 18 F.3d 778, 783 (9th Cir, 1994), the petitioner alleged that his court-appointed defense attorney called him a "stupid [n*****] son of a bitch and said he hopes I get life. And if I continue to insist on going to trial I will find him to be very ineffective." In addition, the petitioner alleged that "his appointed trial attorney refused to collect information that would have been helpful in mitigating his sentence." <u>Id.</u>

Similarly, in this case, the petitioner's court-appointed defense attorney made the following statements while attempting to coerce the petitioner into pleading guilty based on fraudulent legal advice, which demonstrate that he did not act "in the role of an

advocate":[25] (1) during one of the early "strategy meetings," Mr. Schachter openly referred to the petitioner's defense as a "large pro bono account" and as a "drain on his firm"; (2) Mr. Schachter told the petitioner that the Court was "sick of [her] case," that he would use her case to "train" the less experienced attorneys who were assigned to her case, and that she would have a 95% chance of being convicted at trial under the circumstances; (3) when the petitioner stated that she was concerned for her safety and for the safety of her family, as she had received several threats, Mr. Schachter told her that if she was really afraid, then she should plead guilty, as she would no longer be in any danger; (4) during one of the meetings, prior to stepping out of the room, Mr. Schachter reminded several of the less experienced attorneys who were assigned to her case "[not to] be nice to [her]" in his absence; and (5) Mr. Schachter stated at the plea hearing that the petitioner wished to "put this matter behind [her]," when the petitioner had never expressed this sentiment, and when he was the only individual who had expressed this sentiment at that time. (See The petitioner's motion, p. 6-58.)

Further, as addressed above, Mr. Schachter also refused to conduct an adequate investigation in the petitioner's case. To this effect, the petitioner's motion states as follows:

> Though I was very, very sick throughout the criminal proceedings, I asked Mr. Schachter on several occasions to review the defense materials with me so that I could demonstrate to him that no embezzlement actually occurred in this case. When it became clear that Mr. Schachter would not take the time to review these materials with me, I even offered to make a presentation in order to demonstrate that I was actually innocent of the charges. In response, though Mr. Schachter called several "strategy meetings," he never permitted our conversations to go very far, and always returned to the subject of arranging a Plea Agreement with the government before I could go through the defense materials, including the original Fund Records, which show that no embezzlement occurred in this case.

(The petitioner's motion, p. 12 and p. 60.)

As established in the petitioner's motion, in the end, Mr. Schachter ultimately advised the petitioner to plead guilty based on fraudulent legal advice, without obtaining expert witness reports to verify the facts of her case, without contacting KingCare's civil attorneys from the civil case, and after he had stopped contacting the tax expert who had advised on the original tax filings (who also could have confirmed his original advice).

(It should be noted that the petitioner's motion fully explains Mr. Schachter conduct, and that, for the sake of brevity, this information is not fully repeated here. See the petitioner's motion, p. 6-58 and p. 60-138.)

In addition, in Frazer v. United States, the Court found that the petitioner's attorney's conduct was "irreconcilable with the duty of loyalty and the responsibility of

---

[25] See Frazer v. United States, quoting United States v. Cronic, 466 U.S. 648 (1984).

providing meaningful assistance," and determined that prejudice should be presumed, as "certain circumstances are so egregiously prejudicial that ineffective assistance of counsel will be presumed."" See Frazer v. United States, quoting Swanson, 943 F.2d 1070 (9th Cir, 1991) (among other cases). The Court also found specifically that the magistrate judge's statement that the petitioner's "allegations are "conclusory" and "unsupported by any facts" is manifestly erroneous, as is the government's argument in its brief that Mr. Frazer's claims are "mere folderol."" Id. Moreover, the Court found that "[t]o hold otherwise in this case would reduce a sacred right to worse than a sham." Id.

It should also be noted that the petitioner's representations are clearly not "patently incredible," first, since they actually happened, and second, since they are supported by evidence, including the attached emails, the attached declarations, and the transcript of the plea hearing, which shows that Mr. Schachter lied to his client (as he could have requested an extension of time, as he lied about the basis of the Plea Agreement, and as the petitioner was not competent to plead guilty at that time, contrary to his representations in court), and that both Mr. Schachter and AUSA Facciponti lied in court (regarding the basis of the plea, regarding the fact that the petitioner's case was defensible, and regarding the strength of the government's case, as there was insufficient evidence to support the convictions when the petitioner was sentenced).

Therefore, it is clear that the petitioner was constructively denied the effective assistance of counsel guaranteed by the Sixth Amendment, and therefore, that prejudice should be presumed. (See The petitioner's motion, p. 60-138.) "To hold otherwise in this case would reduce a sacred right to worse than a sham." See Frazer v. United States, 18 F.3d 778, 783 (9th Cir.1994).

In addition, it should also be noted that the petitioner's court-appointed defense attorney also wrote in an email to the petitioner stating that, in his opinion, "any expert in the duties of a fund administrator would convict [her] through his testimony." (See The petitioner's motion, p. 17.) On this point, while Mr. Schachter named two specific reasons for making this assertion – that the petitioner would be convicted because KingCare "[used] fund assets for union expenses," which the petitioner did not know the fund professionals couldn't authorize under ERISA, and as Mr. Schachter argued that KingCare "[took] fees with no invoices and no records which show exactly what is owed," when this is not how the contract between KingCare and Local 147 worked, as KingCare was not required to lay out expenses for the additional projects demanded by the Local 147 Trustees – it should be noted that this email is additional evidence of Mr. Schachter's numerous conflicts, as "an attorney who is burdened by a conflict between his client's interests and his own sympathies to the prosecution's position is considerably worse than an attorney with loyalty to other defendants, because the interests of the state and the defendant are necessarily in opposition." See Frazer v. United States, 18 F.3d 778, 783 (9th Cir.1994).

Therefore, it is clear that Mr. Schachter labored under numerous conflicts, as he referred to the petitioner's defense as a "large pro bono account," and as a "drain on his firm"; as Mr. Schachter was clearly sympathetic to the government's case, despite his inability to identify any criminal conduct on the petitioner's part; and as Mr. Schachter

advised the petitioner to plead guilty based on fraudulent legal advice, and then realized that the payments were listed on the Funds' certified financial statements, so it was clear that the petitioner's case was defensible, as no crimes were committed in this case. (See The petitioner's motion, p. 6-58.)

Regarding the government's fourth point, it is clear that the petitioner would have chosen to proceed to trial, had she known that Mr. Schachter's legal advice was fraudulent, for the following reasons: (1) the petitioner relieved Mr. Schachter as counsel prior to the sentencing hearing, after realizing that Mr. Schachter had provided fraudulent legal advice in order to coerce the petitioner into pleading guilty, as he had not conducted an adequate investigation of the facts and of the evidence of the petitioner's case, and as he wished to "put this matter behind [him]" at that time, as he had stated that the petitioner's case was a "large pro bono account" and a "drain on [his] firm."; (2) it is clear from the emails between the petitioner and her attorneys that the petitioner repeatedly returned to the idea of withdrawing her plea, as it was based on fraudulent legal advice, and as the petitioner was preparing to be sentenced for a crime that she did not commit, and for a crime that did not and could not have happened; (3) the petitioner's sentencing submissions argued the loss amount based on Mr. Schachter's fraudulent legal advice, as this was the only loss amount that she was going to agree to; and (4) the petitioner told her first court-appointed defense attorney that she could not plead guilty to the embezzlement and tax charges that Mr. Schachter ultimately tricked her into pleading guilty to, so it is clear that the petitioner's only option would have been to proceed to trial. (See The petitioner's motion, p. 6-58 and p. 60-138.)

(It should also be noted that this point is further addressed in the petitioner's motion, which establishes that her guilty plea was not entered knowingly, intelligently and voluntarily, and that the petitioner was denied the effective assistance of counsel guaranteed by the Sixth Amendment. See The petitioner's motion, p. 6-58 and p. 60-138, respectively.)

Therefore, while the petitioner maintains that the government had a legal and an ethical obligation to drop the charges, and while the petitioner maintains that she is actually innocent and that this case is a conspiracy and a fraud upon the court, if the petitioner's choice was between pleading guilty to crimes that never occurred or proceeding to trial, it is clear from the facts and evidence presented by the petitioner that the petitioner would have chosen to proceed to trial, had Mr. Schachter's provided competent legal advice. See Hill v. Lockhart, 474 U.S. 52 (1985), in which the Supreme Court stated that, for a claim of ineffective assistance of counsel, "[in] the context of a guilty plea, a petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."

Further, it should be noted that it is clear that the petitioner would have chosen to proceed to trial, as she was actually innocent of the charges; as the government demonstrated at the sentencing hearing that they knowingly criminalized a civil billing dispute; and as the petitioner's case would have been dismissed when the government

rested, as there was insufficient evidence to support the convictions when she was sentenced, as verified by the case law that was used to write the petitioner's sentencing submissions, and which was incorporated in the petitioner's pre-trial Motion to Dismiss. (See The petitioner's motion, p. 6-58 and p. 60-138.)

The government also argues that the petitioner's claims of ineffective assistance of counsel should be denied because the "[petitioner's] claim that she would have proceeded to trial had defense counsel further investigated the case contradicts the record" for the following reasons: (1) "the Plea Agreement awarded the petitioner a three-level reduction for acceptance of responsibility"; (2) "the Plea Agreement enabled [the petitioner] to plead guilty solely to the two-count Information, rather than risk a high likelihood of conviction on fifteen additional counts of money laundering and tax evasion"; (3) the petitioner discussed with her court-appointed defense attorney "that she 'was not capable of proceeding to trial at that point' "; and (4) the government "offered [the petitioner the opportunity to abandon her plea agreement and proceed to trial," and that the petitioner "declined, chose to abide by her plea agreement, and agreed to acknowledge, at sentencing, that she had embezzled at least $7 million." (The government's response, p. 22-23.) As discussed below, the government's points are meritless.

Regarding the government's first point that "the Plea Agreement awarded the petitioner a three-level reduction for acceptance of responsibility," this point is clearly meritless, given that the petitioner never received credit for acceptance responsibility, as the government argued at the sentencing hearing that the petitioner had not accepted responsibility, as the petitioner's sentencing submissions argued the loss amount based on Mr. Schachter's fraudulent legal advice, which formed the basis of the Plea Agreement. (See The petitioner's motion, p. 6-58.)

Regarding the government's second argument that "the Plea Agreement enabled [the petitioner] to plead guilty solely to the two-count Information, rather than risk a high likelihood of conviction on fifteen additional counts of money laundering and tax evasion," it should be noted that, as outlined in The petitioner's motion, the petitioner's case should have dismissed when the government rested, as the EisnerAmper and Vasil Reports verified prior to the sentencing hearing that there was no basis in fact for the convictions; as there was insufficient evidence to support the convictions when the government rested, as the prosecutors brought charges in this case without having sufficient evidence in order to prove their accusations at trial; as the government demonstrated at the sentencing hearing that they knowingly criminalized a civil billing dispute; and as the petitioner is actually innocent of the charges, as no crimes were committed in this case. (See The petitioner's motion, p. 1-290.)

Regarding the government's third point, again, while the petitioner maintains that the government had a legal and an ethical obligation to dismiss the charges, and while the petitioner maintains that she is actually innocent and that this case is a conspiracy and a fraud upon the court, if the petitioner's choice was between pleading guilty or proceeding to trial, it is clear from the facts and evidence presented by the petitioner that the

petitioner would have chosen to proceed to trial, had Mr. Schachter's provided competent legal advice.

Further, it should be noted that, as the petitioner understands, the standard for being competent to plead guilty is the same as the standard for being competent to proceed to trial. See Godinez v. Moran, 509 U.S. 389 (1993), in which the Supreme Court stated that "[t]he competency standard for pleading guilty or waiving the right to counsel is the same as the competency standard for standing trial." Therefore, the government's position that the petitioner wouldn't have chosen to proceed to trial because she had discussed with her court-appointed defense attorney that she "was not capable of proceeding to trial at that point," but that the petitioner was simultaneously able to plead guilty because she had stated that she was "prepared to proceed with her guilty plea," is untenable. (See The government's response, p. 23.)[26]

Regarding the government's fourth point that the government "offered [the petitioner the opportunity to abandon her plea agreement and proceed to trial," it should be noted that the government's "offer" was really more of a "threat," as the prosecution needed the petitioner to plead guilty, as it could not prove its case (or a loss amount) at trial. (See The government's response, p. 23.)

To this effect, at the May 11, 2012 hearing, AUSA Hernandez stated:

*If we are going to have a potentially lengthy Fatico about the loss amount, which is in essence the issue of criminal liability, because if we prove embezzlement and there is no dollar threshold, we have proven the crime under that circumstance, we wouldn't consent to that and we would say the proper remedy would be to tear up the agreement, and we would have a trial in which Ms. King's exposure would be decades in prison.*[27] (May 11, 2012 Transcript, p. 8.)

---

[26] It should be noted that this supports the petitioner's position, as the petitioner repeatedly asked her attorneys if they could ask for an extension of time prior to the plea hearing, as the petitioner was not well throughout this time, but was advised that each time that her health was not a valid reason to ask for an extension; that it was not possible to obtain additional extensions; that she "must understand that [she would] not receive any more time"; that the Court "[was] sick of [her] case"; and that "the time we have, is the time we have." (See the petitioner's motion, p. 6-58.)

[27] This statement shows that the prosecutors did not want to have to prove that there was a loss amount in court in this case, and that they were using the tax evasion and mail fraud charges – which they also had no right to bring, as the prosecutors also did not have sufficient evidence in order to prove the tax evasion or mail fraud charges in court, as no crimes were committed in this case – in order to try to force the petitioner into entering into a Plea Agreement, so that the petitioner would admit to a loss amount in court, so that they could make a sensational case, and so that they would not have to prove their accusations at trial.

Further, it should also be noted that The Government's Request to Charge also

Further, as demonstrated by Ms. Fontier's letter, dated May 18, 2012, the government later rescinded this offer, and stated that they would oppose "any motion by the defendant to withdraw the guilty plea." (See The petitioner's motion, Exhibit 5.) Moreover, it should be noted that the petitioner wished for her attorneys to withdraw her guilty plea, but that her defense attorneys refused to do so, as evidence by Ms. Fontier's letter, dated May 18, 2012, in which she states that she would not file the motion. (See The petitioner's motion, Exhibit 5.)

Therefore, given that the defendant wished for her attorneys to withdraw her guilty plea, but that her defense refused to do so; given that the prosecution later rescinded this offer, and stated that they would oppose "any motion by the defendant to withdraw the guilty plea"; given that the petitioner's sentencing submissions argued the loss amount based on Mr. Schachter's fraudulent legal advice (after the petitioner's court-appointed defense attorneys refused to file the motion to withdraw her guilty plea before the sentencing hearing); given that the government argued at the sentencing hearing that the petitioner did not deserve credit for acceptance of responsibility, as the loss amount was argued using Mr. Schachter's fraudulent legal advice, as this fraudulent legal advice formed the basis of the Plea Agreement; and given that the Court did not give the defendant credit for acceptance of responsibility at the sentencing hearing, as the loss amount was argued using Mr. Schachter's fraudulent legal advice, as this fraudulent legal advice formed the basis of the Plea Agreement; it can hardly be said that the petitioner "declined" the offer the to "abandon her plea agreement and proceed to trial," or that she "chose to abide by her plea agreement, and agreed to acknowledge, at sentencing, that she had embezzled at least $7 million." (The government's response, p. 23.)

Finally, the government argues that the petitioner's second court-appointed defense attorney's "decision not to move to withdraw [the petitioner's] plea is no deficiency under *Strickland*" for the following reasons: (1) the petitioner's second court-appointed defense attorney advised the petitioner "in writing that any motion to withdraw her plea would be "frivolous" "; (2) the petitioner's second court-appointed defense attorney "explained" that such a motion would likely be denied "due to, among other things, "the clear and uncontested statements that [the petitioner] made at the time of making [her] plea" "; (3) the petitioner's second court-appointed defense attorney "stated that such a motion "would be affirmatively detrimental to [the petitioner's] best interests" because "[the petitioner] will be scheduled for trial on the fifteen remaining counts of the Indictment,' which 'will almost certainly result in [the petitioner] receiving a significantly higher prison sentence than [the petitioner] would otherwise receive" "; and

---

supports this conclusion. For example, though the Indictment accuses the petitioner of mail fraud, on this count, The Government's Request to Charge states as follows: "Furthermore, the mailed matter need not itself be fraudulent. For example, the mailed matter need not contain any fraudulent representations and indeed may be completely innocent." (The Government's Request to Charge, p. 35.) Therefore, it is clear that the prosecutors knew that the petitioner was not guilty of mail fraud when she was indicted, as it is clear from The Government's Request to Charge that the prosecutors knew that there was no mail fraud in this case.

(4) "because defense counsel's reasoned strategy deserves deference as an effort to protect [the petitioner's] penal interests, [the petitioner] has not credibility proven any deficiency, and has not established prejudice." (The government's response, p. 23.) As discussed below, the government's arguments are meritless.

Regarding Ms. Fontier's legal advice, as outlined in Ms. Fontier's letter, dated May 18, 2012, under Fed. R. Crim. P. 11(d)(2)(B), after a court accepts a guilty plea, the defendant may withdraw the guilty plea if she can show a "fair and just" reason for doing so. Because Mr. Schachter's legal advice was fraudulent, because this fraudulent legal advice formed the basis of the plea agreement, because the petitioner was not competent to plead guilty when her guilty plea was entered, because the rule requires that the defendant understand the charges included in the Plea Agreement, because the petitioner is actually innocent (as there were no crimes in this case), and because it was clear that there was insufficient evidence to support the convictions when the petitioner was sentenced (as there were no crimes in this case), it is clear that there was an adequate basis for Ms. Fontier to have filed the motion, as these facts would constitute a "fair and just reason" for withdrawing the guilty plea. (See The petitioner's motion, p. 6-58 and p. 60-138 and p. 263-277.)

It should also be noted that Ms. Fontier had access to the emails that show that the petitioner pleaded guilty based on her court-appointed defense attorney's fraudulent legal advice; that she had access to the Expert Reports, which showed that there were no crimes in this case (and which were submitted to the Court prior to the sentencing hearing); and that she was present in court when the Court discredited Mr. Schachter's fraudulent legal advice at the sentencing hearing (and then ruled that the petitioner had not accepted responsibility, though this fraudulent legal advice formed the basis of the Plea Agreement). Therefore, as established in the petitioner's motion and as discussed above, the motion to withdraw the petitioner's plea would not have been "frivolous," contrary to Ms. Fontier's and to the government's assertions.[28]

Further, had Ms. Fontier presented Mr. Schachter's emails to the Court (which show that the petitioner pleaded guilty based on fraudulent legal advice), this coupled with the Expert Reports and the case law that was incorporated in the petitioner's motion to dismiss and which was used to write the petitioner's sentencing submissions (which verifies that the petitioner is factually innocent and that there was insufficient evidence to support the convictions when the petitioner was sentenced), this clearly would have provided an adequate basis for the Court to allow the petitioner to withdraw her invalid guilty plea prior to the sentencing hearing (especially since the Court later discrediting Mr. Schachter's fraudulent legal advice at the sentencing hearing, as this fraudulent legal advice was used to argue the loss amount in the petitioner's sentencing submissions).

It should also be noted that, while Ms. Fontier (and the government) repeatedly relied on the scripted statements that were provided for the petitioner's plea allocution, on

---

[28] It should be noted that the petitioner's guilty plea was not entered knowingly, intelligently, and voluntarily for many reasons, and that each of these reasons is discussed in detail on pages 6-58 and on p. 60-138 of the petitioner's original motion.

this point, in her motion, the petitioner establishes that she was, in essence, "set up" by her court-appointed defense attorney and by the prosecution, as the original scripted statements contained the basis of her guilty plea (as described by Mr. Schachter), and as her court-appointed defense attorney took this out of her plea allocution before the plea hearing. On this point, it should be noted that Mr. Schachter told the petitioner that he removed this information from the scripted statements after discussing them with AUSA Facciponti, which is also significant, as the prosecution proceeded to argue in court that the petitioner had not accepted responsibility, when this would suggest that the prosecutors also knew that this fraudulent legal advice formed the basis of the Plea Agreement; as the prosecutors turned to disputing the percentages listed in the Report at the sentencing hearing, which demonstrated in court that the prosecutors knowingly criminalized a civil billing dispute, and that they had no right to bring charges in this case in the first place, as they brought charges in this case without having sufficient evidence in order to prove their case at trial; and as the prosecutors objected at the sentencing hearing, as they wished for the Court to impose a greater sentence, when it was clear at the sentencing hearing that the prosecutors knew that no crimes were committed in this case. (See The petitioner's motion, p. 6-58.)

Further, it should be noted that, as discussed above on p. 16-20, the petitioner was also incompetent, and therefore, unable to defend herself and unable to plead guilty at that time.

Further, it is clear that Ms. Fontier's decision not to withdraw the petitioner's plea was motivated by her choice to actively defend Mr. Schachter, who provided the fraudulent legal advice that formed the basis of the plea, rather than actively defend her client, who pleaded guilty based on Mr. Schachter's fraudulent legal advice. Therefore, it is clear that Ms. Fontier labored under an actual conflict of interest.

Therefore, since Ms. Fontier labored under an actual conflict of interest, the test, as stated in Cuyler v. Sullivan, 466 U.S. 335 (1980), is whether the conflict of interest adversely affected the performance of the petitioner's attorney, and not the test as stated in Strickland v. Washington, 466 U.S. 668 (1984), which requires a showing that (1) counsel's performance was deficient because it fell below an objective standard of reasonableness, and (2) prejudice resulted because there is a reasonable probability that, but for the deficient performance, the result of the proceeding would be different.[29]

---

[29] It should also be noted that it is also clear that this constitutes deficient performance, as it was clear that the petitioner's guilty plea was invalid, as it was based on fraudulent legal advice; as the petitioner did not understand the charges included in the Plea Agreement; as there is a reasonable probability that, had Ms. Fontier filed the motion to withdraw the petitioner's plea, the result of the proceedings would have been different, as the petitioner's case should've been dismissed when the government rested, as there was insufficient evidence to support the convictions when the petitioner was sentenced, as the government demonstrated at the sentencing hearing that they knowingly criminalized a civil billing dispute, and as the petitioner was actually innocent, as there were no crimes in this case. (See The petitioner's motion, p. 60-138.)

Therefore, in order to satisfy <u>Cuyler</u>, the Court must determine whether Ms. Fontier refrained from filing the motion to withdraw the petitioner's guilty plea prior to the sentencing hearing because of her divided loyalties (in this case, to Mr. Schachter, who lied to his client and provided the fraudulent legal advice that formed the basis of the Plea Agreement), and, if so, whether the petitioner's legal representation would have benefitted from the filing of the motion. See <u>Brown v. United States</u>, 665 F.2d 271 (9th Cir. 1982).

Regarding the first point, it should be noted that Ms. Fontier's letter, dated May 18, 2012, and Ms. Fontier's email, dated May 23, 2012, demonstrate that Ms. Fontier chose not to file the motion to withdraw the petitioner's guilty plea prior to the sentencing hearing because of her loyalty to Mr. Schachter, as Ms. Fontier's letter addresses the fact that she spoke to Mr. Schachter before determining that the petitioner's guilty plea was knowing and voluntary and, therefore, that she would not be filing the motion, and as Ms. Fontier's email, dated May 23, 2012, then attempts to explain away Mr. Schachter's fraudulent legal advice (which was then discredited by the Court at the sentencing hearing), though the petitioner was not actually guilty of any crimes, and though this fraudulent legal advice formed the basis of the Plea Agreement.

It should also be noted that Ms. Fontier's language in her letter shows that she very deliberately chose between the petitioner and the petitioner's prior counsel, as Ms. Fontier stated, among other things, that: (1) Mr. Schachter would "testify at any hearing" regarding the knowing and voluntary aspects of the plea; (2) that "any motion to withdraw the plea would be frivolous," and that attorneys are not obligated to file motion that are "frivolous"; and (3) CJA defendants are entitled to representation, but "are not entitled to be involved in legal strategy." (Ms. Fontier's letter, p.1-2, emphasis added.) (Exhibit 5) Obviously, at that point, had Ms. Fontier chosen to actively represent the petitioner's interests, she would have chosen to aggressively defend the petitioner, rather than aggressively defend Mr. Schachter.

This shows that Ms. Fontier's letter was sent to the petitioner in an attempt to protect the petitioner's first court-appointed defense attorney, who provided the fraudulent legal advice that formed the basis of the Plea Agreement, not to adequately defend her client, or to provide a true accounting of what she believed had transpired between the petitioner and her court-appointed defense counsel prior to the plea hearing.

Further, it should be noted that, regarding Ms. Fontier letter, dated May 18, 2012, though the letter states that Ms. Fontier agreed with Mr. Schachter's legal advice, and that therefore, she determined that the motion to withdraw the guilty plea would be "frivolous," this is discredited by the following email, which is attached as Exhibit 2H to the motion and dated May 23, 2012, in which she attempts to explain away Mr. Schachter's fraudulent legal advice, which formed the basis of the Plea Agreement.

To this effect, in her email, Ms. Fontier states as follows:

... If I do work for you, and believe that I am due $100 for that work, so I then take $100 from Michael, I have stolen $100 from Michael. It makes no difference that I believe that I am owed the money. It also would make no difference if you told me to take the money from Michael, because you say he owes it to you. If I take $100 from Michael, for work done for you, then I have stolen from Michael.

(Alice Fontier's email, May 23, 2012, p.1) (Exhibit 2H)

As an experienced criminal attorney, it is clear that Ms. Fontier had to have known that this legal advice was fraudulent. Further, it should also be noted that, if there was ever any doubt as to the validity of Mr. Schachter's fraudulent legal advice, the issue was clearly resolved at the sentencing hearing, as the Court discredited Mr. Schachter's fraudulent legal advice and ruled that the petitioner had not accepted responsibility, as Mr. Schachter's fraudulent legal advice (which formed the basis of the Plea Agreement) was used to argue the loss amount prior to the sentencing hearing.

Therefore, it is clear that the petitioner's legal representation would have benefitted from the filing of the motion to withdraw her guilty plea prior to the sentencing hearing, as the petitioner's guilty plea was not entered knowingly, intelligently, and voluntarily, as the petitioner pleaded guilty based on fraudulent legal advice; as the government could not have proven its case at trial, as the Local 147 Trustees' allegations from the civil case were fraudulent, and were disproven in the civil case (through the discovery materials) prior to the petitioner's arrest (see The petitioner's motion, p. 141-185); as there was insufficient evidence to support the convictions when the petitioner was sentenced, as the prosecution brought charges in this case without having sufficient evidence in order to prove its accusations at trial; as the petitioner's case should have been dismissed when the government rested, as verified by the case law that was used to write the petitioner's sentencing submissions (See United States v. Goyal, 629 F.3d 912 (9th Cir. 2010)); as the prosecutors demonstrated at the sentencing hearing that they knowingly criminalized a civil billing dispute; and as there petitioner is actually innocent, as no crimes were committed in this case. (See The petitioner's motion, p. 263-277).

Moreover, it is clear that, had the petitioner's second court-appointed defense attorney filed the motion to withdraw the petitioner's invalid guilty plea prior to the sentencing hearing, and had she presented the petitioner's first court-appointed defense attorney's emails to the Court (which show that the petitioner pleaded guilty based on fraudulent legal advice), along with the expert witness reports and the case law that was incorporated in the petitioner's motion to dismiss and which was used to write the petitioner's sentencing submissions, it would have been clear that the petitioner's guilty plea was invalid (especially considering that the Court later discredited the basis of the Plea Agreement fraudulent legal advice at the sentencing hearing); therefore, the petitioner's second court-appointed defense attorney's assertion that "[the petitioner would have been] scheduled for trial on the fifteen remaining counts of the Indictment," which "almost certainly" would've resulted in the petitioner receiving a higher sentence was not a valid concern, as there was a valid reason for the withdrawal of the guilty plea.

Finally, the government argues that the petitioner's second court-appointed defense attorney's decision not to withdraw the petitioner's invalid guilty plea "deserves deference as an effort to protect King's penal interests," and that, therefore, the petitioner "has not credibly proven any deficiency, and has not established prejudice." (The government's response, p. 23.)

However, "[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable." See Roe v. Flores-Ortega, 528 U.S. 470 (2000). On this point, as discussed above, it is clear that Ms. Fontier could have (and should have) filed the motion to withdraw the petitioner's invalid guilty plea prior to the sentencing hearing; that there was a "fair and just reason" for withdrawing the plea, as it was based on fraudulent legal advice; that she chose not to file the motion to withdraw the petitioner's invalid guilty plea because of her loyalty to Mr. Schachter, who provided the fraudulent legal advice that formed the basis of the Plea Agreement (and therefore, that prejudice should be presumed); and further, that there is a reasonable probability that the result of the proceedings would have been different, had Ms. Fontier filed the motion, as the petitioner never should have been convicted, as there was insufficient evidence to support the convictions when the petitioner was sentenced; as the government brought charges in this case without having sufficient evidence in order to prove any of its accusations in court; as the prosecutors demonstrated that they knowingly criminalized a civil billing dispute at the sentencing hearing; as this case was a willful fraud upon the court, as the prosecutors knew that there were no crimes in this case during the proceedings; and as the petitioner is "factually innocent," as no crimes were committed in this case. (See The petitioner's motion, p. 263-277.)

Therefore, it is clear that Ms. Fontier's refusal to file to the motion to withdraw the petitioner's invalid guilty plea prior to the sentencing hearing was objectively unreasonable, especially in light of the Court's comments at the sentencing hearing, as the Court discredited Mr. Schachter's incorrect legal advice and sentenced the petitioner to 72 months imprisonment when there were no crimes in this case.

It should also be noted that, since the Court discredited Mr. Schachter fraudulent legal advice at the sentencing hearing (as this fraudulent legal advice was used to argue the loss amount in the petitioner's sentencing submissions, as this fraudulent legal advice formed the basis of the Plea Agreement), under the circumstances, Ms. Fontier had an obligation to consult with the petitioner regarding the possibility of filing an appeal (or a motion under 28 U.S.C. § 2255) to address the knowing and voluntary aspects of the petitioner's guilty plea (among other claims, as outlined in The petitioner's motion, on p. 89-92 and p. 187-244), since there was reason to think that the petitioner would have wished to file an appeal to address multiple concerns at that time (including the knowing and voluntary aspects of the guilty plea) and since it was clear that the petitioner would have wished to file a timely appeal, had she known that this was an option at the time. See Roe v. Flores-Ortega, 528 U.S. 470 (2000), in which the Supreme Court held that "counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want an appeal... or (2) that this particular defendant reasonably demonstrated to counsel that he

was interested in appealing." (In addition, the petitioner must show that had he been consulted about an appeal he would have timely appealed.)

Further, on this point, it should also be noted that the petitioner clearly would have wished to challenge her conviction, either in a direct appeal or in a motion under 28 U.S.C. § 2255, had Ms. Fontier properly advised the petitioner, as the petitioner's sentencing submissions argued the loss amount using Mr. Schachter's fraudulent legal advice; as the petitioner's sentencing submissions incorporated Expert Reports that verified that there was no basis in fact for the convictions, as well as case law from the petitioner's pre-trial <u>Motion to Dismiss</u>; as the Court discredited Mr. Schachter's fraudulent legal advice at the sentencing hearing and ruled that the petitioner had not accepted responsibility, though this legal advice formed the basis of the Plea Agreement; as there was insufficient evidence to support the convictions when the petitioner was sentenced, as the government brought charges in this case without having sufficient evidence in order to prove any of its accusations in court; as the petitioner is "factually innocent," as there were no crimes in this case; as the prosecutors demonstrated that they knowingly criminalized a civil billing dispute at the sentencing hearing [see <u>The petitioner's motion</u>, p. 263-277]; and as this case was a willful fraud upon the court, as the prosecution knew that there were no crimes in this case during the proceedings [see <u>The petitioner's motion</u>, p. 263-277.])

As the petitioner established in her motion and as discussed above, it is clear that Ms. Fontier refused to file the motion to withdraw the petitioner's guilty prior to the sentencing hearing because of her loyalty to Mr. Schachter, who provided the fraudulent legal advice that formed the basis of the Plea Agreement. As Ms. Fontier also did not consult with the petitioner regarding the possibility of filing an appeal, especially when the Court discredited Mr. Schachter's legal advice at the sentencing hearing, the fact that Ms. Fontier did not advise the petitioner that she could appeal the knowing and voluntary aspects of the guilty plea at that time should also be sufficient to establish that Ms. Fontier labored under a conflict of interest, as she essentially abandoned the petitioner to protect Mr. Schachter, and at that point, to protect herself. See <u>Ramsey v. United States</u>, 569 A.2d 142 (D.C. 1990), in which the Court held that "[i]t would be a conflict of interest for a lawyer to appeal a ruling premised on that lawyer's ineffectiveness." See also <u>Bloomer v. United States</u>, No. 96-2531 (2nd Cir. 1998), in which the Court stated: "we effectively excuse the failure to raise [a claim of ineffective assistance of counsel] on appeal...due simply to counsel's inherent conflict of interest."

Therefore, at that point, Ms. Fontier had two conflicts of interests, and therefore, should have advised the petitioner to ask the Court to appoint different counsel to consult with the petitioner regarding the filing of an appeal, so that a timely appeal could have been filed. See <u>Shelton v. United States</u>, 323 A.2d 717 (D.C. 1974), in which the Court stated that "[i[n the future, where an attorney has represented a convicted defendant at trial and, as the defendant's attorney on appeal, concludes in good faith that a legitimate issue exists as to the constitutional adequacy of his representation of the defendant at trial, it is the duty of the attorney to move to withdraw as counsel on appeal." See also <u>Bloomer v. United States</u>, No. 96-2531 (2nd Cir. 1998), in which the Court stated: "we

effectively excuse the failure to raise [a claim of ineffective assistance of counsel] on appeal…due simply to counsel's inherent conflict of interest."

Because Ms. Fontier did not do so, and instead, confirmed the Court's representation at the sentencing hearing that the petitioner could not file an appeal, prejudice should be presumed, as Ms. Fontier represented conflicting interests, and as these conflicts of interest clearly had an adverse effect on Ms. Fontier's performance, since Ms. Fontier could have filed either a direct appeal or a motion under 28 U.S.C. 2255 after the sentencing hearing, but as Ms. Fontier did not do so, as this would have harmed Mr. Schachter, who arranged the Plea Agreement with the government and who coerced me into pleading guilty based on fraudulent legal advice, and as this would have exposed her own errors at that point, as she had refused to file the motion to withdraw the petitioner's guilty plea prior to the sentencing hearing, though the Court later discredited Mr. Schachter's legal advice at the sentencing hearing, as the conduct that Mr. Schachter described as an embezzlement was not actually an embezzlement. See Ramsey v. United States, 569 A.2d 142 (D.C. 1990), in which the Court held that "[i]t would be a conflict of interest for a lawyer to appeal a ruling premised on that lawyer's ineffectiveness." See also Bloomer v. United States, No. 96-2531 (2nd Cir. 1998), in which the Court stated: "we effectively excuse the failure to raise [a claim of ineffective assistance of counsel] on appeal…due simply to counsel's inherent conflict of interest."

Further, it is clear that the petitioner's legal representation would have benefitted from the filing of either an appeal or a motion under 28 U.S.C. 2255 (to address several concerns, as identified on p. 89-92 and p. 187-244 of The petitioner's motion), as the petitioner pleaded guilty based on Mr. Schachter's fraudulent legal advice, which was later discredited by the Court at the sentencing hearing; as there was insufficient evidence to support the convictions when the prosecution rested (See US v. Goyal, 629 F.3d 912 (9th Cir. 2010)); as the prosecution demonstrated at the sentencing hearing that they knowingly criminalized a civil billing dispute; and as the petitioner was actually innocent, as there were no crimes in this case. (The petitioner's motion, p. 263-277.) See Brown v. United States, 665 F.2d 271 (9th Cir. 1982).

(Finally, on this point, as the petitioner understands, as the petitioner would have wished to file an appeal after the sentencing hearing, but did not do so, as she was incorrectly advised that she could not file an appeal, as she had waived her "appellate rights" under the Plea Agreement, this would constitute an "independent ground for habeas relief." See Garcia v. United States, 278 F.3d 134 (2nd Cir. 2002), in which the Court found that "vacatur [was] warranted" where "[the petitioner's] attorney advised him on the record that no appeal could be filed and the district court confirmed that incorrect advice."

On this point, in Garcia v. United States, 278 F.3d 134 (2nd Cir. 2002), the Court stated that:

When a defendant has been incorrectly advised by counsel that no appeal is possible, we do not require that the defendant have gone through the futile

exercise of requesting counsel to file an appeal to demonstrate that his counsel's ineffective assistance deprived him of an appeal that would have otherwise been filed. Instead, as when a court mistakenly informs a defendant that he has no right to appeal, relief is appropriate unless the Government can show by clear and convincing evidence that the defendant actually appealed or had independent knowledge of his right to appeal and elected not to do so.

Therefore, as the petitioner would have wished to file an appeal after the sentencing hearing, and as she did not do so, as she was incorrectly advised that she had waived her "appellate rights" under the Plea Agreement, as the petitioner understands, the petitioner was denied the effective assistance of counsel and is entitled to file an appeal.)

Finally, the government contends that the petitioner "raises a host of additional conclusory claims for which she has failed to show prejudice," and cites the following examples: (1) "that [the petitioner] was denied effective assistance because defense counsel was 'not familiar enough with the documents . . . of my case,'" and that "defense counsel failed to advise [the petitioner] that a determination of the amount of forfeiture would be postponed until after the sentencing hearing." The government further argues that "these claims are entirely inadequate to warrant a hearing and should be rejected." (The government's response, p. 22.)

First, it should be noted that the documents that are significant are included in the EisnerAmper and Vasil Reports (as the reports utilized the original Fund Records and the original tax filings to establish that there was no basis in fact for the convictions); are attached to the petitioner's motion, as the exhibits establish that there was no basis in fact for the convictions, and that this case was a willful fraud upon the Court (see The petitioner's motion, p. 141-185); and that these documents were also attached to the petitioner's sentencing submissions, as the petitioner pleaded guilty based on fraudulent legal advice, and as the expert reports verified that there was no basis in fact for the convictions when the petitioner was sentenced.

Second, as discussed above, the petitioner has demonstrated that her claims are not conclusory, and that prejudice should be presumed in her case under United States v. Cronic, 466 U.S. 648 (1984) and under Cuyler v. Sullivan, 466 U.S. 335 (1980).

In addition, it should be noted that, regarding the petitioner's claims of ineffective assistance of counsel, in Rodriguez v. Hoke, 928 F.2d 534 (2d Cir. 1991), the Court stated that "[the previous court] should have been given the opportunity to consider all the circumstances and the cumulative effect of all the claims as a whole," and that "[s]ince [the petitioner's] claim of ineffective assistance of counsel can turn on the cumulative effect of all of counsel's actions, all his allegations of ineffective assistance should be reviewed together." Therefore, the petitioner's allegations should be reviewed together, and the government's attempt to exclude these points should be rejected.

Finally, it should be noted that, as the petitioner understands, any attorney error that results in additional prison time is sufficient to establish prejudice. See Glover v.

United States, 531 U.S. 198 (2001).[30] Therefore, as there were multiple unprofessional errors by the petitioner's court-appointed counsel, and as the case law establishes that the petitioner's convictions should have been reversed, and that the charges should have been dismissed when the prosecution rested, as it was clear that there was insufficient evidence to support the convictions (see US v. Goyal, 629 F.3d 912 (9th Cir. 2010)), it is clear that, but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceedings would have been different, as the government should not have brought the charges to been with, as there were no crimes in this case, and as the petitioner has currently served approximately 32 months of a 72 month sentence, when the petitioner should not have served any prison time, as no crimes were committed in this case. Therefore, it is clear that the petitioner has also established both deficient performance and prejudice under Strickland v. Washington, 466 U.S. 668 (1984).

(For the sake of brevity, the petitioner will not repeat each of the examples of ineffective assistance of counsel here, but they are each alleged in The petitioner's motion, on p. 60-138.)

6. The petitioner's claims regarding prosecutorial misconduct have merit, as they are adequately supported by facts and by law.

In its response, the government argues that the petitioner's claims of prosecutorial misconduct should be rejected for the following reasons: (1) the Court "should not consider [the petitioner's] claim" that the "Government failed to conduct an adequate investigation" because the petitioner "simply states that the Government failed to contact attorneys associated with the Civil Lawsuit" and "does not explain why this purported violation warrants reversal of the conviction"; (2) "the Government's investigation was thorough and meticulous, and amply documented [the petitioner's] criminal conduct"; (3) the petitioner's claim that the prosecutors "improperly restrained funds that were intended specifically for defense costs" is "conclusory," and should be denied, as "the Supreme Court affirmed the Government's use of a pre-trial asset freeze to preserve the availability of forfeitable assets during the pendency of criminal proceedings," and as "[the] Court held that such assets may be frozen even if the defendant would have designated those funds for the retention of defense counsel of choice"; (4) the petitioner's "argument that the prosecutors "knowingly submitted perjured testimony to the Court" in the form of the "Epstein Affidavit" (the "Affidavit") flatly contradicts findings that the Court made at sentencing"; and (5) the petitioner's "remaining claims regarding

---

[30] In addition, as the petitioner understands, this is also supported by Lafler v. Cooper, 132 S. Ct. 1376 (2012). In that case, the petitioner alleged that his attorney was ineffective because he advised his client to reject a plea offer based on his misinterpretation of the evidence, and the Court found that, but for counsel's deficient performance, there was a reasonable probability that the petitioner and the trial court would have accepted the guilty plea, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed. See Lafler v. Cooper, 132 S. Ct. 1376 (2012) (emphasis added).

prosecutorial misconduct are simply bare and baseless allegations," that are unsupported by "evidence" or by "sworn declarations."[31] (The government's response, p. 24-27.) As discussed below, the government's arguments are meritless.

Regarding the government first argument, it should be noted that the petitioner identified in her motion the information that the government would have gained from contacting KingCare's civil attorneys prior to the petitioner's arrest, as the materials produced in discovery in the civil case prior to the petitioner's arrest showed that the Local 147 Trustees' civil Complaint was fraudulent (which prompted the Local 147 Trustees and the Local 147 Trustees' civil attorneys to go to the Department of Labor with their fraudulent accusation in the first place, so that the Department of Labor would restrain the petitioner's and the petitioner's family's assets, in order to prevent the petitioner and the petitioner's family from defending against their fraudulent accusations in both civil and criminal court).[32]

To this effect, in her motion, the petitioner states:

> When I was arrested, the civil case was in mid-discovery, and was already pending for (approximately) eight months. KingCare was clearly intending to fight the Trustees' civil accusations, hiring civil attorneys, independent forensic auditors, and filing an answer to the Trustees' civil complaint, as well as significant counterclaims. (KingCare's Counterclaims from the civil case are attached as Exhibit 1.)

> Prior to my arrest, the government agents did not attempt to contact KingCare's civil attorneys, which would have been necessary in order to conduct an adequate investigation in this case. (They also executed the arrest and search warrants in a very aggressive and dramatic manner, and gave no indication prior to my arrest that I was even under investigation.) As a result, DOL Agent Della Penna's sworn Complaint essentially mirrored the Trustees' civil Complaint, even though much

---

[31] According to the government, this includes the following claims: (1) the petitioner's claim that the government "made "numerous misrepresentations" in Court"; (2) the petitioner's claim that the government "misled the grand jury"; (3) the petitioner's claim that the government destroyed "a "massive amount" of exculpable material"; (4) the petitioner's claim that the government ""caused the process to lose its character as a confrontation between adversaries" by seizing materials from King Care pursuant to a search warrant"; and (5) the petitioner's claim that the government "prosecuted without evidence of wrongdoing." (The government's response, p. 27.)

[32] As the petitioner states in her motion, it is also significant to note that the Local 147 Trustees and the Trustees' civil attorneys likely went to the Department of Labor at that time, as the Local 147 Trustees were supposed to be deposed in the civil case, as KingCare had filed extensive Counterclaims in civil court, and as the Trustees and the Trustees' civil attorneys needed the government to restrain the petitioner's family's assets in order to prevent KingCare and the petitioner from defending against their fraudulent accusations in civil court, as there was no embezzlement in this case. (See The petitioner's motion, p. 8.)

of the evidence that was produced in discovery in the civil case had already disproven much of the Trustees' fraudulent representations from the civil case.[33]

After I was arrested, I repeated over and over that the work was completed and that the payments made to KingCare were earned.[34] In response, Department Of Labor Agent Joseph Della Penna told me that "there are a lot of innocent people in prison" and that "once the jury hears horses, they will convict."[35]

At the arrest hearing, Mr. Till, an attorney who represented KingCare in the civil case, addressed the lack of investigation in this case, and observed that the government's position came from information provided by the Trustees and by the Trustees' civil attorneys, who had already put forth many fraudulent accusations in the civil case.[36]

To this effect, at the arrest hearing, Mr. Till stated:

> ... By the way, there's a parallel civil case that was initiated literally eight months ago. We are in the throes of discovery. We're in the middle of document discovery. The government's complaint here is the mirror image of the civil complaint. There has been a period, it appears to be, no investigation done by the Department of Labor on this case. It has been purely on the say-so of the persons who are associated and hired by the union, focusing properly.[37]

Though the government denied Mr. Till's assertions that they had not conducted an adequate investigation in this case, in the sentencing submissions, when faced

---

[33] This also explains why the Trustees' decided to go to the Department of Labor with their fraudulent accusation at that time, as they did so before they were to be deposed in the civil case, and as this allowed the government to restrain my family's assets, which effectively prevented me from defending against the Local 147 Trustees' fraudulent accusations in both civil and criminal court. (It should be noted that the government also restrained an Insurance Settlement that was intended specifically for defense costs, which was settled out of court because the Trustees took KingCare off of their Fiduciary Policy directly preceding the civil suit, attempting to prevent KingCare from defending against their fraudulent accusations.)

[34] It should also be noted that the original Fund Records show that the payments were transparent and fully disclosed.

[35] Here, it should be noted that I was advised that when the prosecution was told that the additional projects were completed and that the expenses were deferred, DOL Agent Della Penna's answer was that "even if [the defendant] didn't steal the money, [the defendant] stole the money."

[36] Again, the evidence that was produced in discovery in the civil case also refuted the representations of the Trustees and the Trustees' civil attorneys in the civil case prior to my arrest, as there was no embezzlement in this case.

[37] November 30, 2009 Arrest Hearing Transcript, p. 8.

with the EisnerAmper and Vasil Reports, which showed that there were no crimes in this case, the government essentially admitted that they had not conducted an adequate investigation prior to my arrest. To this effect, in The Government's Sentencing Memorandum, AUSA Facciponti wrote:

> In the end, however, there is no way that King can demonstrate how a third party administrator of the benefit funds of a Union with 500 members could ever be entitled to $40 million for six years of work.[38]

However, if the prosecution had conducted an adequate investigation prior to my arrest, the prosecutors would have known that nothing about this statement is correct: I was not an employee of Local 147; KingCare provided tremendous additional services at the request of the Local 147 Trustees and hired many additional employees to complete the additional projects; the government's assertion that the Union had "500 members" is incorrect and misleading; and, as the government was informed from the beginning and prior to the filing of the original Indictment, the administrative expenses were deferred over a period of several years, as directed by the Local 147 Trustees, due to the lack of work in the industry.[39]

(It should also be noted that even without the deferral of compensation, the payments would never be assessed over six years, as the payments always have to be placed in the proper fiscal years. On this issue, it should be noted that several questions have been raised about the validity of the multiple Indictments filed by the government, as the Indictments consider the payments on a cash basis, without making any attempt to address the payments by proper auditing procedures. This is very significant, especially considering the level of work that was produced by the company, and especially considering that KingCare was owed deferred compensation from the prior period, which are very significant points that were clearly not factored into the government's original accusation, which is clear, as the prosecutors later made many fraudulent representations in court – such as their fraudulent argument that the additional projects were "phantom projects," when it was clear during the proceedings that the additional projects were completed by the company – in order to make a sensational case in court, and in order to push their fraudulent accusation through, when it was clear during the proceedings that no crimes were actually committed in this case, and that the prosecutors knew that no crimes were actually committed in this case.)...

The day after I was arrested, the prosecutors went out in the press and circulated many materially false and extremely inflammatory statements, which had no basis

---

[38] The Government's Sentencing Memorandum, p. 12.

[39] Here, it should be noted that payment for the additional services and for additional expenses that were considered outside the scope of the Administrative Agreements were later reimbursed, and that the contractual fee due to KingCare for the administrative services inside the scope of the retainer was paid to KingCare in advance.

in fact, and which reflected the lack of investigation in this case. To cite an example, the prosecutors went out in the press, calling the case a "shopping spree of epic proportions" in *the New York Times,* when there was no embezzlement in this case, when the prosecution had to list purchases made by my entire family in order to paint this picture, and when the prosecutors obviously knew that they did not have any evidence of an embezzlement to present in court.[40]

By going out in the press before they had conducted an adequate investigation, the prosecution created a tremendous amount of pressure to indict and to make their case in court, regardless of the truth of their accusations, including whether or not an embezzlement had actually occurred in this case. (It should be noted that it was clear during the proceedings that the prosecutors were refusing to let go of there fraudulent accusation, as they wished to make a sensational case, even though it was clear that they were prosecuting an innocent person, and even though they made their case at my family's expense.) This ultimately caused the government to make many materially false representations in court, which were clearly contradicted by the results of their investigation (which, I believe, also began after I was arrested), and by the evidence that the government produced in discovery during the case pursuant to a search warrant executed on the day of my arrest (as the evidence shows that the work was completed by the company).

Moreover, as the government worked closely with the Local 147 Trustees and with the Local 147 Trustees' civil attorneys throughout the proceedings, it was clear from the arguments put forth by the prosecution in this case that the Trustees' civil attorneys were perpetuating their fraudulent representations from the civil case, which also were disproven over the course of the criminal proceedings, even though the evidence disproving their accusations had already been produced in the civil case prior to my arrest.[41] (This also shows that this case was a conspiracy and a willful fraud upon the court, as it was clear during the proceedings that each party knew that the additional work was completed, and that the administrative expenses were deferred, which is also verified by the attached exhibits, including Exhibits 7A-10 and Exhibits 12A-12B, and Exhibits

---

[40] Mr. Preet Bharara, the District Attorney for the Southern District of New York, made this comment. Besides being an extremely sexist comment, this comment also demonstrates the complete lack of investigation in this case, as the evidence that was produced in discovery in the civil case shows that KingCare completed an extraordinary amount of work at the request of the Local 147 Trustees. (This is also demonstrated by the EisnerAmper and Vasil Reports, which were submitted to the Court prior to the sentencing hearing, and by the attached exhibits, which show that Mr. Epstein's Affidavit was perjured testimony. See Exhibits 6-10.)

[41] On this point, it is also significant to note that it is unlikely that the Trustees or the Trustees' civil attorneys would have waited approximately eight months to call the Department of Labor if they had actually believed that someone had stolen $40 million from the Benefit Funds. Moreover, it is also clear that they would not have relied on KingCare to provide administrative services during the "transition" if they had actually believed that I had embezzled any funds from the Local 147 Benefit Funds.

11A-11F, respectively.)

(The petitioner's motion, p. 141-144.)

Therefore, as the government's case was premised upon false information, it is clear that the government failed to conduct an adequate investigation prior to the petitioner's arrest, including failing to contact KingCare's civil attorneys, who could have explained to the government prior to the petitioner's arrest that the Local 147 Trustees' representations from the civil case were fraudulent. (The petitioner's motion, p. 141-185.)

Therefore, since the government's entire case was premised on a fraudulent construction of the facts of this case, as the government failed to conduct an adequate investigation prior to the petitioner's arrest; since the government clearly presented this fraudulent information to the Grand Jury (and, therefore, willfully defrauded the Grand Jury, as the prosecution was aware of the true facts of the case prior to the filing of the original Indictment [and, by extension, erroneously limited the petitioner's choice of counsel in violation of her Sixth Amendment right to be represented by counsel of her choice]); and since the government argued successfully throughout the proceedings that the petitioner was guilty based on this fraudulent construction of the facts of this case; it is clear that this violation resulted in substantial prejudice to the petitioner, and that the prosecutors' additional misconduct (stemming from this violation) could not have been more severe (especially as the prosecutors later committed a willful fraud upon the court in order to obtain a fraudulent conviction in this case). Further, it should be noted that the prosecutors' misconduct went unchecked throughout the proceedings, as the prosecutors continuously made the petitioner's arguments appear unreasonable, when the government's positions were never supported by any credentialed professionals.[42] Moreover, it is clear that the prosecution could not have obtained a valid conviction, had the prosecutors presented the true facts of this case, as no crimes were committed in this case (as verified by the EisnerAmper and Vasil Reports, which were submitted to the Court prior to the sentencing hearing, and which used the original Fund Records and the original tax filings to confirm that there was no embezzlement, tax crime, mail fraud, or

---

[42] On this point, concerning the evidence the government presented in court, in the end, the government did not rely on a single Fund Record while arguing their case; they did not present an expert witness, did not present a forensic audit, presented a tax expert who was not certified to justify a $30 million tax accusation, and repeatedly cited a perjured affidavit to contradict the content of the original Fund Records.

In addition, when faced with the original Fund Records in court, the prosecution argued to have them removed from the proceedings, as the EisnerAmper Report, which was submitted as part of the Defense's sentencing submissions, used the original Fund Records to show that there was no embezzlement in this case.

Further, concerning the EisnerAmper and Vasil Reports, it should be noted that the Reports verified that the government's accusations had no basis in fact, as the business was reported like any other business; as the company worked and earned; and as the income was reported and as the taxes were paid, as advised by the tax attorney who advised on the original tax filings, and as advised by KingCare's accounting firm, who also put together all of KingCare's books and records.

money laundering in this case); as there was insufficient evidence to support the convictions when the petitioner was sentenced, as the government brought charges in this case without having sufficient evidence in order to prove any of its accusations in court; as the petitioner is "factually innocent," as no crimes were committed in this case; as the prosecutors demonstrated that they knowingly criminalized a civil billing dispute at the sentencing hearing; as this case was a willful fraud upon the court, as the prosecution knew that there were no crimes in this case during the proceedings; and as the evidence produced by the government in discovery in this case proves that the Local 147 Trustees' civil Complaint was fraudulent, and that the Local 147 Trustees' filed this Complaint in order to blame the petitioner for a loss to the Benefit Funds that was unrelated to the petitioner's conduct. (See The petitioner's motion, p. 141-185.) See United States v. McCarthy, 54 F.3d 51 (2d Cir. 1995), in which the Court stated that "[t]he severity of the misconduct, curative measures, and the certainty of conviction absent the misconduct are all relevant to the inquiry."

Therefore, the government's argument that the Court "should not consider [the petitioner's] claim" that the "Government failed to conduct an adequate investigation" because the petitioner "simply states that the Government failed to contact attorneys associated with the Civil Lawsuit" and "does not explain why this purported violation warrants reversal of the conviction" is meritless, and should be rejected. (The government's response, p. 24.)

Further, regarding the government's assertion that its "investigation was thorough and meticulous, and amply documented [the petitioner's] criminal conduct," first, it should be noted that, as she established in her motion, the petitioner did not engage in any criminal conduct, and further, did not commit any crimes, as there was no embezzlement, tax crime, mail fraud, or money laundering in this case. (See above and The petitioner's motion, p. 1-290.)

Second, it should be noted that the government has failed to provide such documentation, and in fact, has only pointed specifically to the Epstein Affidavit and to the Catanzaro Declaration, both of which are not credible, as outlined in the petitioner's motion (see The petitioner's motion, p. 6-58 and p. 141-185), and both of which were created after the petitioner pleaded guilty (based on fraudulent legal advice). (See The petitioner's motion, p. 6-58 and p. 141-185.) Therefore, it is clear that the government has not provided any proper documentation to support the petitioner's prosecution, nor to support the government's assertion that it conducted an adequate investigation in this case, which should have occurred prior to the petitioner's arrest.[43] (See The petitioner's

---

[43] On this point, concerning the evidence the government presented in court, in the end, the government did not rely on a single Fund Record while arguing their case; they did not present an expert witness, did not present a forensic audit, presented a tax expert who was not certified to justify a $30 million tax accusation, and repeatedly cited a perjured affidavit to contradict the content of the original Fund Records.

In addition, when faced with the original Fund Records in court, the prosecution argued to have them removed from the proceedings, as the EisnerAmper Report, which

motion, p. 141-185 and p. 263-277.)

Further, it should be noted that it is clear from the prosecutors' statements in court that the prosecutors realized during the proceedings that they did not have sufficient evidence in order to prove in court that the petitioner had engaged in any criminal conduct (as the petitioner did not engage in any criminal conduct), regardless of the government's meritless reassurances.

For example, regarding this point, during the October 7, 2010 Hearing, regarding the ownership of the petitioner's family's horses, AUSA Hernandez stated:

> It's also difficult for the government to prove a negative, to prove anyone who walks in through the door doesn't have it, have title to something. So we issue discovery. And if your discovery shows you don't own it, then you can't be here. Or if you refuse to provide discovery but say it's ours, then you're entitled to make an adverse inference from that, your Honor.

(October 7, 2010 Hearing Transcript, p. 51.)

Therefore, since "the negative" is literally the government's case, it is clear from this comment alone that the prosecutors knew during the proceedings that they did not have sufficient evidence in order to prove their accusations in court, including their accusation that the petitioner engaged in any criminal conduct. Therefore, it is clear that the government's assurances that it conducted an adequate investigation in this case are meritless, as declared by AUSA Hernandez in court. (See The petitioner's motion, p. 6-58 and p. 141-185.)

(In addition, it should be noted that, since it is clear that the prosecutors knew during the proceedings that they did not have sufficient evidence in order to prove that the petitioner had engaged in any criminal conduct, or that there were any crimes in this case, it is clear that the prosecutors knowingly engaged in prosecutorial misconduct, as it is clear that the government should not have brought charges without having sufficient evidence in order to prove its accusations in court. On this point, in US v. Goyal, Chief Judge Kozinski stated that "[t]his is not the way criminal law is supposed to work," and that "[t]he government should not have brought charges unless it had clear evidence of wrongdoing, and the trial judge should have dismissed the case when the government rested and it was clear the evidence could not support a conviction." See US v. Goyal, 629 F.3d 912 (9th Cir. 2010). It should also be noted that the government's entire

---

was submitted as part of the Defense's sentencing submissions, used the original Fund Records to show that there was no embezzlement in this case.

Further, concerning the EisnerAmper and Vasil Reports, it should be noted that the Reports verified that the government's accusations had no basis in fact, as the business was reported like any other business; as the company worked and earned; and as the income was reported and as the taxes were paid, as advised by the tax attorney who advised on the original tax filings, and as advised by KingCare's accounting firm, who also put together all of KingCare's books and records.

argument, in reality, is ridiculous on its face [and never should have ben accepted by the Court]: Mr. Friedman wasn't representing just "anyone," he was representing the people who owned the company [which was also confirmed by the case agents on national television, as evidenced by the Declaration attached as Exhibit 1], who reported these entities, and who paid the taxes on these entities over many years [which were also prepared by credentialed professionals], and which were reported as advised by KingCare's tax attorney and accounting firm.)

Moreover, regarding the government's investigation, it should be noted that, at this point, there are only two options: either the government failed to conduct an adequate investigation prior to the petitioner's arrest, and has since committed a fraud upon the court in order to try to hold its fraudulent case together, or the government was aware of the extensive work-product produced by the company, of the deferral of compensation from the prior years, and of the transparency of the payments, and arrested the petitioner with the full intention of committing a fraud upon the court from the beginning, in order to obtain fraudulent convictions. (The government's response, p. 24-25.)

Here, it should be noted that, while the government clearly went out in the press after the petitioner's arrest in order to influence public opinion and to try to scare the petitioner into pleading guilty (see The petitioner's motion, p. 141-185), the former is also supported by DOL Agent Della Penna's assertions, as DOL Agent Della Penna made many unprofessional comments after the petitioner's arrest, which show that he failed to conduct an adequate investigation in this case.

To this effect, in her motion, the petitioner identified DOL Agent Della Penna's comments as follows:

1.    DOL Agent Della Penna stated: "There are a lot of innocent people in prison."

2.    DOL Agent Della Penna stated: "Once the jury hears horses, they will convict."[44]

3.    DOL Agent Della Penna stated: "No man ever made that much money as a TPA, therefore [the defendant] must have stolen it."[45]

---

[44] It should be noted that (as far as I'm aware) DOL Agent Della Penna offered several variations of this comment at different times to different people. For example, at one point DOL Agent Della Penna stated that the government "[would] scream horses," and "the jury [would] convict."

[45] It should be noted that (as far as I'm aware) DOL Agent Della Penna offered several variations of this comment at different times to different people. For example, at one point, I believe that DOL Agent Della Penna used "embezzled" instead of "stolen."

It should also be noted that the company completed a tremendous amount of work at the direction of the Local 147 Trustees (so much so that Mr. Epstein's Affidavit

4. DOL Agent Della Penna stated: "Even if [the defendant] didn't steal the money, [the defendant] stole the money."[46]

(See The petitioner's motion, p. 141-185 and p. 263-277.)

It should also be noted that, as the petitioner addressed in her motion (and as confirmed by the attached Declaration, which is attached as Exhibit 1), DOL Agent Della Penna also stated on national television that he knew he had "a slam-dunk case" when he could trace all of the payments to the KingCare accounts, and when he was able to trace payments out of the KingCare accounts, which is completely inadequate for an investigation, and further, which actually confirms that there was no criminal intent in this case, as this confirms that the payments were completely transparent.[47]

---

indicates that he didn't believe that I had sufficient knowledge in order to complete the additional projects), and that KingCare was owed deferred compensation from the prior period, which shows that this observation is meritless.

In addition, it should be noted that the case agent's Complaint admitted that there was an additional 26% in the KingCare accounts, which exceeds the cost of the expenses listed in the Indictment, so it is clear that there was no motive for me to have embezzled any funds in this case, as this amount exceeds the cost of the expenses listed in the Indictment.

It should also be noted that this comment goes against all of the civil liberties guaranteed in this country, and that this comment shows that the prosecution had no right to bring charges in this case in the first place, as there was no evidence of a crime, and as no crimes were actually committed in this case.

In addition, it should also be noted that, in this country, hard work is supposed to be valued, especially by the Department of Labor, and that DOL Agent Della Penna's comments show that his investigation was not objective, but intended to advance his career at my family's expense.

[46] It should also be noted that this comment goes against all of the civil liberties guaranteed in this country, and that this comment shows that the prosecution had no right to bring charges in this case in the first place, as no crime was committed in this case.

In addition, it should also be noted that, in this country, hard work is supposed to be valued, especially by the Department of Labor, and that DOL Agent Della Penna's comments show that his investigation was not objective, but intended to advance his career at my family's expense.

[47] Further, regarding DOL Agent Della Penna's comments, in her motion, the petitioner states:

To address DOL Agent Della Penna's comments, it is significant to note that DOL Agent Della Penna admitted in his sworn Complaint that the KingCare accounts held an additional 26% independent of the relationship between KingCare and Local 147, which exceeds the total cost of the purchases listed in the Indictment. Moreover, as KingCare was owed deferred compensation, this concept invalidates DOL Agent Della Penna's observation that "no man ever

72

Further, it should be noted that, as the petitioner addressed in her motion (and as confirmed by the attached Declaration, which is attached as Exhibit 1), the agents advised that they believed that there was an embezzlement in this case, as the payments were in round numbers, which is also completely inadequate for an investigation, especially as the contract between KingCare and the Local 147 Benefit Funds states that KingCare was not required to lay out the expenses for the additional services demanded by the Local 147 Trustees. (Again, the government's argument also does not make sense, as the administrative expenses were transparent and audited; as the round amounts were used going back over many years; and as the Department of Labor conducted various audits for the payments made to KingCare for the amounts in question.)

Therefore, it is clear from the case agents' statements that the prosecution brought charges in this case without conducting an adequate investigation, without having clear evidence of wrongdoing, and when they were well aware during the proceedings that the petitioner was actually innocent, especially since the petitioner submitted the EisnerAmper and Vasil Reports prior to the sentencing hearing, which used the original Fund Records and the original tax filings to confirm that there was no embezzlement, tax crime, or mail fraud in this case. (See The petitioner's motion, p. 141-185.)

In addition, it should also be noted that The Government's Request to Charge also supports the conclusion that the government knew that the petitioner was actually innocent during the proceedings. For example, though the Indictment accuses me of mail fraud, on this count, The Government's Request to Charge states as follows: "Furthermore, the mailed matter need not itself be fraudulent. For example, the mailed matter need not contain any fraudulent representations and indeed may be completely innocent." (The Government's Request to Charge, p. 35.) Therefore, it is clear that the prosecutors knew that the petitioner was not guilty of mail fraud when she was indicted, as it is clear from The Government's Request to Charge that the prosecutors knew that there was no mail fraud in this case.

(Further, it should be noted that, though the government states in its response that the petitioner "mailed to fund participants financial statements that falsely overstated each participant's balance by failing to account for the millions of dollars that she had stolen from the Local 147 Funds," it should be noted that the government has not put any such documents before the Court, most likely as it is clear from the actual documents that KingCare fulfilled its responsibilities, as outlined by the Administrative Agreements. [The government's response, p. 4.])[48]

---

made that much money as a TPA," as the percentages are much more reasonable when the expenses are placed in the proper years, which is an analysis that the government never attempted to do (also as this would have invalidated their accusation).

(See the petitioner's motion, p. 173-174.)

[48] Further, as the petitioner explained in her motion, the petitioner also did not have control over the information that the Local 147 Trustees decided to show on *the Local 147 statements*. On this point, it should also be noted that the Trustees and the

Therefore, it is clear that the prosecution's assertion that its "investigation was thorough and meticulous, and amply documented [the petitioner's] criminal conduct," is meritless, and in fact, at this point, in light of the case agents' representations, in light of the evidence attached to the petitioner's motion, in light of the fact that the petitioner is actually innocent, and in light of the prosecutors' numerous false representations, is actually fraudulent. (See The petitioner's motion, p. 141-185).

Therefore, despite the government's reassurances, it is clear that the government failed to conduct an adequate investigation prior to the petitioner's arrest; that the government abandoned its investigation at an unreasonable juncture, given that DOL Agent Della Penna stated that he "knew that he had a slam-dunk case" when he subpoenaed the records and was able to trace the payments to the KingCare accounts, and when he was able to trace payments out of the KingCare accounts, which in reality, confirms that the payments were transparent, and that there was no criminal intent in this case; and further, it is clear that the petitioner's conviction must be vacated, as the petitioner's prosecution was based on fraudulent information, which the government was clearly aware prior to the filing of the original Indictment, and as the prosecutors continuously argued that the petitioner was guilty based on a fraudulent theory of guilt throughout the proceedings, when it was clear that the petitioner was actually innocent during the proceedings, as there were no crimes in this case. (See The petitioner's motion, p. 141-185.)

Regarding the government's third argument that the petitioner's claim that the prosecutors "improperly restrained funds that were intended specifically for defense costs" is "conclusory," and should be denied, as "the Supreme Court affirmed the Government's use of a pre-trial asset freeze to preserve the availability of forfeitable assets during the pendency of criminal proceedings," and as the Court held that "such assets may be frozen even if the defendant would have designated those funds for the retention of defense counsel of choice," it should be noted that, as the petitioner understands, in Kaley v. United States, 571 U.S. ___ (2014) the petitioners conceded that the property in question was traceable to the government's accusations.

However, in this case, at the very least, it is clear that the government should have been able to release funds for defense costs, as there were funds that were unrelated to its accusation. This would include the following examples (among others): (1) the

---

Fund professionals made many decisions that would have affected the statements; that these decisions were unrelated to KingCare; and that a TPA company would not bear the responsibility for the content of a client's statements, especially as the content of a client's statements are decided by the client – not by the TPA company that mails the statements. (In other words, the Trustees could have written whatever they wanted on their statements, and the petitioner would not have had any control, or any right to challenge their wishes.) Further, it should also be noted that this information is also checked by the Fund Professionals, who reviewed these materials, and who are completely independent from KingCare. (See The petitioner's motion, p. 156, which also explains in more detail KingCare's role regarding the Local 147 Statements.)

government should have released the insurance settlement, which clearly could not be traced to the government's accusation, as it came from a different source (and which was also intended specifically for defense costs); (2) as the government now admits, at least $3.6 million of the funds transferred to KingCare from the Local 147 expense account during the Indictment period was legitimate, so it is clear that the government should have been able to release funds for defense costs during the proceedings (The government's response, p. 6); and (3) DOL Agent Della Penna's Sealed Complaint admits that there was an additional 26% in the KingCare accounts, which exceeded the cost of the purchases listed in the Indictment, so it is clear that there were funds from other sources, which should have allowed for the release of funds for the petitioner's defense.[49] (See The petitioner's motion, p. 141-185.)

Therefore, not only did the government bring charges in this case without having sufficient evidence to prove its case at trial; not only did the government demonstrate at the sentencing hearing that it knowingly criminalized a civil billing dispute; and not only did the government refuse to release funds for defense costs during the proceedings because it was clear that there were no crimes in this case; but in addition, in this case, the government also refused to release funds for defense costs that clearly came from other sources. (See The petitioner's motion, p. 248-256.)

Further, it should be noted that, in this case, the government restrained assets that were not subject to forfeiture, and then threatened the petitioner's family so that her family members would not come forward to prove that they owned these properties, and so that her family members would ultimately give up their interests in these properties. (See The petitioner's motion, p. 162-164.)

In addition, it should be noted that, in this case, it is clear that the prosecutors fraudulently manufactured probable cause by omitting the key facts of this case, which the prosecutors were clearly well aware of when they filed the original Indictment.[50] This

---

[49] It should be noted that this is also explained in the petitioner's motion (among other facts), so it is clear that the petitioner's claim is not "conclusory." (The government's response, p. 25.)

[50] It should also be noted that, in Kaley v. United States, 571 U.S. ___ (2014), regarding a pre-trial hearing on the issue of probable cause, the Court also stated:

> A prosecutor, of course, might drop the case because of the court's ruling, especially if he thought that decision would bring into play an ethical standard barring any charge "that the prosecutor knows is not supported by probable cause." ABA Model Rule of Professional Conduct 3.8(a) (2013). (See Kaley v. United States, 571 U.S. ___ (2014))

Therefore, since it is clear that the government's case is based on a fraudulent construction of the facts of this case (as addressed above and in The petitioner's motion), it is clear that the prosecutors brought charges in this case, while knowing that their accusations were not supported by probable cause. (See The petitioner's motion, p. 141-

would include the following facts: (1) the extensive work-product produced by KingCare, which was demanded by the Local 147 Trustees, which the government agents personally removed from the KingCare offices on the day of the petitioner's arrest, and which was produced in discovery in this case by the government; (2) KingCare was owed deferred compensation from the prior period, as the Local 147 Trustees deferred the administrative expenses of the Funds, due to the lack of work in the industry, as the prosecution was advised after the petitioner's arrest; (3) the payments made to KingCare were earned pursuant to the Administrative Agreements, and were transparent, authorized, and fully disclosed (as verified by the EisnerAmper Report); (4) it is clear from the Fund Records that the payments were in amounts that were intended to be transparent upon audit, as the payments are very easily identifiable as payments that were made to KingCare (which DOL Agent Della Penna later admitted on national television), and as payments were in amounts that could only have been transferred to KingCare, as no other entity received compensation in this way; (5) the Benefit Funds were subject to extensive oversight, which makes the government's accusation ridiculous on its face; and (6) there was an additional 26% in the KingCare accounts, as admitted by DOL Agent Della Penna in his Sealed Complaint, which exceeds the cost of the purchases listed by the government. (See The petitioner's motion, p. 141-185.)

Further, it should also be noted that: (1) the payments made to KingCare were earned, as confirmed by the EisnerAmper and Vasil Reports, which used the original Fund Records and the original tax filings to confirm that there were no crimes in this case, and which were submitted to the Court prior to the sentencing hearing; and (2) each firm that properly reviewed the amount of work and the level of the work completed by the company, as well as the administrative expenses, stated that it would have cost much more for them to have provided comparable services, especially given that most of the additional projects required specialized services and specialized software to meet this particular client's servicing requirements.

Again, on this point, it should also be noted that the prosecutors were well aware that there were no crimes in this case during the proceedings; that they conspired with the Local 147 Trustees and with the Local 147 Trustees' civil attorneys, who made many fraudulent accusations in civil court, who clearly had a very substantial interest in the outcome of the criminal case, as they wished to benefit financially, politically, and professionally from this case; and that the prosecutors acted like the Local 147 Trustees' private lawyers, as the prosecutors perpetuated the Local 147 Trustees fraudulent representations in the criminal case, and as they argued the positions that the Local 147 Trustees needed them to argue, not what the prosecutors knew to be true. (See The petitioner's motion, p. 141-185.)

Therefore, it is clear that the prosecutors (most likely) met the standard for probable cause by defrauding the Grand Jury, as it is clear that the prosecutors made these representations throughout the proceedings, and as it is clear that the prosecution would not have been able to meet this standard, had the prosecutors provided the true

185). Therefore, it is clear that the prosecutors, once again, knowingly engaged in unethical conduct. (See The petitioner's motion, p. 263-277.)

facts of this case (which were also known to the prosecutors prior to the filing of the original Indictment). (See The petitioner's motion, p. 141-185 and p. 263-277.)

Further, it should also be noted that it is clear that the prosecution willfully defrauded the Court and (most likely) the Grand Jury because, in its latest submission, even in the face of evidence showing that the Local 147 Trustees clearly knowing provided false testimony, the prosecution is continuing to argue that this testimony is credible, in order to hold its fraudulent case together. (See The government's response, p. 25-26.)

Therefore, as alleged in the petitioner's motion (see The petitioner's motion, p. 141-185, p. 248-256, and p. 263-277), it is clear that the petitioner's claim is not "conclusory," and that the prosecution still has not provided an adequate legal explanation for their refusal to release any funds for defense costs.

Therefore, as discussed above, it is clear that the prosecution also erroneously limited the petitioner's choice of counsel in violation of her Sixth Amendment right to be represented by counsel of her choice, especially as it was clear that the prosecutors were refusing to release funds for defense costs during the proceedings because they knew that the petitioner's case defensible, as no crimes were committed in this case. (See The petitioner's motion, p. 141-185 and p. 248-256.) See United States v. Gonzalez-Lopez, 548 U.S. 140 (2006), in which the Supreme Court stated that the erroneous deprivation of a defendant's choice of counsel entitles him to reversal of his conviction.

Regarding the government's fourth argument that the petitioner's "argument that the prosecutors "knowingly submitted perjured testimony to the Court" in the form of the "Epstein Affidavit" (the "Affidavit") flatly contradicts findings that the Court made at sentencing," first, it should be noted that, as the petitioner established in her motion, it is clear that the Epstein Affidavit was brazenly perjured. (See The petitioner's motion, p. 141-185.)

Further, in addition to the instances identified in the petitioner's motion, it should be noted that it is also clear that Mr. Epstein's Affidavit was perjured, as Mr. Epstein swore that, as he understood, "King's monthly fee from her contracts with the Local 147 . . . Funds would pay for any expenses she incurred." (See The government's response, p. 25.) On this point, it should be note that, as confirmed by the EisnerAmper Report, the Administrative Agreements specifically allowed for KingCare to be compensated for services that were considered outside of the scope of the Administrative Agreements.

To this effect, one of the 2002 Administrative Agreements (which is attached as Exhibit 2), states as follows:

> 2. In consideration of the services enumerated in paragraph "1" of this Agreement, the Trustees of the funds agree collectively to pay KingCare, LLC. the sum of ten thousand ($10,000.) dollars per month, said fees to be payable quarterly in advance prior to the quarter for which the services are to be rendered.

All services outside this fee which include additional staffing, computer technicians, computer system design and engineering, etc. will be billed by KingCare at the rate of 3 (three) times the hourly labor cost.

3. All disbursements will be reimbursed to [KingCare] by the Fund. These costs include printing, duplicating, postage, messengers, paper, diskettes, binders, etc. Storage costs relating to those records of the funds stored by a third party shall also be borne by the Fund as well as long distant phone calls benefit inquiry. The Funds will also pay and reimburse [KingCare] for their cost of computer equipment, their use of telephone lines, as [well] as any other cost paid by [KingCare] on behalf of the Funds. A reconciliation of expenses will be done annually. It is not the intention of the parties that [KingCare] advance to the Funds the cost of the items needed by the Plans in order to appropriately manage the Funds.

4. Services which are not normally required in administering the Funds, services which could not reasonably be anticipated at the time this Agreement was executed and services requiring significant expenditures of time not reasonably contemplated at the time this Agreement was executed are not within the scope of the Agreement and the Trustees agree that the Fund will be billed separately for the reasonable costs of providing such services. The services described in this paragraph shall include but not be limited to reconstruction or other work performed which relates to periods prior to [KingCare's] retention as Fund Manager, work performed as a result of statutory or regulatory changes and work performed in connection with benefit or eligibility changes enacted by the Trustees.

...

15. It is the intention of the parties that KingCare, LLC. shall rent office space in the Bronx, NY with a back up office in Irvington to supplement the Bronx space (for computers and files) and that all costs associated with the Bronx and Irvington office will be borne by the Funds. The office space in the Bronx will be paid directly by the Funds to the landlord and the costs of running the Irvington will be billed to the Funds and paid to [KingCare]. The Office space in the Bronx will be used by the Funds as a needed office to meet with Participants that are unable to come to the office in NYC. All expenses related to these two offices will be paid by the Fund and any additional staffing will also be reimbursed by the Funds to [KingCare].

(The 2002 Administrative Agreement, p. 6-7 and 9, Exhibit 2.)

Therefore, it is clear that Mr. Epstein's representations in his Affidavit are fraudulent, and further, that Mr. Epstein's Affidavit was submitted in a deliberate effort to deceive the Court. (See The petitioner's motion, p. 141-185.)

On this point, in her motion, the petitioner states:

Therefore, Mr. Epstein's Affidavit clearly demonstrates that the criminal case was fraudulent, as Mr. Epstein could not swear to the government's position without committing perjury. Further, as an Employer Trustee of the Funds, Mr. Epstein's Affidavit shows that the Trustees' civil Complaint is also fraudulent, as the Trustees were clearly well aware of the additional projects and of the additional expenses, and were clearly directing the KingCare employees on this additional work while the additional projects were in progress.

Further, given the evidence that was produced in discovery, which shows that the Trustees requested the additional services and which shows that the services were provided, for the prosecutors and the Trustees' civil attorneys to contend that the additional services that were demanded by the Trustees and provided by KingCare were "phantom projects" is truly fraudulent, as are their representations that the Trustees never authorized additional payment for the tremendous additional projects that were completed by KingCare.[51]

Therefore, it is clear that Mr. Epstein's testimony was actually false and that the prosecutors knew that his testimony was actually false when this testimony was submitted to the Court. (This is also clear, as the prosecutors reviewed the EisnerAmper Report prior to making these arguments in Court, so it is clear that the prosecutors knew that the Fund Records showed that there was no embezzlement in this case when I was sentenced.)

(See The petitioner's motion, p. 150.)


Second, it should be noted that, in light of the petitioner's claim that the government knowingly submitted this false testimony, and further, that the government willfully committed a fraud upon the court, the government's reliance on the Court's comments at the sentencing hearing is untenable, since the Court relied on the prosecution's representations in order to reach its conclusion. (See The petitioner's motion, p. 6-58.)

On this point, in her motion, the petitioner states:

It should also be noted that the prosecutors' fraudulent representations had a substantial effect on the outcome of the proceedings, as the Court relied on the fraudulent representations of the prosecutors and of the Trustees' civil attorneys at the sentencing hearing, rather than on the evidence that was available (as the EisnerAmper Report, which was submitted to the Court prior to the sentencing hearing, used and attached the original Fund Records to confirm the Defense's position), as the Court found that the prosecution's argument was "more credible" than the Defense's "argument," though the prosecutors clearly committed a fraud upon the court, as the prosecutors knew that the additional projects were not

---

[51] The Government's Sentencing Memorandum, p. 12.

"phantom projects," and as the prosecutors knew that the additional work was actually completed by KingCare. To this effect, at the sentencing hearing, the Court stated: "But the defendant contends that these amounts were for special projects, the deferred compensation and legitimate expenses, a proposition that the government and counsel for the funds vigorously disputes."[52]

Therefore, it is clear that Mr. Epstein's testimony was actually false; that the prosecution knew that his testimony, the representations of the Trustees' civil attorneys, and the representations of the prosecutors were actually false; and that this clearly had a substantial effect on the outcome of the proceedings, as the Court relied on the representations of the prosecutors and of the Trustees' civil attorneys at the sentencing hearing, when the prosecution's case was entirely fraudulent, as KingCare completed the additional work; as the payments made to KingCare were transparent and fully disclosed; and as it was clear during the proceedings that there was no embezzlement, tax crime, or mail fraud in this case, as it was clear when the prosecution rested that there was insufficient evidence to support the convictions, as the prosecutors brought charges in this case without having clear evidence of wrongdoing, as there were no crimes in this case.

(See The petitioner's motion, p. 150-151.)

Therefore, it is clear that the government's reliance on the Court's comments at the sentencing hearing is inadequate to demonstrate the validity of Mr. Epstein's representations. (See The government's response, p. 25-26.)

On this point, it should also be noted that, in its response, the government does not attempt to address the exhibits that are attached to the petitioner's motion, which confirm that Mr. Epstein's Affidavit was perjured testimony, nor does it provide additional evidence to support Mr. Epstein's fraudulent representations, which it could have provided in the form of additional affidavits from the case agents, or from the prosecutors themselves, who could have sworn under penalty of perjury to the government's positions (e.g. that the additional projects were "phantom projects"). (See The petitioner's motion, p. 141-185.)

Further, it should also be noted that the government agents gave interviews on national television, which contradict the government positions in court. (See The Second Declaration of Melissa King, Exhibit 1.) Moreover, it should be noted that the government fails to raise, let alone explain, how the Affidavit could be credible in light of the EisnerAmper Report, which verified that KingCare received compensation as outlined in the Administrative Agreements, and as approved by the Local 147 Trustees, as confirmed by the original Fund Records. (See The government's response, p. 1-30.)

Further, it should be noted that the petitioner addressed the Court's comments at the sentencing hearing in her motion, as the Court accepted the government's fraudulent

---

[52] June 21, 2012 Sentencing Hearing Transcript, p. 61.