representations in order to sentence the petitioner, when it was clear that there were no crimes in this case when the petitioner was sentenced, and when it was clear that the prosecutors knew that there were no crimes in this case when the petitioner was sentenced.

To the effect, in her motion, the petitioner states:

At the sentencing hearing, the Court discredited Mr. Schachter's incorrect legal advice, discredited the Defense's "argument," and accepted the government's fraudulent argument that the additional services were "phantom projects," even though the Reports showed that the projects were completed, and even though the prosecutors relied on an email at the sentencing hearing, which demonstrated in court that the employees worked on the additional projects, as requested by the Local 147 Trustees.

The Court also ruled that I had not accepted responsibility and imposed a sentence of six years imprisonment, though I did not knowingly, intelligently, and voluntarily plead guilty to the conduct that is identified in the Superseding Indictment, though the Reports showed that there was no basis in fact for the convictions when I was sentenced, and though I was actually innocent of the charges, as the prosecutors did not present any evidence of a crime in court to justify the accusations that they made in court and in the press.

To this effect, at the sentencing hearing, the Court stated:

*A word of overview is useful.*

*The government contends that the defendant embezzled over $40 million from the benefit funds by having the funds pay King Care which the defendant controlled and then using the funds in King Care for extravagant personal expenses including jewelry, expensive wines, horses, home improvements, and the like.*

*The defendant in her submissions attempts to paint a different picture. She contends that she is guilty of embezzlement only because she caused the benefit funds to pay for expenses that were properly charged to other entities such as the Welfare Fund and the Union itself and, therefore, charging those expenses to the benefit funds was improper.*

*She contends that she did, in fact, do this work and was compensated appropriately for it although she should not have – although the money should not have come out of the benefit funds, and that was the nature of the embezzlement. She also contends that some of the money that was paid and otherwise unaccounted for was for past compensation that was deferred and not previously paid.*

*The defendant's argument is not credible for several reasons. There are no documents such as bills, invoices, work orders, or the like to support*

81

> *all of this work that the defendant claims she was authorized to do. Nor is there such documentation for the deferred compensation. Moreover, in all of the extensive submissions there is no explanation where the defendant came up with the figure of $7 million to estimate the amount of the embezzlement.*
>
> *More credible is that the defendant was able to control the expenditures from the funds; that she caused these expenditures from the funds; that she caused these expenditures to be paid to KingCare, which she controlled; and that these expenses were unjustified expenses; and that she used the accounts of KingCare to pay for extravagant personal expenses.[53]*

First, it should be noted that this shows that the prosecutors brought charges in this case without having sufficient evidence in order to prove their case at trial, as the Court had to discredit the Defense's position when the prosecution rested at the sentencing hearing (in order to find me responsible for an embezzlement that also had not occurred). Further, the attached documentation confirms that the administrative expenses were deferred (Exhibits 11A-11F), that the Local 147 Trustees even deferred their own compensation (Exhibit 11D), that Mr. Epstein's Affidavit was perjured (Exhibits 6-10), and that the Local 147 Trustees even directed the additional work while the additional projects were in progress (Exhibits 7A-7B). Therefore, it is clear that as there was nothing wrong with the Defense's argument at the sentencing hearing, and that it was the prosecution's argument that was not credible, as there was no embezzlement, tax crime, or mail fraud in this case.

Second, it should be noted that this description of the prosecution's case shows that this was a civil case, as this description shows that the prosecutors had to stretch the evidence and the law in order to characterize these actions as criminal (though the work was completed, so the payments were actually earned). It should also be noted that it is clear from this description that the prosecution did not have sufficient evidence in order to prove that I had engaged in any criminal conduct, as "I" was not "KingCare"; as the payments were transparent and fully disclosed; as the Fund Records show that the Trustees ratified the payments made to KingCare; as the Fund Records show that KingCare completed the additional work, which was requested and directed by the Board of Trustees; as the Fund Records show that the administrative expenses were audited by the Fund professionals, in compliance with governmental regulations, which is also confirmed by the EisnerAmper Report; and as the income was reported and as the taxes were paid, as advised by KingCare's accounting firm and by counsel, and as in any other business.

(See The petitioner's motion, p. 50-51.)

---

[53] June 21, 2012 Sentencing Hearing Transcript, p. 59-64.

Therefore, it is clear that the petitioner addressed the Court's comments at the sentencing hearing in her motion, as the Court's comments were based on the petitioner's invalid guilty plea and on the government's fraudulent representations, and as it was clear that the petitioner's case should have been dismissed when the prosecution rested, as her guilty plea was not entered knowingly, intelligently, and voluntarily; as there was insufficient evidence to support the convictions when the petitioner was sentenced, as the government brought charges in this case without having sufficient evidence in order to prove any of its accusations in court; as the petitioner is "factually innocent," as there were no crimes in this case; as the prosecutors demonstrated that they knowingly criminalized a civil billing dispute at the sentencing hearing; and as this case was a willful fraud upon the court, as the prosecution knew that there were no crimes in this case during the proceedings (see The petitioner's motion, p. 6-58).

In addition, regarding the Catanzaro Declaration and the Vasil Report, though the government relies on the Court's comments at the sentencing hearing, as the Court stated that the "government's expert report [was] more credible because among other reasons the defendant's report does not include as income to the defendant the admitted millions of dollars that she embezzled," and as the government contends that this "further undermines King's claim of perjury," it should be noted that the government's argument on this point is meritless, as the Court's argument (which came from the government) is meritless, as the petitioner's guilty plea was unconstitutional, as it was not entered knowingly, intelligently, and voluntarily (and as the petitioner's guilty plea should have been withdrawn prior to the sentencing hearing, as addressed in the petitioner's motion, and as addressed above). (The government's response, p. 25-26.)

Further, regarding the Catanzaro Declaration and the Vasil Report, as the petitioner addressed in her motion, it is clear that the Catanzaro Declaration is meritless, first, as it relies on the petitioner's guilty plea to establish a loss amount, and further as the Vasil Report (which was created by a credentialed and licensed professional) established that no crimes were committed in this case, as the Vasil Report used the original tax filings to show that the taxes were paid, as decided and approved by KingCare's accounting firm and by KingCare's tax attorney. (See The petitioner's motion, p. 141-185.)

To this effect, in her motion, the petitioner states:

In response to the Vasil Report, which used the original tax filings to show that the taxes were paid (as advised by KingCare's accounting firm and by counsel), the prosecution submitted a declaration by an agent who was not certified.

In the sentencing submissions, the prosecution used Agent Catanzaro's Declaration to assert that Mr. Vasil's Report was not credible, "most notably" because "it [failed] to account for any of the 7 million that King admitted to embezzling."[54] AUSA Facciponti also asserted that Agent Catanzaro's

---

[54] On this point, at the sentencing hearing, the Court stated: "the government's expert is more credible because among other reasons the defendant's report does not

Declaration "offers an alternate calculation that ascribes certain income to Melissa King that was improperly ascribed as income to Jerome and Mabel King. The alternative calculation shows that King owes and additional $8,023,907 to the IRS."[55]

Given that my understanding of the Plea Agreement was that the $7 million represented services that were actually provided, the $7 million referenced in the plea allocution would have been properly taxed, as the business expenses were actually incurred.

In addition, I have also been advised that the IRS cannot receive the taxes twice, which would invalidate the other calculations, as the business income was reported on the original tax filings under KingCare, as advised by KingCare's accounting firm and by counsel, as confirmed by the Vasil Report. This shows that the calculations provided by the government were meaningless, (especially) as there was no tax benefit to the government's accusations; as the government cannot receive the taxes twice; and as the income was reported under KingCare, as advised by counsel and as in any other business. (This also shows that the government's calculation would also invalidate the company, which does not make sense, as the company worked and earned as any other company, and as the company rendered services to several clients, as any other company.)

Concerning the Report, Mr. Vasil's Report used the original tax filings to show that the taxes were paid, as decided and approved by KingCare's accounting firm and by KingCare's tax attorney. (It should also be noted that the accountants also worked from the Irvington office location at times, so the structure of the company and the job descriptions of the employees were also clearly known to KingCare's accounting firm.)

Further, if the prosecution had to rely on the plea allocution itself to attack Mr. Vasil's findings, it is clear that the government did not have sufficient evidence to bring criminal charges in the first place. (It is also clear that the prosecution misrepresented the strength of their case at the plea hearing, and that there was insufficient evidence for the Court to accept the guilty plea, as the government could not produce any competent evidence or a certified expert to corroborate their position for the sentencing hearing.)

Moreover, the government also continuously misrepresented the facts of this case in order to make it seem as if purchases were billed to Local 147, or that purchases and expenses were incorrectly reported, even when there was absolutely no tax benefit to their accusations (as the work was completed by the company, as the taxes were reported and paid as advised by counsel, and as the government cannot receive the taxes twice).

---

include as income to the defendant the admitted millions of dollars she embezzled." (June 21, 2012 Sentencing Hearing Transcript, p. 62.)

[55] The Government's Sentencing Memorandum, p. 23.

In addition, it should be noted that Ms. Catanzaro's Declaration also makes it clear that there was absolutely no basis for the (approximately) $30 million alleged in the Indictment, which demonstrates that the prosecution clearly misled the Grand Jury on this issue.

(See The petitioner's motion, p.161-162.)

Therefore, the government's assertion that "neither the Vasil Report nor any other evidence contradicts the validity of the Affidavit" is meritless and should be rejected, as the exhibits attached to the petitioner's motion proves that the Epstein Affidavit is perjured testimony, and as the EisnerAmper and Vasil Reports used the original Fund records and the original tax filings to show that there were no crimes in this case. (See The petitioner's motion, p. 141-185.)

Therefore, it is clear that the prosecutors submitted testimony in this case that was actually false; that the prosecutors knew or should have known that this testimony was actually false when it was submitted; that this testimony went uncorrected (and further, that the prosecution wishes to continue to leave this false testimony uncorrected, in order to continue to incarcerate the petitioner, who is actually innocent); that this testimony was prejudicial, as the Court relied on the fraudulent representations of the prosecutors and of the Trustees' civil attorneys at the sentencing hearing, in order to discredit the petitioner's position, in order to sentence the petitioner for crimes that never occurred, though the petitioner is actually innocent, as there were no crimes in this case; and therefore, that the petitioner's convictions must be vacated. (See The petitioner's motion, p. 141-185.) See Shih Wei Su v. Filion, 335 F.3d 119 (2nd Cir. 2003).

Further, it should be noted that, it is clear that the prosecutors knowingly submitted perjured testimony, in light of the government's latest submission, in which the prosecution continues to quote the Epstein Affidavit (see The government's response, p. 25-26), which is clearly perjured, especially in light of the exhibits petitioner's motion. (See The petitioner's motion, p. 141-185.)

(Again, it should also be noted that the petitioner's motion [with the attached exhibits] established that the petitioner is factually innocent, as her guilty plea was not entered knowingly, intelligently, and voluntarily; as there was insufficient evidence to support the convictions when the petitioner was sentenced, as the government brought charges in this case without having sufficient evidence in order to prove any of its accusations in court; as the petitioner is "factually innocent," as there were no crimes in this case; as the prosecutors demonstrated that they knowingly criminalized a civil billing dispute at the sentencing hearing; and as this case was a willful fraud upon the court, as the prosecution knew that there were no crimes in this case during the proceedings [see The petitioner's motion, p. 263-277].)

It should also be noted that it is very disturbing that the government is continuing to cite the Epstein Affidavit, given that the evidence attached to The petitioner's motion proves that the Epstein Affidavit was perjured. (See The petitioner's motion, p. 141-185.) It should also be noted that this shows that the government has gone from fraudulently

denying the extensive work-product that was produced in discovery, to fraudulently denying documents that have been put directly before the Court, which were signed by the government's key witness, who clearly has an immense motive to lie in court in order to support the government's case (as the Local 147 Trustees' civil Complaint was fraudulent, and as the Local 147 Trustees and the Local 147 Trustees' civil attorneys only went to the Department of Labor with their fraudulent accusation, so that the Department of Labor would restrain the petitioner's and the petitioner's family's assets, in order to prevent the petitioner and the petitioner's family from defending against their fraudulent accusations in both civil and criminal court).[56]

On this point, in <u>Shih Wei Su v. Filion</u>, 335 F.3d 119 (2nd Cir. 2003), the Court stated:

> Since at least 1935, it has been the established law of the United States that a conviction obtained through testimony the prosecutor knows to be false is repugnant to the Constitution. *See Mooney v. Hohohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935). This is so because, in order to reduce the danger of false convictions, we rely on the prosecutor not to be simply a party in litigation whose sole object is the conviction of the defendant before him. The prosecutor is an officer of the court whose duty is to present a forceful and truthful case to the jury, not to win at any cost. See, e.g., Jenkins v. Artuz, 294 F.3d 284, 296 n. 2 (2nd Cir. 2002) (noting the duty of prosecutors under New York law "to seek justice, not merely to convict").

Therefore, it should be noted that, since the government is continuing to cite the Epstein Affidavit, which is clearly perjured testimony, this also confirms the government's willingness to present false arguments and to present false testimony in court in order to secure a conviction in this case. (See <u>The government's response</u>, p. 25-26.) Further, it should also be noted that, at this point, the government is also not even bothering to hide its misconduct from the Court, as this evidence is clearly perjured. (See <u>The government's response</u>, p. 25-26.)

Finally, in its response, the government argues that the petitioner's "remaining claims regarding prosecutorial misconduct are simply bare and baseless allegations," that are not supported by "evidence" or by "sworn declarations." (<u>The government's response</u>, p. 27.)

---

[56] As the petitioner states in her motion, it is also significant to note that the Local 147 Trustees and the Trustees' civil attorneys likely went to the Department of Labor at that time, as the Local 147 Trustees were supposed to be deposed in the civil case, as KingCare had filed extensive Counterclaims in civil court, and as the Trustees and the Trustees' civil attorneys needed the government to restrain the petitioner's family's assets in order to prevent KingCare and the petitioner from defending against their fraudulent accusations in civil court, as there was no embezzlement in this case. (See <u>The petitioner's motion</u>, p. 8.)

According to the government, this includes the following claims: (1) the petitioner's claim that the government "made "numerous misrepresentations" in Court"; (2) the petitioner's claim that the government "misled the grand jury"; (3) the petitioner's claim that the government destroyed "a "massive amount" of exculpable material"; (4) the petitioner's claim that the government ""caused the process to lose its character as a confrontation between adversaries" by seizing materials from King Care pursuant to a search warrant"; and (5) the petitioner's claim that the government "prosecuted without evidence of wrongdoing." (The government's response, p. 27.) The government argues that the petitioner's claims "should therefore be rejected." (The government's response, p. 27.) The government's arguments regarding these claims are meritless, as discussed below.

First, it should be noted that the petitioner attached numerous exhibits to her motion, which confirm the petitioner's representations, and which support her claims. (See The petitioner's motion, p. 1-290.) Further, it should be noted that the petitioner also included in her motion numerous quotes from the government's submissions, as well as from the transcripts of the proceedings, which serve as additional evidence, and which support the petitioner's claims. (See The petitioner's motion, p. 1-290.) Moreover, it should be noted that the petitioner has attached another declaration to this reply, in order to confirm her representations in her motion. (See Exhibit 1.) Therefore, it is clear that the petitioner's claims are properly supported by facts and by evidence, so it is clear that the petitioner's claims should not be rejected, as advocated by the prosecution. (See The government's response, p. 27.)

In addition, regarding the government's assertion that the petitioner is claiming that the government ""caused the process to lose its character as a confrontation between adversaries" by seizing materials from King Care pursuant to a search warrant," it should be noted that the claim as raised by the petitioner is as follows:

> VI. The government removed the discovery materials from the KingCare offices and then became responsible for preparing the data in this case, which led to a breakdown in the adversarial system of justice, as the government essentially became responsible for preparing the Defense materials, which caused the process to lose its character as a confrontation between adversaries, in violation of my right to due process guaranteed by the Fifth Amendment.

(See The petitioner's motion, p. 258.)

Further, as outlined in the petitioner's motion, the difference, as the petitioner understands, between this case and the typical case, on this point, are as follows:

> It should be noted that the Defense provided its own IT Expert's estimation for the data; that the government provided an estimation that was not credible, and which they could not live up to, which caused them to produce the data in a way that was not approved by the Court; and that I was later told that a "massive amount" of the data was corrupted during the conversion (as the government provided an estimation during the proceedings that was not credible on its face),

which harmed my ability to present an adequate defense in court, as my ability to defend myself was contingent upon the government's production of the discovery materials, as the prosecution removed the Defense materials from the KingCare offices, pursuant to a search warrant executed on the day of my arrest.

...

Though the government made these representations in court, in the end, the government failed to abide by the Court Order, producing one potentially privileged set of data, rather than one clean and one potentially privileged set.[57]

In addition, when I asked Mr. Gise for specific records that should have been produced in discovery, Mr. Gise advised that he could not locate the documents; that the data was produced in such a way so that the Defense could only keyword search; and that a "massive amount" of the data was corrupted during the conversion.

This issue is also very significant, as the data consisted of KingCare's work-product, so the data was essential to my defense. Therefore, my ability to defend myself was contingent upon the government's production of the discovery materials, as the prosecution removed these materials from the KingCare offices. (This is in addition to the extensive work product that was in the IBM AS400, which, as far as I'm aware, the government never returned to remove from the Irvington office location.)

It should also be noted that while the government provided these materials in other forms, (if I'm remembering correctly) I was advised that the prosecution refused to provide the software, so this was essentially useless to the Defense, as the Defense had no way to review these materials, and as the prosecution restrained my family's assets and then refused to release funds for a proper defense, so there was no way for the Defense to acquire the software and the equipment to review these materials.

Moreover, it should be noted that (if I'm remembering correctly) the Defense requested that the government provide the data by mirroring each of the computers and then providing this information on flash drives, along with one of the computers to review the flash drives on, which, as far as I am aware, would have cost much less than the numbers that were later provided by the prosecution and by the Defense. However, (if I'm remembering correctly) I was advised that the prosecutors refused to do so, without providing an adequate explanation for refusing this request, especially as it is my current understanding that this is usually how the data is provided.

---

[57] This also ultimately led to the violation of my attorney-client privilege, as Mr. Schachter eventually waived my attorney-client privilege for the materials from the civil case, as he chose not to litigate the privilege logs (against my wishes).

As I now understand, the government does not usually remove the computers from offices when they execute search warrants – as I now understand, they usually mirror each of the computers, and remove this information on their own flash drives, leaving the computers at their original location. It should also be noted that I believe that the prosecution did not do this in this case, as they wished to intimidate me, so that I would plead guilty, as they had no evidence of a crime to present in court, so they executed the arrest and search warrants in a very aggressive and dramatic manner, and gave no indication prior to my arrest that I was even under investigation; had many government agents execute the arrest and search warrants at the Irvington location; took the work product and all of the defense materials from the civil case from the Irvington location; took out all of the computers from the KingCare offices; when through all of my family's personal mail; questioned me without reading me my Miranda rights; towed our cars out of the drive way to make a scene and to intimidate me; went out in the press after my arrest and made numerous false representations and circulated many lies to ruin my reputation; kept me on home confinement for 16 months when they had no evidence of a crime, when my children could have and were willing to sign for me from the beginning, when they did not have jurisdiction to prosecute this case, and while the prosecutors admittedly searched for a crime that they could prosecute in court; restrained my family's assets without having any evidence of a crime; refused to release funds for a proper defense; sold off my family's assets prior to trial, without having any evidence of a crime to present in court; and improperly limited my choice of counsel so that I could not demonstrate my innocence in court.

(See The petitioner's motion, p. 258-260.)

Further, as outlined in the petitioner's motion, the specific facts that support this claim are as follows (among the other facts identified in the petitioner's motion):

Therefore, while my rights were violated, as the government ultimately became responsible for destroying a "massive amount" of the Defense materials,[58] the fact that the government was responsible for producing the Defense materials in the first place (also against the Defense's wishes); the fact that the Defense was dependent on the government's production for the Defense materials; the fact that the government controlled the exculpatory materials of this case (and then also refused to acknowledge its existence, as the prosecution knew that there was a tremendous amount of work-product produced by the company, but argued that the additional projects were "phantom projects" in court); and the fact that the Defense was dependent on the government's choice of format for the Defense materials (as the prosecutors gave an estimation to the Court that was not credible

---

[58] Here, it is significant to note that my ability to defend myself was contingent upon the prosecution's production of the discovery materials, which were then destroyed by the prosecution, so it seems that it would have been impossible for me to have received a fair trial, as I could not adequately defend myself without the materials that were supposed to be produced in discovery.

and which they could not live up to, which ultimately allowed the prosecutors to essentially personally dictate the format of the Defense materials, as the materials were not produced in a way that was approved by the Court), this led to a breakdown in the adversarial system of justice, as the government ultimately became responsible for preparing the Defense materials, which caused the process to lose its character as a confrontation between adversaries, in violation of my right to due process guaranteed by the Fifth Amendment.[59]

(See The petitioner's motion, p. 258.)

Therefore, it is clear that the issue is not that the government " "caused the process to lose its character as a confrontation between adversaries" by seizing materials from King Care pursuant to a search warrant" (though it is clear from the prosecutors representations at the sentencing hearing and from case agents statements on national television that the petitioner's pre-trial motions had merit), but that the process lost its character as a confrontation between adversaries, as these materials were ultimately given to the government to produce for the Defense (also against the Defense's wishes); as the Defense became dependent on the government's production for the Defense materials; as the government unnecessarily controlled the exculpatory materials of this case (and then also refused to acknowledge its existence, as the prosecution knew that there was a tremendous amount of work-product produced by the company, but argued that the additional projects were "phantom projects" in court); and as the Defense became dependent on the government's choice of format for the Defense materials (as the prosecutors gave an estimation to the Court that was not credible and which they could not live up to, which ultimately allowed the prosecutors to essentially personally dictate the format of the Defense materials, as the materials were not even produced in a way that was approved by the Court); this led to a breakdown in the adversarial system of justice, as the government ultimately became responsible for preparing the Defense materials, which caused the process to lose its character as a confrontation between adversaries, in violation of my right to due process guaranteed by the Fifth Amendment.

Again, it should be noted that, as the petitioner understands, this case is not the typical case, as the government removed the materials from the KingCare office; as the government usually mirrors each of the computers, and removes this information on their own flash drives, leaving the computers at their original location (which they did not do in this case, as they wished to scare the petitioner [which the government did not deny in its response]); as the government failed to turn it over to the Defense so that these materials could be reviewed; as the government submitted an estimation that was not credible and which they could not live up to, which ultimately allowed the prosecutors to essentially personally dictate the format of the Defense materials, as the materials were

---

[59] It should be noted that this also ultimately led to the violation of my attorney-client privilege, as Mr. Schachter eventually waived my attorney-client privilege for the materials from the civil case, as he chose not to litigate the privilege logs (against my wishes).

not produced in a way that was approved by the Court; as the government refused to provide the data in a way that it could be reviewed by the Defense, when the government could have mirrored the computers and given one computer back in order to review the flash drives; as the government, essentially, intentionally interfered with the exculpatory materials of this case, when it was clear that the petitioner's case was defensible, especially given the work-product that was to be produced in this form; as the government destroyed "a massive amount" of these materials, as the petitioner was later advised that "a massive amount" of the data was destroyed during the conversion; and as the government failed to return to the KingCare Office to pick up the AS400, which would have included much more evidence of the work-product produced by KingCare, and significantly, much of the work-product going back over many years.  (See The petitioner's motion, p. 258-260.)

Finally, regarding the government assertion that the petitioner's claim that the government "made "numerous misrepresentations" in Court" is a "bare and baseless [allegation]," it should be noted that the government not only failed to explain in its response the numerous fraudulent representations that it advanced during the proceedings, but the government also advanced many of the same fraudulent arguments in its latest submission.  (See The government's response, p. 1-31.)

For example, in its submission, the government states:

Of the over $7 million that King took from the Local 147 Funds, only approximately $3.6 million—the value of her salary paid during those years under the administrative agreements— appears to be legitimate.

(The government's response, p. 6.)

First, regarding this comment, it should be noted that it is truly outrageous that that the government is now arguing that the amount of their fraudulent "embezzlement" is "over $7 million," when the petitioner ultimately had no choice but to sign a settlement for approximately $21 million (when the petitioner's attorneys were unprepared to proceed to have a Fatico Hearing). (The government's response, p. 6.)

Second, regarding this comment, it is clear from this assertion that the government is continuing to fail to acknowledge the true facts of this case, which are proven by the exhibits attached to the petitioner's motion and by the evidence produced in discovery, including: (1) the additional services completed by KingCare and the extensive work-product produced by KingCare, which was completed at the direction of the Local 147 Trustees;[60] (2) the extensive office at the Irvington location (which is confirmed by the photographs of the Irvington office, which were taken by the

---

[60] On this point, it is clear that the contract between KingCare and Local 147 specifically allowed for KingCare to be reimbursed at 3 times the hourly labor cost for the additional projects completed at the direction of the Local 147 Trustees (which is also a standard business construct). (See Exhibit 2, which is the 2002 Administrative Agreement.)

government agents on the day of the petitioner's arrest); (3) the documentation showing that KingCare was owed deferred compensation from the prior period (including the EisnerAmper Report, which confirmed this point during the proceedings), as the Local 147 Trustees deferred the administrative expenses of the Funds (including their own compensation), due to the lack of work in the industry;[61] (4) the evidence proving that Mr. Epstein's Affidavit is fraudulent testimony (which also undermines the Local 147 Trustees' civil Complaint); (5) the emails and invoices showing that the Trustees personally directed the KingCare employees; (6) the evidence showing that the Trustees threatened the petitioner's life and the safety of her family when their demands were not met fast enough, and when it was clear that the petitioner and the petitioner's family intended to defend against the Trustees accusations in civil court; and (7) the EisnerAmper and Vasil Reports (as the reports utilized the original Fund Records and the original tax filings to establish that there was no basis in fact for the convictions), which confirm that the payments made to KingCare were not the petitioner's "salary."[62] (See The petitioner's motion, p. 141-185 and p. 263-277.)

Moreover, it should be noted that, as the petitioner explained in her motion, each firm that properly reviewed the amount of work and the level of the work completed by the company, as well as the administrative expenses, stated that it would have cost much more for them to have provided comparable services, especially given that most of the additional projects required specialized services and specialized software to meet this particular client's servicing requirements. (See The petitioner's motion, p. 6-58, p. 141-185, and p. 263-277.)

---

[61] On this point, in her motion, the petitioner explained that the government's insistence that the payments made to KingCare from the Local 147 benefit Funds administrative expense accounts were intended for the specific year in which they were disbursed does not make sense, as this does not account for the different fiscal years of each Fund; for the deferral of the administrative expenses; or for the capitalization and for the depreciation of the expenses, which demonstrates that it was the Trustees' philosophy to defer the administrative expenses of the Funds, as the Funds did not have the income to pay the expenses in the proper years, due to the lack of work in the industry, as demonstrated by the original Fund Records. (See The petitioner's motion, p. 141-185.)

[62] In addition, it should be noted that the documents of this case confirm that this amount was not the petitioner's "salary." On this point, it should be noted that even Local 147 did not report this amount as the petitioner's "salary," so it is clear that this representation is incorrect, and further, it is clear that this representation is additional evidence of the complete lack of investigation in this case.

Further, it should also be noted that it is clear from the documents of this case that the petitioner was not the owner of KingCare, which was also confirmed by the government agents on national television, as the agents admitted that the petitioner's family owned the company. Therefore, it is clear that the prosecutors know the true facts of this case, and further, it is clear that the prosecution is continuing to engage in obvious prosecutorial misconduct by continuing to argue positions that are clearly false. (See The petitioner's motion, p. 141-185 and p. 263-277.)

Therefore, it is clear that the government's representation that "only approximately $3.6 million—the value of [the petitioner's] salary paid during those years under the administrative agreements— appears to be legitimate" is simply fraudulent, and further, it is clear that the petitioner's allegations of prosecutorial misconduct have merit, as the government is continuing to perpetuate its fraudulent representations from the proceedings in its latest submission, even in the face of evidence proving otherwise. (The government's response, p. 6.)

In addition, it should be noted that the government's latest submission confirms that the government's strategy to secure a conviction in this case was to use inflammatory rhetoric, to provide materially false statements, and to "scream lavish lifestyle," in the place of providing legitimate evidence of a crime in court.[63]

For example, in its response, without providing or pointing to any legitimate evidence of a crime, the government states:

> King used the money she embezzled to support a lavish lifestyle consisting of trips on private jets, two apartments on Park Avenue, the purchase of show horses for her daughter, jewelry, a large Westchester home, a full staff of servants, and many other luxuries.

> (The government's response, p. 2.)

Again, regarding this comment, it is clear that there was no embezzlement in this case, as the government is only able to reach this conclusion by ignoring the true facts of

---

[63] On this point, in her motion, regarding the government's deliberate and improper strategy in this case, the petitioner states:

> It should also be noted that the prosecution relied on this strategy [as DOL Agent Della Penna told the petitioner that "there are a lot of innocent people in prison" and that "once the jury hears horses, they will convict"] throughout the proceedings, listing purchases made by my family (which, as far as I am aware, were each made legitimately, with after-tax income, as verified by the EisnerAmper and Vasil Reports) in an attempt to paint a picture of a "lavish lifestyle" in court, while providing a completely false and misleading construction of the facts of this case (as they addressed the payments on a cash basis, over six-years, when the prosecution was informed from the beginning that KingCare was owed deferred compensation from the prior years), in order to make it seem as if an embezzlement had occurred, when it was clear that no embezzlement had actually occurred in this case (especially from the Fund Records, which show that the Trustees requested the additional work, and from the nature of the payments that were made to KingCare, as the payments were transparent and fully disclosed).

> (See The petitioner's motion, p. 6.)

this case, including: (1) KingCare completed tremendous additional projects at the direction of the Local 147 Trustees (as discussed in the petitioner's motion); (2) the government agents personally removed much of the extensive work-product that was produced by KingCare from the KingCare offices on the day of the petitioner's arrest and was also responsible for producing much of the extensive work-product in discovery during the proceedings;[64] (3) there was an extensive office at the Irvington location (which is confirmed by the photographs of the Irvington office, which are attached to the petitioner's motion, and which were taken by the government agents on the day of the petitioner's arrest); (4) the original Fund Records show that the Trustees specifically requested the services provided by KingCare, reviewed and ratified the administrative expenses year after year, and personally interacted with and directed the KingCare employees; (5) the payments made to KingCare were transparent and fully disclosed, as outlined in the Administrative Agreements; (6) it is clear from the Fund Records that the payments were in amounts that were intended to be transparent upon audit, as the payments are very easily identifiable as payments that were made to KingCare (which DOL Agent Della Penna later admitted on national television), as the payments received by KingCare were disbursed from a segregated administrative expense account, were reviewed in either QuickBooks or Excel format, and were in amounts specifically intended to be transparent upon audit, and as payments were in amounts that could only have been transferred to KingCare, as no other entity received compensation in this way, and as the Fund Records show that the $50,000 increments have been used going back over many years (since the 1990's, as the petitioner recalls), when the servicing requirements increased, which made it more practical to use the Administrative Reports for reporting purposes at the Trustees Meetings; (7) KingCare was owed deferred compensation from the prior period, as the Local 147 Trustees deferred the administrative expenses of the Funds (including their own compensation), due to the lack of work in the industry, as confirmed by the original Fund documents and additional records (which are also attached to the petitioner's motion), and as confirmed by the EisnerAmper Report (which confirmed the petitioner's representations on this point during the proceedings);[65] (8) the payments that were made to KingCare were listed on the Local 147 Certified

---

[64] On this point, it is clear that the contract between KingCare and Local 147 specifically allowed for KingCare to be reimbursed at 3 times the hourly labor cost for the additional projects completed at the direction of the Local 147 Trustees (which is also a standard business construct). (See Exhibit 2, which is the 2002 Administrative Agreement.)

[65] On this point, in her motion, the petitioner explained that the government's insistence that the payments made to KingCare from the Local 147 benefit Funds administrative expense accounts were intended for the specific year in which they were disbursed does not make sense, as this does not account for the different fiscal years of each Fund; for the deferral of the administrative expenses; or for the capitalization and for the depreciation of the expenses, which demonstrates that it was the Trustees' philosophy to defer the administrative expenses of the Funds, as the Funds did not have the income to pay the expenses in the proper years, due to the lack of work in the industry, as demonstrated by the original Fund Records. (See The petitioner's motion, p. 141-185 and p.263-277.)

Financial Statements and could be traced to the Form 5500s (as the petitioner's defense attorneys should have been able to say at the sentencing hearing);[66] (9) the Local 147 Benefit Funds were subject to extensive oversight, including audits and review, which makes the government's accusation ridiculous on its face, as this would not have permitted the embezzlement described by the Local 147 Trustees and the prosecution to occur; (10) the Local 147 Trustees received their own individual benefit statements and copies of all of the benefit statements and individual settlement reports, and also attended the Trustees Meetings, so they knew if there was a loss or gain on the Funds' investments and the Funds' Portfolio, and were aware of the details that would have affected their own personal statements; (11) the evidence proves that Mr. Epstein's Affidavit is fraudulent testimony (as discussed on p. 141-185 of The petitioner's motion), which also undermines the Local 147 Trustees' civil Complaint; (12) the payments made to KingCare were earned, as confirmed by the EisnerAmper and Vasil Reports, which used the original Fund Records and the original tax filings to confirm that there was no basis in fact for the convictions, and which were submitted to the Court prior to the sentencing hearing;[67] (13) the evidence shows that the Local 147 Trustees threatened the petitioner's life and the safety of her family when their demands were not met fast enough, and when it was clear that the petitioner and the petitioner's family intended to defend against the Trustees fraudulent accusations in civil court; (14) each firm that properly reviewed the amount of work and the level of the work completed by the company, as well as the administrative expenses, stated that it would have cost much more for them to have provided comparable services, especially given that most of the additional projects required specialized services and specialized software to meet this particular client's servicing requirements; and (15) there was an additional 26% in the KingCare accounts, as admitted by DOL Agent Della Penna in his Sealed Complaint, which exceeds the cost

---

[66] It is also very significant to note that the prosecution was aware that the payments were completely transparent, as the increments were used to be transparent upon audit, so it is clear from the Fund Records that the payments were completely transparent, first, as the amounts stick out because they are in even amounts, and second, as the payments can be very easily traced to KingCare, as they are in amounts that match no other payments that are dispersed from the Benefit Funds, so it was clear that these payments could only be payments that were dispersed to KingCare.

[67] In addition, it should be noted that the EisnerAmper and Vasil Reports also confirmed that the payments made to KingCare were not for the petitioner's "salary." On this point, it should be noted that even Local 147 did not report this amount as the petitioner's "salary," so it is clear that this representation is incorrect, and further, it is clear that this representation is additional evidence of the complete lack of investigation in this case.

Further, it should also be noted that it is clear from the documents of this case that the petitioner was not the owner of KingCare, which was also confirmed by the government agents on national television, as the agents admitted that the petitioner's family owned the company. Therefore, it is clear that the prosecutors know the true facts of this case, and further, it is clear that the prosecution is continuing to engage in obvious prosecutorial misconduct by continuing to argue positions that are clearly false. (See The petitioner's motion, p. 141-185 and p. 263-277.)

of the purchases listed by the government. (See The petitioner's motion, p. 141-185 and p.263-277.)

Regarding the lack of legitimate evidence in this case, as well as the government's improper strategy in this case, in her motion, the petitioner states:

> Despite their accusations in court and to the press, in the end, the government did not rely on a single Fund Record in court while arguing their case; they did not present an expert witness, did not present a forensic audit, presented a tax expert who was not certified to justify a (approximately) $30 million tax accusation, submitted interview reports of witnesses that were false and inflammatory, cited an appraisal of a website that was not credible on its face, and repeatedly cited a perjured affidavit to contradict the content of the original Fund records, which demonstrate that their accusations did not occur.[68]

When faced with the original Fund Records in court, the prosecution argued to

---

[68] Here, it should be noted that the government's "Interview Reports" were refuted in my sentencing submissions, and are also contradicted by the EisnerAmper Report, as the Report addressed the employees' job descriptions by year. Further, the government's appraisal of the website is also refuted by the EisnerAmper Report, and by the attached Exhibits, which are discussed above, under the separate claim that the prosecutors engaged in prosecutorial misconduct. (See Exhibits 9A-9C.)

It should also be noted that the website was the least involved project that KingCare was asked to perform, so the fact that the prosecutors only addressed this project was also very misleading, given that the other projects were much more extensive, and given that the other projects were clearly far beyond the type of work that would be consider typical TPA work.

For example, concerning KingCare's Work Projection Study, this was a highly specialized project, as it required both extensive knowledge of the industry and specialized programs in order to complete this additional project. In addition, it is also significant to note that, as far as I am aware, it is the only project of its kind, so it would not really be possible to provide an estimation of this study, as the prosecutors attempted to do for the website.

Though the website was the least involved project, it also should be noted that the "estimation" of the website that was submitted by the prosecution is also an example of how the prosecution refused to acknowledge the extensive work product that was produced by KingCare (as demonstrated by the proposal from the Segal Company for the consulting services for a similar project, which is attached as Exhibit 9C); of how the prosecution continuously devalued the administrative services that they had to recognize as services that were actually provided to Local 147 (as they devalued the project so that they could fraudulently argue that the additional projects were "phantom projects"); and of how the prosecution made the scope of the services provided by KingCare seem implausible by devaluing the abilities and job descriptions of the King Care employees, as the estimation stated that the website was likely created by a non- professional, which was contradicted by the EisnerAmper Report, and which is contradicted by Exhibits 9A-9C, which show that the estimation submitted by the prosecution is not credible.

have them removed from the proceedings, as the prosecution argued that I had not accepted responsibility, as my final sentencing submissions still included the EisnerAmper and Vasil Reports as attachments, which relied on the original Fund Records and on the original tax filings to show that there was no embezzlement, tax crime, or mail fraud in this case.

...

It should also be noted that when I was arrested, DOL Agent Della Penna told me (as well as several witnesses) that he had "a slam-dunk case," and that it was clear that he was so confident at that time, not because he had any evidence of wrongdoing, but because he felt that the prosecution could be successful in restraining my family's assets, could be successful in preventing me from defending myself (by refusing to allow the release of funds for a proper defense), and because he felt that the prosecution would be successful in court, as they would "scream horses, and the jury would convict," as is reflected in his comments, which are also addressed above.

It was also clear during the proceedings that the prosecution felt that they could be successful in this case by "screaming lavish lifestyle" in court, not because they had any evidence of wrongdoing, or because any crimes were actually committed in this case. Therefore, this case is truly a conspiracy and truly a fraud upon the court, as each party realized that no embezzlement actually occurred in this case, and as they all persisted in asserting that an embezzlement had occurred, solely because they wished to make a sensational case in court at my family's expense.

Further, as DOL Agent Della Penna stated that "there are a lot of innocent people in prison," and that "once the jury hears horses, they will convict," it was clear that the government realized when I was arrested that they did not have sufficient evidence in order to prove their accusations in court, so it is clear that they realized that they did not have sufficient evidence when I was indicted, as they did not gather any evidence of a embezzlement from the search warrant that was executed on the day of my arrest, as there was no evidence of a crime to find, as no embezzlement, tax crime, or mail fraud actually occurred in this case.

Therefore, as the prosecution premised their case on an incorrect theory of guilt (assessing the payments – which were in increments intended to be transparent upon audit – on a cash basis, over six years), it is clear that for the prosecution to acknowledge the true facts of this case (the deferral of compensation, the tremendous additional work produced by KingCare, and the Trustees' clear knowledge of and clear involvement in the day-to-day administration of the three Funds) would be for the prosecution to admit that they brought criminal charges in this case without having the right to do so; that they knowingly criminalized a civil billing dispute; that they committed a fraud upon the court, as they continuously lied in court in order to try to push this case through; and that the Trustees' civil Complaint is fraudulent, as the Trustees were aware of the additional work that was completed by KingCare, as they were aware of the

additional costs of completing the additional projects, and as they personally directed the additional work while the additional projects were in progress, so it is clear that there was no embezzlement in this case.

(See The petitioner's motion, p. 158-159 and p. 177-178.)

Further, regarding the government's statement,[69] it should be noted that, at this point, the government is well aware that this statement contains numerous fraudulent representations, and that it is truly incredible that the government is comfortable submitting this to the Court at this point.

On this point, it should be noted that the government's assertion is false for the following reasons: (1) the petitioner never used a "private jet"; (2) the petitioner (and the petitioner's family) used "time" on a small private plane on three occasions when the petitioner needed to travel with extensive business records (which also could not be checked underneath the plane due to HIPAA requirements [which also would have been a problem if the records were misplaced]), with extensive additional work, and with equipment necessary to complete the additional projects (including computers and printers), which, taken together, made traveling commercial unreasonable (as the petitioner needed to continue to work);[70] (3) there were no apartments on "Park Avenue";

---

[69] In its response, the government states:

King used the money she embezzled to support a lavish lifestyle consisting of trips on private jets, two apartments on Park Avenue, the purchase of show horses for her daughter, jewelry, a large Westchester home, a full staff of servants, and many other luxuries. (The government's response, p. 2.)

[70] It should also be noted that, as the petitioner remembers, for two of the occasions, there were no connecting flights (which made it more difficult, given the amount of business records), and for the third occasion, the amount of records and equipment was even more extensive, given that the petitioner and the petitioner's family were intending to leave for Florida for an extended period of time.

It should also be noted that, as the petitioner remembers, this alternative was originally researched, given the extensive business records required for each trip; given the petitioner and the petitioner's family's previous experience with transporting the extensive amount of business records on commercial flights; and given that it was becoming more and more difficult for the petitioner to continue to transport business documents, given her extensive medical conditions, which were making traveling I general more and more difficult. Therefore, it is clear that, under normal circumstances, the petitioner and the petitioner's family would have flown commercial, as they would not have researched this option, without the extensive business records, without the petitioner's medical conditions, and without the tremendous demands placed on the petitioner due to the requirements of the additional services and due to the tremendous daily demands of the Local 147 Trustees.

(4) the Apartments were on 67th Street, and were also intended to replace the Soho office; (5) the house in Irvington (which is in Westchester) was purchased prior to the Indictment period;[71] (6) regarding any jewelry or horses that were purchased, again, as

---

(Here, it should also be noted that, as the petitioner established in her motion, the Trustees were so involved in the daily administration of the Funds, and requested so much additional support, that, at one point, Mr. Fitzsimmons even told [the petitioner] that when his father died, he was back to work within the week, and that [the petitioner] could not travel to [her] parents in Florida, as [she] was needed in New York to work on their account on a daily basis.)  (See The petitioner's motion, p. 33.)

In addition, it should be noted that the petitioner's elderly parents spent the rest of the time spent on the small plane, as they had a medical emergency and needed to fly home to Florida.

Therefore, it is clear that this was not intended as a "luxury," but came about as a result of the petitioner's work schedule, as demanded by the Local 147 Trustees.  (It should also be noted that this is one of the points that makes the Local 147 Trustees' accusation so outrageous, as the petitioner worked endlessly for this particular client; as this particular client forced the petitioner to work outrageous hours [often by threatening the safety of the petitioner and the petitioner's family]; and as the petitioner would have been able to live a more normal life, and certainly a less stressful life, but for the daily demands of the Local 147 Trustees.)

[71] Here, it should also be noted that the petitioner was living on Long Island with her children prior to moving to Irvington; that the petitioner was forced to move because her former husband (who lives in White Plains) told her that he wouldn't take their children to events on Long Island when it was his weekend and because Local 147 wanted the petitioner to work out of the administrative office in the Bronx for at least part of the week; that the petitioner was forced to open an additional office in Irvington, as the Union was always in the process of purchasing a larger building, which would have accommodated the additional space required to administer the funds, as the Bronx office was not large enough in order to administer the Funds; and that, since the Union never purchased such a building, the additional work spilled over into the Irvington office, so this additional office became a necessity during this time.  Therefore, the petitioner basically moved from Long Island due to the demands of her former husband and of Local 147, which invalidates the government's accusation that the "Westchester" location was part of a "lavish lifestyle."

(It should also be noted that, on this point, the petitioner was strung along by the Local 147 Trustees for many years, as she wanted to move the office out of the Irvington location, but was never permitted to do so, because the Trustees continuously told her that they would be purchasing a larger building, and that they wanted the office to remain in Irvington until it could be moved to the Bronx.  Further, it should also be noted that the Soho office was also required by the Local 147 Trustees, as demonstrated by the 2002 Administrative Agreements [which is attached as Exhibit 2.])

On this point, in her motion, the petitioner's states:

It is also significant to note that, while the prosecution accused me of using the location in Irvington to take advantage of the Benefit Funds, in reality, as the

far as the petitioner is aware, any purchases that were made were made legitimately, with after-tax income, as verified by the EisnerAmper and Vasil Reports, which were submitted to the Court prior to the sentencing hearing, and which utilized the original Fund Records and the original tax filings to establish that there was no basis in fact for the convictions when the petitioner was sentenced; (7) regarding the petitioner's family's horse business, it should be noted that the horse business was modeled after the professional horse businesses that the petitioner and the petitioner's family were familiar with; that the petitioner and the petitioner's family engaged in similar practices as the professional horse businesses that the petitioner and the petitioner's family were familiar with (such as leasing and selling horses in ways that would increase profits, purchasing younger horses to develop, and looking for land to purchase to decrease stabling costs); that numerous decisions were made that were beneficial to the business (and that were not intended to benefit the petitioner's family); that it is basically the rule for a horse business to be owned by someone who rides or by someone who has a family member that rides, and not the exception; and that, therefore, as the petitioner understands, when each of the issues are examined, the government would ultimately have to deny each of the other horse businesses as well, in order to deny the petitioner's family's horse

---

office had spilled so far over, I was constantly trying to move the office out of the Irvington location and into a normal business area. This is verified by the 2008 application for the signature stamps (which was signed by the Trustees), which identifies KingCare's primary location as "1 Bridge Street," which was a separate office intended to replace much of the functions of the Irvington location. The 2008 application for the signature stamps is attached as Exhibit 12C.

On this point, it should be noted that while I had started to move the office out of the Irvington location in 2008, I had been trying to do so for several years; however, whenever I raised the possibility of moving the office out of the Irvington location with Mr. Fitzsimmons, Mr. Fitzsimmons refused to consider the suggestion, as the Union was always in the process of purchasing a larger building, which would theoretically have provided the additional space required to condense (some of) the administrative offices into this location. (It seems that the government would know about this, as the "Bronx office" location is in the Union's building, and as the government did not execute a search warrant for a KingCare office at that location.) This option was favored by the Trustees, as this would also have permitted them to allow for the rent for the administrative offices to be reimbursed to the Union, rather than to KingCare, or to another third party.

It should also be noted that I could not have predicted the actions of the Trustees, or the level of the servicing requirements for the Funds when this location began to function as an additional office. Therefore, it is not logical to argue that this office (which was a requirement set by the Local 147 Trustees, and which was really intended to be a temporary location) was established to take advantage of the Funds, as the level of the extensive servicing requirements could not have been predicted when the servicing requirements originally increased.

(See The petitioner's motion, p. 161-168.)

business; (8) there was an additional 26% in the KingCare accounts, as admitted by DOL Agent Della Penna in his Sealed Complaint, which exceeds the cost of the purchases listed by the government; (9) the government's representations that there was a "staff of servants," is disproven by the EisnerAmper Report, which addressed the percentage of time that the KingCare employees spent working on additional projects for Local 147; by the extensive work-product that was produced in discovery, which was produced by the company; by the extensive data that the government was supposed to produce during the case, but which was apparently "destroyed" by the government; and by the photographs of the office in Irvington, which were taken by the government agents on the day of the petitioner's arrest; (10) in order to make the case of a "lavish lifestyle" against the petitioner, the government has added together an entire family's expenses, as well as an entire family's earnings, and then attributed it to one person, which is a clearly false representation, and which is particularly unjust, given that it was clear during the proceedings that the prosecutors knew that KingCare was owned by the petitioner's family;[72] (11) there is nothing illegal about earning funds pursuant to a contract, nor is it illegal for a family to make purchases with income that is earned and reported, as in any other business;[73] and (12) the government's assertion that there were "many other luxuries," this is curious, since the petitioner was always working, and since the government agents stated on national television that the petitioner was a "recluse," because there was no evidence of an actual "lavish lifestyle."[74]

Finally, it should also be noted that neither the petitioner, nor the petitioner's family should have to defend against the government's accusations of a "lavish lifestyle" – the work was completed and the funds were earned pursuant to a legitimate contract – beyond that, the petitioner's family's lifestyle is not the government's concern, and is certainly not a sufficient basis for the government to file criminal charges, as they have done in this case. (See The petitioner's motion, p. 263-277.)

Therefore, regarding the government's assertion, it should be noted that the government's assertion validates the petitioner's allegations of prosecutorial misconduct, as the petitioner described in her motion. (See The petitioner's motion, p. 141-185 and p. 263-277.)

Further, regarding the government's assertion that "[the petitioner] used the money she embezzled to support a lavish lifestyle consisting of trips on private jets, two apartments on Park Avenue, the purchase of show horses for her daughter, jewelry, a large Westchester home, a full staff of servants, and many other luxuries,"[75] not only is this statement entirely fraudulent, as described above; not only is the "wealth" at issue not the petitioner's, as the petitioner did not own the entities, and as the government's main argument is centered around the horses, which the government has now argued was "for [the petitioner's] daughter"; but it also demonstrates that the government's strategy is to equate wealth with wrongdoing and to consistently appeal to class prejudice, which

---

[72] See The petitioner's motion, p. 141-185.
[73] See The petitioner's motion, p. 263-277.
[74] The Second Declaration of Melissa King, Exhibit 1.
[75] The government's response, p. 2.

clearly constitutes prejudicial prosecutorial misconduct. See US v. Stahl, 616 F.2d 30, 31-33 (2nd Cir. 1980) (in case where government continually equated wealth with wrongdoing and appealed to the potential bias of not-so-wealthy jurors against a very wealthy defendant, the court found that there was prejudicial prosecutorial misconduct).

On this point, in US v. Stahl, 616 F.2d 30, 31-33 (2nd Cir. 1980), the Court found that there was prejudicial prosecutorial misconduct where the government continually equated wealth with wrongdoing and appealed to the potential bias of not-so-wealthy jurors against a very wealthy defendant.

Specifically, the Court stated:

Our own review of the record and our questioning of the Assistant United States Attorney during oral argument lead us to conclude that this young prosecutor did in fact intend to arouse prejudice against the defendant because of his wealth and engaged in calculated and persistent efforts to arouse such prejudice throughout the trial. In addition, the prosecutor made several statements during the trial that were not supported by the evidence and may, in some instances, have been intentionally misleading.

...

Time and again during interrogation of witnesses, the prosecuting attorney went out of his way to refer, or have witnesses refer, to the "Park Avenue offices" of the various participants in this drama, an emphasis that had nothing whatever to do with defendant's guilt or innocence. When questioning Attorney Brody, the prosecutor persistently tried to get Brody to characterize the Stahl estate as a "substantial estate" of some "$13.5 million dollars", when in fact the prosecutor had the estate tax forms in front of him and knew that the total estate was approximately one million dollars and the taxable estate, after legitimate deductions, was approximately $300,000. When the defendant took the stand, the prosecutor made a point of delving into his estimated net worth (over $20 million) and how he had managed to build up such a fortune.

...

These examples indicate the nature of the prosecutor's trial strategy a strategy that obviously included a persistent appeal to class prejudice. Because such appeals are improper and have no place in a court room...we are compelled to reverse. This was not a case in which the proof of guilt was so overwhelming that censure of misconduct will suffice. Nor is it one in which curative instructions by the trial court were sufficient to eliminate the taint. See United States v. Berger, 295 U.S. 78, 85, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). There was prejudicial error, and the judgment of conviction must be reversed.

See US v. Stahl, 616 F.2d 30, 31-33 (2nd Cir. 1980) (footnotes omitted).

102

Therefore, as DOL Agent Della Penna stated directly that "there are a lot of innocent people in prison," and that "once the jury hears horses, they will convict";[76] as the government's entire case was to portray a fictional "lavish lifestyle" in court, and to contrast this with statements such as the government's assertion in its response that "[the petitioner's] embezzlement so financially devastated the Sandhogs' retirement funds that some elderly and retired union members were compelled to return to the dangerous and difficult work of the Sandhogs in order support themselves,"[77] though neither the petitioner nor KingCare was responsible for any intentional loss to the Local 147 Benefit Funds; as the government fraudulently ignored the extensive work-product produced by the company, and even argued that the additional projects were "phantom projects," when the work-product was produced in discovery by the government; as the government blew up the numbers by repeatedly referring to a $40 million embezzlement, when it was clear that KingCare was owed deferred compensation from the prior period, which invalidated the government's $40 million number; as the government could not have proven its case at trial, as the Local 147 Trustees' allegations from the civil case were fraudulent, and were disproven in the civil case (through the discovery materials) prior to the petitioner's arrest (which prompted the Local 147 Trustees and the Local 147 Trustees' civil attorneys to go to the Department of Labor with their fraudulent accusation, so that the Department of Labor would restrain the petitioner's and the petitioner's family's assets, in order to prevent the petitioner and the petitioner's family from defending against their fraudulent accusations in both civil and criminal court);[78] as there was insufficient evidence to support the convictions when the petitioner was sentenced, as the prosecution brought charges in this case without having sufficient evidence in order to prove its accusations at trial; as the prosecutors demonstrated at the sentencing hearing that they knowingly criminalized a civil billing dispute; as there petitioner is actually innocent, as no crimes were committed in this case; as the petitioner's case should have been dismissed when the government rested, as verified by the case law that was used to write the petitioner's sentencing submissions (See US v. Goyal, 629 F.3d 912 (9th Cir. 2010)); and as the Court never criticized the government's use of inflammatory rhetoric, nor its use of materially false statements; it is clear that the government engaged in prosecutorial misconduct, that the prosecutorial misconduct was prejudicial, and that the petitioner's convictions must be vacated. (See The petitioner's motion, p. 141-185 and p. 263-277.)

---

[76] It should be noted that (as far as I'm aware) DOL Agent Della Penna offered several variations of this comment at different times to different people. For example, at one point DOL Agent Della Penna stated that the government "[would] scream horses," and "the jury [would] convict."

[77] The government's response, p. 2-3.

[78] As the petitioner states in her motion, it is also significant to note that the Local 147 Trustees and the Trustees' civil attorneys likely went to the Department of Labor at that time, as the Local 147 Trustees were supposed to be deposed in the civil case, as KingCare had filed extensive Counterclaims in civil court, and as the Trustees and the Trustees' civil attorneys needed the government to restrain the petitioner's family's assets in order to prevent KingCare and the petitioner from defending against their fraudulent accusations in civil court, as there was no embezzlement in this case. (See The petitioner's motion, p. 8.)

103

Therefore, as the government persisted in using this strategy in its latest submission, it is clear that the government has continuously engaged in prosecutorial misconduct, that this prosecutorial misconduct was prejudicial, and that the petitioner's convictions must be vacated. (See The petitioner's motion, p. 141-185.)  Further, it is also clear that this is the only argument that the government is capable of presenting, as it is clear that no crimes actually occurred in this case, given the true facts of this case and given the evidence attached to the petitioner's motion. (See The petitioner's motion, p. 263-277.)

Therefore, given the numerous examples of prosecutorial misconduct in this case, and given the cumulative effect of these examples, which amounts to egregious misconduct, it is clear that the proceedings were fundamentally unfair, and further, that the petitioner's convictions must be vacated, as they were obtained in violation of her right to due process guaranteed by the Fifth Amendment.  (See The petitioner's motion, p. 141-185.)

Finally, it should also be noted that the prosecutors are supposed to be held to a higher standard than the defense attorneys, and that the prosecutors should have to face serious consequences for their numerous fraudulent representations, which resulted in serious harm to the petitioner and to the petitioner's family.

On this point, in Berger v. US, 295 U.S. 78 (1935), the Court stated:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all, and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the two-fold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor -- indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

Therefore, given the level of prosecutorial misconduct in this case, and given that the prosecution is arguing to continue to incarcerate the petitioner, who is actually innocent, who worked endlessly for Local 147 for most of her life, and who is a victim of this conspiracy and of this fraud upon the court, at this point, each of the prosecutors should be reported for their misconduct, including for making numerous fraudulent representations, for continuing to cite fraudulent testimony, and for participating in this fraud upon the court, as the prosecutors should have to answer for their misconduct, and as the prosecutors should not be permitted to get away with committing a fraud just because it's "the Southern District of New York."

7.  The petitioner is actually innocent.

In its response, the government argues that the petitioner is not actually innocent,

as: (1) the petitioner "*admitted* her guilt under oath—and chose not to withdraw her guilty plea"; (2) the petitioner read the scripted statements provided by Mr. Schachter at the plea hearing; (3) "[ample] additional evidence, including the Epstein and Catanzaro Affidavits, materials seized from the offices of King Care LLC, individual and business bank records, and tax records, supported the Government's prosecution"; (4) the petitioner "at sentencing and in her sentencing submissions…continued to maintain her guilt through counsel"; (5) the Court "stated at sentencing that the fact of [the petitioner's] guilt is "supported by the defendant's agreement to forfeit as the proceeds of the crime the horses, jewelry, the funds in numerous accounts among other specific assets" "; (6) the Court "specifically rejected King's "attempt[] to paint a different picture at sentencing" about the nature of the embezzlement," as the petitioner's sentencing submissions argued the loss amount in her sentencing submissions using Mr. Schachter's fraudulent legal advice, as this fraudulent legal advice formed the basis of the Plea Agreement; and (7) the Court found the government's position to be "more credible" at the sentencing hearing. (The government's response, p. 27-29.)

Regarding the government's argument that the petitioner "*admitted* her guilt under oath—and chose not to withdraw her guilty plea," it should be noted that, as the petitioner established in her motion (see p. 6-58) and as discussed above (see p. 60-138), the petitioner pleaded guilty based on fraudulent legal advice; the petitioner was not advised regarding several aspects of the Plea Agreement; the petitioner was given scripted statements for the plea hearing (which were also edited before the hearing, after Mr. Schachter discussed them with AUSA Facciponti); the petitioner was given a "Q&A Sheet" for the plea hearing; the petitioner was incompetent to plead guilty when her guilty plea was entered; and the petitioner was coerced into pleading guilty by both the prosecution and by her court-appointed defense attorney.

Further, while the government argues that the petitioner "chose not to withdraw her guilty plea," it should be noted that this argument is disingenuous, as the government also chose in its response to rely on Ms. Fontier's motion when arguing that the petitioner's (invalid) guilty plea was knowing and voluntary, in which Ms. Fontier, in the government's words, "[explained] why "any motion to withdraw the plea would be frivolous."" As the petitioner's court-appointed defense attorney was relieved in court when the petitioner realized that he had provided fraudulent legal advice (which formed the basis of the Plea Agreement); as it is clear from Ms. Fontier's letter that the petitioner wished to withdraw her (invalid) guilty plea; as it is clear that it was Ms. Fontier's refused to file the motion to withdraw the petitioner's (invalid) guilty plea (and therefore, that it was not the petitioner's decision); as Ms. Schachter's fraudulent legal advice was used to argue the loss amount in the petitioner's sentencing submissions (as this fraudulent legal advice formed the basis of the Plea Agreement, and as Ms. Fontier refused to file the motion to withdraw the petitioner's invalid guilty plea prior to the sentencing hearing); and as the petitioner is still trying to invalidate her guilty plea, as she is serving a sentence for a crime that she did not commit; it can hardly be said that the petitioner "*admitted* her guilt under oath—and chose not to withdraw her guilty plea" during the proceedings. (The government's response, p. 27.)

Regarding the government's argument that "[ample] additional evidence,

including the Epstein and Catanzaro Affidavits, materials seized from the offices of King Care LLC, individual and business bank records, and tax records, supported the Government's prosecution," the government's assertion is meritless for several reasons, as discussed below. (The government's response, p. 28.)

First, it should be noted that, as the petitioner established in her motion, and as confirmed by the exhibits attached to the petitioner's motion, the Epstein Affidavit is clearly perjured testimony. (See The petitioner's motion, p. 141-185.)  Further, as the petitioner addressed in her motion, the Catanzaro Declaration is also clearly unreliable. (See The petitioner's motion, p. 141-185.)

To this effect, in her motion, the petitioner states:

> 6. The prosecution clearly misled the Grand Jury, given that the Indictment alleges that I owes close to $30 million to the IRS, while the Vasil Report used the original tax filings to show that the taxes were paid, and while the government's proposed "expert" (Ms. Catanzaro was not certified) provided an "alternative calculation" of $8,023,907, which relied primarily on the plea allocution itself to establish a loss amount.

> In response to the Vasil Report, which used the original tax filings to show that the taxes were paid (as advised by KingCare's accounting firm and by counsel), the prosecution submitted a declaration by an agent who was not certified.

> In the sentencing submissions, the prosecution used Agent Catanzaro's Declaration to assert that Mr. Vasil's Report was not credible, "most notably" because "it [failed] to account for any of the 7 million that King admitted to embezzling."[79] AUSA Facciponti also asserted that Agent Catanzaro's Declaration "offers an alternate calculation that ascribes certain income to Melissa King that was improperly ascribed as income to Jerome and Mabel King. The alternative calculation shows that King owes and additional $8,023,907 to the IRS."[80]

> Given that my understanding of the Plea Agreement was that the $7 million represented services that were actually provided, the $7 million referenced in the plea allocution would have been properly taxed, as the business expenses were actually incurred.

> In addition, I have also been advised that the IRS cannot receive the taxes twice, which would invalidate the other calculations, as the business income was reported on the original tax filings under KingCare, as advised by KingCare's

---

[79] On this point, at the sentencing hearing, the Court stated: "the government's expert is more credible because among other reasons the defendant's report does not include as income to the defendant the admitted millions of dollars she embezzled." (June 21, 2012 Sentencing Hearing Transcript, p. 62.)

[80] The Government's Sentencing Memorandum, p. 23.

accounting firm and by counsel, as confirmed by the Vasil Report. This shows that the calculations provided by the government were meaningless, (especially) as there was no tax benefit to the government's accusations; as the government cannot receive the taxes twice; and as the income was reported under KingCare, as advised by counsel and as in any other business. (This also shows that the government's calculation would also invalidate the company, which does not make sense, as the company worked and earned as any other company, and as the company rendered services to several clients, as any other company.)

Concerning the Report, Mr. Vasil's Report used the original tax filings to show that the taxes were paid, as decided and approved by KingCare's accounting firm and by KingCare's tax attorney. (It should also be noted that the accountants also worked from the Irvington office location at times, so the structure of the company and the job descriptions of the employees were also clearly known to KingCare's accounting firm.)

Further, if the prosecution had to rely on the plea allocution itself to attack Mr. Vasil's findings, it is clear that the government did not have sufficient evidence to bring criminal charges in the first place. (It is also clear that the prosecution misrepresented the strength of their case at the plea hearing, and that there was insufficient evidence for the Court to accept the guilty plea, as the government could not produce any competent evidence or a certified expert to corroborate their position for the sentencing hearing.)

Moreover, the government also continuously misrepresented the facts of this case in order to make it seem as if purchases were billed to Local 147, or that purchases and expenses were incorrectly reported, even when there was absolutely no tax benefit to their accusations (as the work was completed by the company, as the taxes were reported and paid as advised by counsel, and as the government cannot receive the taxes twice).

In addition, it should be noted that Ms. Catanzaro's Declaration also makes it clear that there was absolutely no basis for the (approximately) $30 million alleged in the Indictment, which demonstrates that the prosecution clearly misled the Grand Jury on this issue.

(The petitioner's motion, p. 160-162.)

Further, as discussed above, it should also be noted that the government has only pointed specifically to the Epstein Affidavit and to the Catanzaro Declaration, both of which were created after the petitioner pleaded guilty (also based on fraudulent legal advice). (See The petitioner's motion, p. 141-185 and p. 263-277.) Therefore, it is clear that both of these documents are not credible, and further, that the government has yet to provide proper documentation to support the petitioner's prosecution or to support the government's assertion that it conducted an adequate investigation in this case, which

should have occurred prior to the petitioner's arrest.[81] (See <u>The petitioner's motion</u>, p. 141-185 and p. 263-277.)

Further, regarding the government's assertion that "materials seized from the offices of King Care LLC, individual and business bank records, and tax records, supported the Government's prosecution," it should be noted that the government refused throughout the proceedings to acknowledge the "materials seized from the offices of King Care LLC," as the government continuously argued that the additional projects were "phantom projects";[82] that the government has yet to point to any "individual and business bank records" that would support the government's contentions that any crimes were committed in this case; and that the Vasil Report used the original tax filings to confirm that no crimes were committed in this case, which disproves the government's assertion that any "tax records" support the petitioner's prosecution.

Moreover, regarding the lack of evidence put forth by the prosecution in this case, in her motion, the petitioner states:

> Concerning the evidence the government presented in court, in the end, the government did not rely on a single Fund Record while arguing their case; they did not present an expert witness, did not present a forensic audit, presented a tax expert who was not certified to justify a $30 million tax accusation, and

---

[81] On this point, concerning the evidence the government presented in court, in the end, the government did not rely on a single Fund Record while arguing their case; they did not present an expert witness, did not present a forensic audit, presented a tax expert who was not certified to justify a $30 million tax accusation, and repeatedly cited a perjured affidavit to contradict the content of the original Fund Records.

In addition, when faced with the original Fund Records in court, the prosecution argued to have them removed from the proceedings, as the EisnerAmper Report, which was submitted as part of the Defense's sentencing submissions, used the original Fund Records to show that there was no embezzlement in this case.

Further, concerning the EisnerAmper and Vasil Reports, it should be noted that the Reports verified that the government's accusations had no basis in fact, as the business was reported like any other business; as the company worked and earned; and as the income was reported and as the taxes were paid, as advised by the tax attorney who advised on the original tax filings, and as advised by KingCare's accounting firm, who also put together all of KingCare's books and records.

[82] It should also be noted that the government is continuing to argue, in essence, that the additional projects were "phantom projects."

For example, in its submission, the government states:

> Of the over $7 million that King took from the Local 147 Funds, only approximately $3.6 million—the value of her salary paid during those years under the administrative agreements— appears to be legitimate.

(<u>The government's response</u>, p. 6.)

repeatedly cited a perjured affidavit to contradict the content of the original Fund Records.

When faced with the original Fund Records in court, the prosecution argued to have them removed from the proceedings, as the EisnerAmper Report, which was submitted as part of the Defense's sentencing submissions, used the original Fund Records to show that there was no embezzlement in this case.

Concerning the EisnerAmper and Vasil Reports, it should be noted that the Reports verified that the government's accusations had no basis in fact, as the business was reported like any other business; as the company worked and earned; and as the income was reported and as the taxes were paid, as advised by the tax attorney who advised on the original tax filings, and as advised by KingCare's accounting firm, who also put together all of KingCare's books and records.

(See The petitioner's motion, p. 32.)

Therefore, it is clear that the government's "bare assertion" that there was "[ample] evidence" is meritless, and, further, is inadequate, and should be rejected.

Further, it should be noted that it is clear from the prosecutors' statements in court that the prosecutors realized during the proceedings that they did not have sufficient evidence in order to prove in court that the petitioner had engaged in any criminal conduct (as the petitioner did not engage in any criminal conduct), regardless of the government's meritless reassurances. (See The petitioner's motion, p. 6-58 and p. 263-277.)

In addition, regarding the government's fourth point that the petitioner "at sentencing and in her sentencing submissions…continued to maintain her guilt through counsel," as the petitioner addressed in her motion, it should be noted that: (1) the petitioner's court-appointed defense attorney's refused to file the motion to withdraw the petitioner's invalid guilty plea prior to the sentencing hearing; (2) the petitioner's second court-appointed defense attorney's refused to file the motion because she decided to protect the petitioner's first court-appointed defense attorney, rather than defend her client; (3) the petitioner's sentencing submissions argued the loss amount based on Mr. Schachter's fraudulent legal advice, which formed the basis of the Plea Agreement, and which was then discredited by the Court at the sentencing hearing; (4) the petitioner's sentencing submissions included the EisnerAmper and Vasil Reports, which showed that there was no basis in fact for the convictions when the petitioner was sentenced; and (5) the Court discredited Mr. Schachter's fraudulent legal advice at the sentencing hearing and then ruled that the petitioner had not accepted responsibility for the crimes identified in the Superseding Indictment.

Therefore, it is clear that the petitioner did not "at sentencing and in her sentencing submissions…[continue] to maintain her guilt through counsel," despite the

fact that the petitioner's court-appointed defense attorneys refused to file the motion to
withdraw her guilty plea prior to the sentencing hearing.

Further, regarding the government's fifth point that the Court "stated at
sentencing that the fact of [the petitioner's] guilt is "supported by the defendant's
agreement to forfeit as the proceeds of the crime the horses, jewelry, the funds in
numerous accounts among other specific assets," it should be noted that the petitioner
addressed this point in her motion, as the petitioner stated that she never agreed to forfeit
these assets (which were legitimately owned by other individuals), as she was advised by
Mr. Schachter that third party claims could still be raised after the Plea Agreement was
signed, and that only the petitioner was giving up any rights to these properties and
entities, which she did not own in the first place.

To this effect, in her motion, the petitioner states:

In addition, Mr. Schachter's email (Exhibit 2C) is also significant, as it confirms
that Mr. Schachter and Mr. Gise advised that the third party interests could still be
litigated after I signed the Plea Agreement. To this effect, Mr. Schachter wrote: "I
don't see how this has any negative repercussions for your parents or your
children." (Michael Schachter, (10/16/2011)) (Exhibit 2C) On this point, Mr.
Schachter also advised that I would not be affecting the business structure of the
company, or affecting any third party claims by signing the Plea Agreement, as
Mr. Schachter advised that third party claims could still be raised after the Plea
Agreement was signed, and that only I was giving up any rights to these
properties and entities, which I did not own in the first place.

(As I found out later, this was also incorrect, and also caused the additional losses
to my parents and my children, who lost these properties, even though I did not
have the legal ability to forfeit these properties on their behalf, as the entities were
set up by counsel, for completely legitimate reasons.)

(The petitioner's motion, p. 22.)

Regarding the government's sixth and seventh points, that the Court "specifically
rejected King's "attempt[] to paint a different picture at sentencing" about the nature of
the embezzlement," and that the Court further found the government's position to be
"more credible," it should be noted that the government failed in its response to restate
the reasons that the Court found the government's position to be more credible at the
sentencing hearing (which is addressed on p. 50-58 of The petitioner's motion), and also
failed to adequately contradict the petitioner's response to these points (which are
addressed on p. 6-58 of The petitioner's motion).

On this point, as addressed in the petitioner's motion, at the sentencing hearing,
the Court stated:

*A word of overview is useful.*

*The government contends that the defendant embezzled over $40 million from the*

110

*benefit funds by having the funds pay King Care which the defendant controlled and then using the funds in King Care for extravagant personal expenses including jewelry, expensive wines, horses, home improvements, and the like.*

*The defendant in her submissions attempts to paint a different picture. She contends that she is guilty of embezzlement only because she caused the benefit funds to pay for expenses that were properly charged to other entities such as the Welfare Fund and the Union itself and, therefore, charging those expenses to the benefit funds was improper.*

*She contends that she did, in fact, do this work and was compensated appropriately for it although she should not have – although the money should not have come out of the benefit funds, and that was the nature of the embezzlement. She also contends that some of the money that was paid and otherwise unaccounted for was for past compensation that was deferred and not previously paid.*

*The defendant's argument is not credible for several reasons. There are no documents such as bills, invoices, work orders, or the like to support all of this work that the defendant claims she was authorized to do. Nor is there such documentation for the deferred compensation. Moreover, in all of the extensive submissions there is no explanation where the defendant came up with the figure of $7 million to estimate the amount of the embezzlement.*

*More credible is that the defendant was able to control the expenditures from the funds; that she caused these expenditures from the funds; that she caused these expenditures to be paid to KingCare, which she controlled; and that these expenses were unjustified expenses; and that she used the accounts of KingCare to pay for extravagant personal expenses.[83]*

(The petitioner's motion, p. 50-51.)

Further, in her motion, regarding these points, the petitioner stated:

First, it should be noted that this shows that the prosecutors brought charges in this case without having sufficient evidence in order to prove their case at trial, as the Court had to discredit the Defense's position when the prosecution rested at the sentencing hearing (in order to find me responsible for an embezzlement that also had not occurred). Further, the attached documentation confirms that the administrative expenses were deferred (Exhibits 11A-11F), that the Local 147 Trustees even deferred their own compensation (Exhibit 11D), that Mr. Epstein's Affidavit was perjured (Exhibits 6-10), and that the Local 147 Trustees even directed the additional work while the additional projects were in progress (Exhibits 7A-7B). Therefore, it is clear that as there was nothing wrong with the Defense's argument at the sentencing hearing, and that it was the prosecution's

---

[83] June 21, 2012 Sentencing Hearing Transcript, p. 59-64.

argument that was not credible, as there was no embezzlement, tax crime, or mail fraud in this case.

Second, it should be noted that this description of the prosecution's case shows that this was a civil case, as this description shows that the prosecutors had to stretch the evidence and the law in order to characterize these actions as criminal (though the work was completed, so the payments were actually earned). It should also be noted that it is clear from this description that the prosecution did not have sufficient evidence in order to prove that I had engaged in any criminal conduct, as "I" was not "KingCare"; as the payments were transparent and fully disclosed; as the Fund Records show that the Trustees ratified the payments made to KingCare; as the Fund Records show that KingCare completed the additional work, which was requested and directed by the Board of Trustees; as the Fund Records show that the administrative expenses were audited by the Fund professionals, in compliance with governmental regulations, which is also confirmed by the EisnerAmper Report; and as the income was reported and as the taxes were paid, as advised by KingCare's accounting firm and by counsel, and as in any other business.

...

Further, it should also be noted that the Defense's position was not that KingCare was "authorized" to do this additional work; the Defense's position was that the Local 147 Trustees "demanded" this additional work, took over several offices, and threatened my life and the safety of my family on a daily basis when the additional work was not completed fast enough. (It should be noted that some of the threats were also put before the Court during the proceedings, and that some of the threats are attached as Exhibit 14A.)

...

In addition, it is also significant to note that the EisnerAmper Report attaches original documents, for both KingCare and for Local 147, which include invoices, bills, and expenses which are directly tied to the work demanded and directed by the Board of Trustees, and that EisnerAmper and Vasil Reports attach invoices from vendors confirming that the work was completed and that KingCare paid these costs on behalf of the Funds to be reimbursed as outlined under the Administrative Agreements, as directed by the Board of Trustees.

It should also be noted that I did not "charge" any of the entities for the additional work: the Trustees ratified the payments that were made to KingCare for the additional work and for the additional expenses, and the Fund accountants then reviewed the payments and the administrative expenses. Therefore, the Fund professionals were aware of the additional work, and were responsible for approving the expenses (which were also approved at every level of review).

It should also be noted that the Fund Records reflect that the relationship between

KingCare and Local 147 was not "formal," in that KingCare was considered a hybrid entity by the Fund Professionals; in other words, KingCare was to provide staffing as required by the Trustees for their servicing needs (which changed daily), as required by the Trustees and as demanded and authorized by Richard Fitzsimmons, Sr., and then by Richard Fitzsimmons, Jr. Therefore, KingCare did not formally "bid" on the additional projects that were completed at the direction of the Trustees, which explains why there are no "work orders," as KingCare was to provide the staffing requirements, with the expenses to be reviewed by the Trustees and the Fund Professionals.

Therefore, it was clear from the EisnerAmper and Vasil that there were invoices, and that the additional projects were not "phantom projects." (The EisnerAmper and Vasil Reports were both completed in April of 2012, and were submitted to the Court on or about April 23, 2012.) Furthermore, it is clear from the content of the invoices that the Trustees were personally directing the additional work, as they were personally directing the employees on the additional projects, including the work completed for the Union, the Welfare Fund, and the Collective Bargaining Parties.

...

Concerning the terms of the Administrative Agreements, it should also be noted that the three times labor provision is a standard business construct, and that many costs that were not billed under the contract were absorbed by this provision. In addition, it is also very significant to note that when the Agreements were negotiated between Local 147 and KingCare, it was determined that the "reasonable costs" of providing such services was three times the hourly labor cost, with the additional reimbursable expenses that the Local 147 Trustees caused KingCare to incur that were considered to be reimbursable under the Administrative Agreements. (In other words, the "reasonable cost" of the services is not to be determined separately from this provision; this was the amount that KingCare was owed, as Local 147 and KingCare agreed that KingCare would provide the additional services at this cost, which was determined to be reasonable when the Administrative Agreements were executed.)...

Finally, it should also be noted that I did not actually "control the expenditures" in the way indicated by the Court. The costs were dictated by governmental regulations, by the timing of governmental regulations, by the Trustees servicing requirements, by the additional benefits that were added after the contract was executed, and by the servicing requirements that were necessitated as KingCare was often required to provide the local 147 Trustees with information when they wished to release benefits in a fashion that was not specifically outlined by the plan documents. (In addition, the costs were also effected by the Trustees' actions, as the Trustees often tried to go around the checks that were in place within KingCare, so that they would be able to release benefits in a way that the Fund fiduciaries would not have approved.) Again, these costs were also then audited, so it is clear that I did not have this kind of control over the expenses.

Finally, it should also be noted that this is the exact reason that the KingCare employees often performed multiple functions, as the time constraints made it impossible to run the office on a normal schedule; as the tasks that had to be completed could only be given to certain employees, as the Local 147 Trustees often tried to control the employees, which made it difficult to assign tasks in a normal fashion (especially as Mr. Fitzsimmons, Jr., was also constantly threatening my life and the safety of my family, which was also known to the employees, as demonstrated by the threatening emails, which are attached as Exhibit 14A); as this was less expensive than hiring additional employees to complete additional tasks; and as this was less expensive than hiring an entire second shift to complete the additional work that the Trustees demanded and directed on a daily basis.

(The petitioner's motion, p. 50-54.)

Therefore, as the petitioner's motion answered these points, and as the petitioner's motion attached numerous exhibits proving the defense's position on these points, it is clear that the government's reliance on the Court's comments at the sentencing hearing is, once again, untenable, especially since the Court relied on the petitioner's (invalid) guilty plea (see The petitioner's motion, p. 6-58 and above) and on the prosecution's fraudulent representations when deciding to agree with the government's position at the sentencing hearing. (See The petitioner's motion, p. 6-58.)

Therefore, it is clear that the petitioner is actually innocent, as the petitioner outlined on p. 263-277 of her motion, and as outlined above in her reply, as there was no embezzlement, tax crime, mail fraud, or money-laundering in this case, as the funds transferred to KingCare were earned pursuant to a contract, as the Local 147 Trustees' civil Complaint was fraudulent, and as the government demonstrated during the proceedings that it had to commit a fraud upon the court in order to continue to allege its fraudulent accusation; as the taxes were reported and paid, as advised by counsel and by KingCare's accounting firm; as there was no embezzlement in this case, as the government admitted that there was nothing wrong with the statements, and as KingCare fulfilled its obligations regarding the statements (which is likely why the government has yet to submit any statements to the Court); and as there was no embezzlement in this case, and as the structure of business was legitimate, as in any other business;[84] so it is clear that the petitioner is factually innocent, as no crimes were committed in this case.

8. Conclusion.

---

[84] On this point, in Cuellar v. United States, 553 U.S. 550 (2008), the Supreme Court held that the concealment element of the money-laundering statute requires that the purpose, not merely the effect, of the endeavor must be to conceal or disguise a listed attribute of the proceeds. In this case, everything was legitimate, transparent, and reported, as advised by counsel. Therefore, there was clearly no money-laundering in this case.

114

As discussed above, the petitioner's Constitutional Rights were clearly violated, as outlined in the motion filed on or about September 24, 2014.  Further, as discussed above, the government's arguments in its response are either moot or meritless.  Therefore, the petitioner requests that the Court grant the relief outlined in the original motion.

In addition, the petitioner respectfully requests the Court to consider expanding the record without a hearing (as raised in The government's response, p. 29-30), should the Court determine that additional evidence is necessary in order to grant the petitioner's motion, especially given the   petitioner's medical conditions, which would make attending a hearing very difficult, as outlined in the petitioner's motion.  (See The petitioner's motion, p. 281-287.)

However, since the government's actual suggestion seems to be for the petitioner's first court-appointed counsel to submit a perjured affidavit in order to prevent a proper review of the petitioner's claims (which is clear, as the emails attached to The petitioner's motion show that Mr. Schachter provided fraudulent legal advice), should there be a dispute of fact, the petitioner respectfully requests the Court to allow for an evidentiary hearing, so that the petitioner has an opportunity to prove that her Constitutional Rights were violated, as outlined in her submissions. (See The petitioner's motion, p. 1-290.)

Further, in addition to the petitioner's court-appointed defense attorneys, the petitioner respectfully requests the Court to consider asking the prosecutors, the case agents (including DOL agent Della Penna and IRS Agent James Hughes), and Mr. Ronald Richmond (the Local 147 Trustees' civil attorney, who previously submitted letters to the Court) to submit affidavits as well, given that the prosecution did not adequately address any of the claims raised in the petitioner's motion, and given that these are the individuals that would likely have to testify at a hearing, so that the petitioner can establish that her Constitutional Rights were violated, as identified in her submissions. (See The petitioner's motion, p. 1-290.)


Dated:      Coleman, FL
            June 21, 2015

                                    Respectfully,


                                    _____/s/_____
                                    Melissa G. King


A copy of this Memorandum of points and authorities was placed in the BOP mailing system June 25, 2015.

                                    Melissa King

115

14 Cv 7962 (JGK)

# EXHIBIT 1

THE SECOND DECLARATION OF MELISSA G. KING

I, Melissa G. King, declare as follows:

1. I am the petitioner in this matter. I am currently (unjustly) located at FCC Coleman, in Coleman, Florida.

2. I submit this second declaration in support of the petition that was filed on September 24, 2014, the reply that was filed on June _25_, 2015, and the memorandum of points and authorities that was filed on June _22_, 2015, *and again on June 25, 2015.*

3. The purpose of this declaration is to verify the facts that are relevant to the claims raised in the motion that was filed on September 24, 2014, the reply that was filed on June _25_, 2015, and the memorandum of points and authorities that was filed on June _22_, 2015, *and again on June 25, 2015*

4. Though the petitioner intended to restate each of the facts raised in the motion that was filed on September 24, 2014, the reply that was filed on June ___, 2015, and the memorandum of points and authorities that was filed on June ___, 2015, due to time constraints, the petitioner was unable to do so. Therefore, the petitioner has included the following pages below, which include the relevant facts.

   a. The petitioner incorporates the following pages of her motion, which was filed on or about September 24, 2014: p. 6-58; p. 60-138; p. 141-185; p. 187-244; p. 248-256; p. 258-260; p. 263-277; p. 281-287; and p. 289-290.

   b. The petitioner incorporates the following pages of the reply and of the memorandum of points and authorities, which were filed on June _25_, 2015: p. _1-21_ and p. _1_-115.

5. Finally, the exhibits attached to the reply and to the memorandum of points and authorities represent, to the best of my knowledge, true and correct copies of the original materials.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge, pursuant to 28 U.S.C. § 1746.

*The declaration was placed in the BOP mailing system on June 25, 2015*

Dated:        Coleman, FL
              June _25_, 2015

                                      Respectfully,

                                      _Melissa King_
                                      Melissa G. King

EXHIBIT 2

# ADMINISTRATIVE AGREEMENT

This agreement (the "Agreement"), entered into as of the 1st day of January, 2002 by and between the respective Boards of Trustees (collectively, the "Trustees") of the Local 147 Tunnel Workers Union Additional Security Benefits Fund (collectively, the "Funds") and KingCare, LLC ("King" or the "Fund Manager").

WHEREAS, the Trustees of the Fund have determined that it would be in the best interests of the Fund (and their respective participants and beneficiaries) to retain a third party administrator to serve as Fund Manager for the respective Fund; and

WHEREAS, KingCare, LLC has agreed to serve as said Fund Manager; and

WHEREAS, the Parties wish to set forth the terms and conditions under which KingCare shall perform its services as said Fund Manager for the respective Fund.

NOW, THEREFORE, in consideration of the premises and mutual promises contained in this Agreement, and other good and valuable consideration (receipt of which hereby is acknowledged), the parties hereto hereby agree as follows:

1. The Trustees of the Funds shall retain King, and King agrees to serve, as Fund Manager with respect to the Fund. As Fund Manager, King agrees to provide each of the following administrative services to the Fund:

(a) Maintenance of bank account(s) in the name of each of the Fund in the bank(s) selected by the Trustees of each respective Fund for deposit of employer contributions and other assets of the Fund.

(b) Maintenance of a general ledger reflecting all receipts and disbursements for

each of the Fund; and preparation of periodic reports for the Trustees of each respective Fund summarizing each Fund's financial operations including welfare benefit claims, cash receipts and disbursements, delinquent employers, pension benefit approval lists; additions to pension roster, vacation benefit approval list and reserve benefit approval list.  The Trustees of each of the Funds may request that these reports be prepared in accordance with their specifications.  These reports shall be furnished on as frequent a basis (but not more frequently than monthly) as the trustees of the Fund reasonably deem necessary for the proper administration of their respective Fund.

(c)  Execution of the employer contribution, collection and delinquency procedures adopted by the Trustees of the Fund (including, to the extent appropriate, the transmittal to and receipt from contributing employers to the Fund of employer reporting forms and the maintenance of a master file of contributing employers and the status of their contributions to the Fund).

(d)  Establishment and maintenance of a "work record" for each participant of each Fund, based on the reports prepared and filed by each contributing employer, which will reflect the wages earned each month from contributing employers and which will make possible the verification of the employee's eligibility for benefits.  In this connection, King will:

(1)  Establish and maintain for each participant a work record, which will reflect the total amount of past and future pension or other service credit as accumulated under the rules of the respective plans maintained by the Trustees of the Fund.  Both in this connection and generally, the parties agree that King bears no responsibility whatsoever for the accuracy of records pertaining to periods prior to its retention.

(2)  Attempt to collect the necessary documents from the Union, Employers and/or the Social Security Administration, as directed by the Trustees, supporting and establishing each employee's entitlement to Past Service Pension Credits.

2